# 23-7199(L)

## 24-368(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

RUJA IGNATOVA, AKA CRYPTOQUEEN, KONSTANTIN IGNATOV, AKA SEALED DEFENDANT 1, DAVID R. PIKE, FRANK SCHNEIDER, IRINA DILKINSKA,

*Defendants,*

KARL SEBASTIAN GREENWOOD, MARK S. SCOTT,

*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANT-APPELLANT
## KARL SEBASTIAN GREENWOOD
## [REDACTED]

---

HOWARD LEADER
534 West 112th Street
New York, New York 10025
(646) 533-7696

JUSTIN S. WEDDLE
JULIA I. CATANIA
WEDDLE LAW PLLC
37 West 20th Street, Suite 1206
New York, New York 10011
(212) 859-3492
jweddle@weddlelaw.com

*Attorneys for Defendant-Appellant Karl Sebastian Greenwood*

March 11, 2024

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION ................................................................................... 4

ISSUES PRESENTED FOR REVIEW ....................................................... 4

STATEMENT OF THE CASE .................................................................. 5

    A.  The Charges and Guilty Plea ...................................................... 6

    B.  The District Court's Decision to Sentence Greenwood Based on Foreign Conduct ...................................................................... 8

    C.  The Sentencing ........................................................................ 12

SUMMARY OF THE ARGUMENT ........................................................ 17

ARGUMENT ..................................................................................... 19

I.  The District Court's Error Dramatically Inflated the Guidelines Range .......................................................................................... 19

    A.  Standard of Review .................................................................. 20

    B.  The Sentencing Court Impermissibly Found that the "Offense of Conviction" Included Worldwide Conduct ................................ 20

        1.  The District Court Erroneously Converted Wire Fraud into an Extraterritorial Crime ..................................................... 20

        2.  Artful Pleading Cannot Expand the Scope of the Offenses of Conviction ...................................................................... 22

        3.  The District Court Erred by Relieving the Prosecution of Its Burden of Proof .............................................................. 27

        4.  The District Court's Global "Offense of Conviction" Theory Erroneously Punished Greenwood for Foreign Crimes ........... 29

    C.  The District Court Contravened *Azeem*'s Rule Against Including Foreign Crimes in "Relevant Conduct" ...................................... 31

1. Foreign Conduct Is Not Included in the Guidelines' Definition of "Relevant Conduct" ............................................ 32

2. The Court's Global "Offense of Conviction" Theory Violates *Azeem* ................................................................ 38

D. The Money Laundering Conspiracy Charge Does Not Save the District Court's Inflated Guidelines Calculation ........................ 41

II. The Sentence Was Substantively Unreasonable and Excessive ...... 46

A. Standard of Review ................................................ 47

B. Greenwood's Substantively Unreasonable Sentence Should Be Vacated .............................................................. 47

CONCLUSION ............................................................ 54

## TABLE OF AUTHORITIES

**Cases**

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001) ................................................................. 30

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ............................................................................. 31

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) ................................................................. 24

*Cantero v. Bank of Am.*,
49 F.4th 121 (2d Cir. 2022) ................................................................. 45

*Eur. Cmty. v. RJR Nabisco, Inc.*,
764 F.3d 129 (2d Cir. 2014) ................................................................. 22

*Hamling v. United States*,
418 U.S. 87 (1974) ............................................................................... 43

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
104 F. Supp. 3d 384 (S.D.N.Y. 2015) ................................................. 23

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013) ............................................................................. 21

*Moore v. Mitchell*,
30 F.2d 600 (2d Cir. 1929) ................................................................. 30

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ...................................................................... 20, 21

*RJR Nabisco, Inc. v. Eur. Cmty.*,
579 U.S. 325 (2016) ............................................................................. 24

*United States v. Aracena de Jesus*,
20-Cr-19 (PAE), Dkt. 29 (S.D.N.Y. July 1, 2020) ................................. 51

*United States v. Archer*,
671 F.3d 149 (2d Cir. 2011) ...................................... 27, 28, 29

*United States v. Azeem*,
946 F.2d 13 (2d Cir. 1991) .................................... 2, 18, 32, 39

*United States v. Broxmeyer*,
699 F.3d 265 (2d Cir. 2012) ............................................ 20

*United States v. Chavez*, 22-cr-303 (JMF),
2024 WL 50233 (S.D.N.Y. Jan. 4, 2024) ........................................ 51, 53

*United States v. Chunza-Plazas*,
45 F.3d 51 (2d Cir. 1995) ........................................ 36, 37, 39

*United States v. Douglas*,
713 F.3d 694 (2d Cir. 2013) ................................................ 47

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) ................................................ 25

*United States v. Federative Republic of Brazil*,
748 F.3d 86 (2d Cir. 2014) ................................................ 31

*United States v. Greer*,
285 F.3d 158 (2d Cir. 2002) ........................................ 37, 38

*United States v. Hawit*,
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ......................................... 22

*United States v. Hoskins*,
902 F.3d 69 (2d Cir. 2018) ................................................ 25

*United States v. Lazarenko*,
564 F.3d 1026 (9th Cir. 2009) .............................................. 46

iv

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) .................................................................. 21

*United States v. Nunez*,
19-cr-691 (CM), Dkt. 28 (S.D.N.Y. May 5, 2021) ................................ 52

*United States v. Parkins*,
953 F.3d 63 (2d Cir. 2019) ...................................................................... 41

*United States v. Ramirez*,
20-cr-29 (JPO), Dkt. 47 (S.D.N.Y. Oct. 20, 2020) .............................. 52

*United States v. Shonubi ("Shonubi I")*,
998 F.2d 84 (2d Cir. 1993) ...................................................................... 27

*United States v. Shonubi ("Shonubi II")*,
103 F.3d 1085 (2d Cir. 1997) .................................................................. 27

*United States v. Stavroulakis*,
952 F.2d 686 (2d Cir. 1992) .................................................................... 44

*Whalen v. United States*,
445 U.S. 684 (1980) ................................................................................ 23

*Wisconsin v. Pelican Ins. Co.*,
127 U.S. 265 (1888) ................................................................................ 30

## Statutes

18 U.S.C. § 1956 ...............................................................................passim

18 U.S.C. § 1961(1) ................................................................................ 44

## PRELIMINARY STATEMENT

Karl Greenwood is a dual Swedish and U.K. citizen who lived in Asia at all relevant times and was extradited from Thailand to face fraud charges in the United States relating to his work with the OneLife Network and OneCoin, a Bulgaria-based cryptocurrency sponsor. Although nearly all (approximately 99%) of OneCoin's activities took place outside the United States and without any link to the United States or its wires, the District Court and the prosecution expressly used sentencing to expand the limits of the statutes of conviction to punish Greenwood for violations of foreign penal law. The District Court did this without requiring the prosecution to present any proof connecting foreign conduct to U.S. criminal conduct, and without engaging in any analysis of which portions of OneCoin's operations violated U.S. law.

The key charges here—a substantive violation of the U.S. wire fraud statute, 18 U.S.C. § 1343, and a wire fraud conspiracy—indisputably have only domestic, not extraterritorial, reach. Substantive wire fraud also formed the sole "specified unlawful activity" for the money laundering conspiracy charge, and thus only proceeds of U.S.-linked wire fraud conduct could serve as a predicate for any criminal money

1

laundering conspiracy. Therefore, a properly-calculated Guidelines range for the U.S. criminal conduct to which Greenwood pled guilty was 97-121 months' imprisonment—a substantial sentence for a non-violent fraud defendant with no criminal history, let alone Greenwood, who presented extraordinary mitigating sentencing factors. Instead, at the prosecution's urging, the District Court erroneously inflated the Guidelines calculation to a level 53 based on OneCoin's non-U.S. activities (level 53 is 10 levels beyond the top of the table; for comparison, level 42 is 360 months' to life).

In so doing, the District Court declined to follow this Court's binding precedent in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), which held that the Guidelines' definition of "relevant conduct" does not include foreign conduct, and that Guidelines provisions must be interpreted to apply only to U.S. criminal conduct unless the Guidelines text expressly invokes foreign criminal conduct. The prosecution sought to sidestep *Azeem* by arguing that the overwhelmingly foreign OneCoin conduct was not "relevant conduct," but rather part of the "offense of

conviction." A.106-07.[1] Thus, in circular fashion, the prosecution arrogated to itself Congress's power to define the "offense of conviction" as "global" simply by pleading that the U.S. wire fraud was part of a scheme operating worldwide. The District Court accepted the Information's allegations as defining the scope of the crimes of conviction. A.115-16.

The result of this GuidelInes error was that Greenwood was sentenced to a substantively excessive sentence, based almost entirely on non-U.S. criminal conduct, that failed to take account of the fact that he had suffered through nearly five years of incarceration—including over two  years of lockdowns—in the Metropolitan Correctional Center ("MCC") and Metropolitan Detention Center ("MDC") in the darkest periods of the already-grim histories of those facilities. And, those five years of horrific confinement came on the heels of, and exacerbated the harmful effects of, Greenwood's torturous three-month incarceration at the notorious Klong Prem prison in Thailand, Redacted

---

[1] "A" refers to the appendix filed with this brief and "ECF" refers to an entry on the District Court's docket in this case.

Redacted. Adding fifteen years onto the extraordinarily punitive and cruel punishment he already served was excessive and completely out of step with sentences imposed on other defendants in this case, as well as defendants in other large-scale fraud cases.

The District Court's erroneous calculation of the Guidelines and forfeiture based on foreign and U.S. conduct, rather than solely based on U.S. criminal conduct, should be reversed, and the case should be remanded for resentencing to a procedurally and substantively reasonable sentence.

## JURISDICTION

The District Court had jurisdiction under 18 U.S.C. § 3231. The sentence was imposed on September 12, 2023, A.134, and the judgment was entered on September 25, 2023, A.17. Consistent with Federal Rule of Appellate Procedure 4(b)(2), Greenwood's timely-filed September 12, 2023 notice of appeal was entered on September 26, 2023, A.17. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Did the District Court err in conducting the Sentencing Guidelines and forfeiture analyses in this wire fraud and laundering-of-wire-fraud-

proceeds case based on foreign criminal conduct that had no connection to the United States *as well as* U.S. criminal conduct?

Was the resulting sentence of 20 years' imprisonment substantively unreasonable, where Greenwood pled guilty and suffered horrific conditions of confinement, Redacted followed by five years' incarceration at the MCC and MDC, during the pandemic and extraordinary security breakdowns resulting in approximately two and a half years of lockdown?

## STATEMENT OF THE CASE

Greenwood appeals from a judgment of conviction entered by the United States District Court for the Southern District of New York (Ramos, J.) for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering after his guilty plea to those charges without a plea agreement. The District Court imposed a sentence of 240 months' imprisonment and ordered forfeiture of $300 million. Greenwood is serving his sentence and has been incarcerated since his arrest in Thailand in July 2018. This appeal challenges the sentence and

forfeiture imposed on Greenwood. The challenged District Court decisions are unreported.

## A. The Charges and Guilty Plea

On December 16, 2022, Greenwood waived prosecution by indictment and pled guilty—without any plea agreement or other waivers—to all three counts of a superseding information: conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; wire fraud in violation of 18 U.S.C. § 1343; and money laundering conspiracy in violation of 18 U.S.C. § 1956(h). The Information specified that the "specified unlawful activity" forming the basis of the money laundering conspiracy was "the proceeds of the wire fraud scheme alleged in Counts One and Two of this information." A.22-23.[2]

In pleading guilty to all charges, Greenwood accepted responsibility for, and admitted his role in, a U.S. wire fraud relating to a purported cryptocurrency called "OneCoin," and a conspiracy to launder the

---

[2] Only substantive wire fraud—not wire fraud conspiracy—is defined as a "specified unlawful activity," as the prosecution conceded below. A.129. Accordingly, the only valid predicate for the money laundering conspiracy charge is the substantive wire fraud alleged in Count Two, and the only "proceeds" that could have been laundered were "proceeds" of substantive violations of Section 1343.

proceeds of that U.S. wire fraud. Greenwood stated that in Bulgaria in 2014, he helped Ruja Ignatova, an unapprehended, indicted co-defendant, establish a multi-level marketing company called the OneLife Network, which offered OneCoin, a purported cryptocurrency. Greenwood and his co-defendants misrepresented that OneCoin was a cryptocurrency based on a distributed blockchain and valued by supply and demand, when neither claim was true—OneLife itself "set and manipulate[d] the stated value of OneCoin." A.55-56. Greenwood admitted that during "the second half of 2015, with [his] participation, the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States." A.56. He also admitted that he agreed with others to conceal the source of proceeds from the sale of OneCoin when engaging in financial transactions, and "that the same agreement would apply to any of those proceeds coming from the United States market." *Id.* Greenwood "knew what [he] was doing was wrong." *Id.*

Greenwood nowhere allocuted or claimed that the U.S. wire fraud statute reached worldwide conduct. On the contrary, Greenwood

specifically previewed for the District Court the parties' disagreement about whether the Sentencing Guidelines analysis should be applied to "U.S.-based conduct" or "worldwide conduct," proposed a briefing schedule to present the issue, and referenced this Court's *Azeem* case as one of the authorities supporting Greenwood's position. A.60-61. The prosecution agreed with the proposal for presenting this issue to the District Court and estimated that "global investor losses is going to be in the billions whereas U.S. investor losses are going to be in the tens of millions." A.63, A.66.

## B. The District Court's Decision to Sentence Greenwood Based on Foreign Conduct

The question of whether the District Court would consider foreign conduct, in addition to U.S.-linked or -targeted conduct, to analyze the Sentencing Guidelines was critical because this prosecution presents the rare, if not unique, situation where nearly all the conduct at issue had no connection whatsoever to the United States. The prosecution throughout has referred to OneCoin as a global fraud with millions of victims and multi-billion-euro investor losses (approximately $4 billion). Only approximately 1% of OneCoin's members (and less if measured in sales) were located in—or were in any way connected to—the United States.

A.65-66. Indeed, at the trial of a co-defendant, the prosecution called as witnesses only two U.S. victims of the fraud, and the prosecution's evidence showed that OneCoin's activity in the United States was short-lived and involved approximately $10 million in transactions.

After receiving briefing from the parties and holding oral argument, on April 11, 2023, the District Court ruled from the bench that it would calculate Greenwood's Sentencing Guidelines based on worldwide OneCoin conduct, rather than U.S.-linked or U.S.-targeted OneCoin activity. The District Court began:

> I think the government is correct, although it is the first time I've had an opportunity to review and analyze *Azeem*, and I do think it's a close case, but I don't think that this case is like *Azeem*.

A.115. The Court reached that conclusion because, "the crime that was charged in this case was a unitary international scheme that was run in substantial part, at least the money laundering part, out of the United States." *Id*. The court found that "where there is a . . . large international scheme," the scheme need not be "chopped up" into a U.S.-based portion for sentencing, even where the crimes of conviction are "not extraterritorial." *Id*.

At multiple times during the oral argument, the Court expressed concern about the administrability of determining what constituted a crime against the United States versus related, but foreign conduct. A.92, A.94-95, A.103-04. After its ruling, the Court stated that it had been "getting scared about the potential *Fatico* issues that [Greenwood's counsel was] suggesting we take on if I were to have ruled in [Greenwood's] favor," although the Court stated that its concern had not been determinative. A.117. In response, Greenwood noted that there is nothing difficult to administer about establishing the U.S.-wire-connected transactions at issue, since bank records reflect these U.S.-linked OneCoin transactions. *Id.* Those bank records, which had been an exhibit during the trial of a co-defendant, establish a total of $10.2 million of U.S.-connected OneCoin membership purchases (i.e., the money appears to come from U.S. and non-U.S. senders and is directed to a U.S. bank account of a U.S. entity called SecurePoint—the same account to which the two U.S. victims called as witnesses sent their money, totaling $54,000). A.120, A.181-314.

The District Court adopted a portion of the prosecution's argument and reasoned that because the prosecution had alleged a "unitary

scheme," the wire fraud "offense of conviction" encompassed not only U.S.-connected criminal conduct, but included all global conduct, even if the conduct was unconnected to any U.S. victim, U.S. wire activity, or U.S.-based false statements. A.115-16. In other words, as the prosecution argued, because the charging instrument alleged that the scheme involved "false statements and misrepresentations soliciting individuals *throughout the world*, including in the Southern District of New York," A.20 (emphasis added), the "offense of conviction" was global and neither *Azeem* nor "relevant conduct" came into play. A.105. The District Court's evident concern with "administrability" indicates that the Court also adopted the prosecution's argument that it would be too difficult for the prosecution to prove a U.S. connection, so it should not have to do so. A.109. And, the District Court's statement that the analysis need not be "chopped up into individual countries," A.115, indicates that the Court likewise adopted the prosecution's argument that it should be permitted to seek punishment for "the full loss of the scheme" as the prosecutors conceived it, without requiring that defendants be "separately prosecuted and convicted in dozens of different countries." A.109.

## C. The Sentencing

On September 12, 2023, the District Court sentenced Greenwood to twenty years' incarceration on each count, to run concurrently, and $300 million in forfeiture. A.174. The Court determined that, because he had no criminal history, he was in Criminal History Category I for purposes of calculating the Sentencing Guidelines range. A.138. The Court further calculated his Guidelines offense level as: a base offense level of seven; plus thirty levels because victim losses totaled more than $550 million; plus six levels based on substantial financial hardship to 25 or more victims; plus two levels because a substantial part of the offense took place outside the United States; plus two levels because he was convicted under 18 U.S.C. § 1956; plus two levels because of sophisticated means; and plus four levels because of his leadership role. *Id*. That led to an offense level of 53, which the court deemed to be 43 "because there is no higher level under the [G]uidelines." *Id*. With that offense level and Criminal History Category I, the Guidelines recommended life imprisonment, but because of statutory maximum sentences placed on the three counts of conviction, the Court reached the final determination that "the effective [G]uidelines range is 720 months, or 60 years." *Id*.

12

The prosecution's sentencing presentation trumpeted "the culmination of an investigation that started in 2016 into what may be the single largest global fraud scheme ever perpetrated." A.139. The prosecution said that the OneCoin fraud harmed "millions of victims around the world" and resulted in more than $4 billion in investor losses worldwide. A.139-40. The prosecution's written submission stated that of these "millions of victims," "several" had submitted statements it included in its submission, A.128,[3] and referenced a Ugandan victim interviewed on a BBC podcast and the two U.S. victims who testified at the trial of Greenwood's co-defendant. The prosecution did not seek any order of restitution because "the vast majority" of investors had not been identified. ECF 570 at 31. At the prosecution's request, the Court

---

[3] Three statements were included. One of these victims' statements demonstrates that he had no connection to the U.S. or U.S. wires—he attested to living either in Thailand or in Australia and investing in OneCoin by sending euros to HSBC Singapore. A.133. He condemned the conduct of "the Bulgarian OneCoin Criminals." *Id.* The second similarly was either living in Ukraine or the United Kingdom and invested in OneCoin by sending euros. A.130. The third did not provide information about which countries he was located in at the relevant times but averred in his "statement with regard to OneCoin scam" that he sent $1000 to invest in "bitcoin and bitcoin mining." A.132.

inquired if there were any victims present in the courtroom who would like to speak; there were none. A.164. The prosecution stated that OneCoin "was the largest international fraud scheme that has ever been investigated and prosecuted," A.140, "deliberately targeted members of the global community," A.143, and that it required "extensive coordination" with "the global law enforcement community," A.145. The prosecution asked the District Court to sentence Greenwood to at least thirty years' imprisonment. A.148.

Through counsel, Greenwood recognized the seriousness of his crimes, his deep remorse for his conduct, and reiterated that Greenwood had accepted responsibility for his actions and pled guilty. Counsel asked for a sentence of time served because of the indisputably horrific conditions Greenwood experienced while incarcerated for five years prior to sentencing. A.149. Before his extradition, Greenwood was arrested and detained in Thailand in inhumane conditions: "Stripped naked. Shaved down. Chained to other inmates for 24 hours. Forced to sleep on the floor full of cockroaches and rodents. Food filled with maggots. Forced to sit outside in the heat for hours on end, housed with nearly 100 inmates living in constant fear." A.151-52. Redacted

14

Redacted

A.316-25.

After being brought to the United States, Greenwood suffered years of incarceration in the MCC and MDC during some of the most difficult conditions in those institutions' histories. Greenwood's time in detention at the MCC included the death of Jeffrey Epstein and subsequent lockdown in 2019, and the start of the COVID-19 pandemic in 2020, including *eighteen* straight months of lockdown when the pandemic began. Greenwood, who suffers from asthma, contracted COVID-19 twice. When the MCC was closed, he was transferred to the MDC, which faced further struggles with the pandemic and an increase in inmates despite a reduction in staffing. A.153-54. Of the five years Greenwood was imprisoned at MCC and MDC, he estimates that he was on lockdown for a total of two and a half years—an inhumane term of near-solitary confinement. Counsel argued that the extraordinarily punitive and traumatizing five years of detention Greenwood served in those

conditions, in Thailand and here, were the equivalent of having served at least twice that amount of time, or ten or more years in prison. A.125.

Greenwood personally addressed the Court to express his shame, embarrassment, and deep remorse for the pain and losses he caused to OneCoin victims. A.165-67. He also spoke of the terror and horrific conditions he faced incarcerated in Thailand and the MCC, and the additional pain of experiencing incarceration far away from his children and parents in Sweden. *Id*. Greenwood had almost never set foot in the United States prior to his extradition.

When the Court imposed the twenty-year sentence, it emphasized that the fraud was "international in scope" and "involved more than 3 million victims worldwide who were defrauded out of more than $4 billion." A.169. The Court indicated that the number and nature of the OneCoin victims worldwide played a decisive role in its sentencing determination. A.169-71. The Court also recited that it had considered Greenwood's personal history and the fact that he will serve his sentence far from his family, his acceptance of responsibility, the "horrific," "subhuman" confinement he had experienced for five years already, and

the need for general deterrence, especially in light of public and media interest in the OneCoin fraud. A.172-73.

Greenwood's counsel stated that the sentence was excessive and preserved for appeal Greenwood's prior sentencing arguments. A.174.

### SUMMARY OF THE ARGUMENT

The District Court erroneously adopted the prosecution's argument that global OneCoin conduct could be included in the "offense of conviction," and thus incorporated in the Guidelines calculation, merely because the prosecution alleged in its charging instrument that U.S. wire fraud crimes were committed as part of a worldwide scheme to solicit OneCoin purchases. A.20-21. But the prosecution's artful pleading cannot expand the scope of the wire fraud statute, which this Court has held is a statute without extraterritorial reach. Moreover, the District Court's decision to so extend it, based on its concern about the "administrability" of determining U.S. criminal conduct, improperly relieved the prosecution of its burden of proving sentencing facts by a preponderance of the evidence. The District Court also contravened the established rule prohibiting U.S. courts from enforcing foreign sovereign's penal laws when it expressly adopted its global "offense of

conviction" theory to obviate the need for other countries to investigate or prosecute the crime.

In addition, the District Court's Guidelines calculation sought to avoid, but instead contravened, this Court's binding precedent in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991). *Azeem* establishes that, absent a specific invocation of foreign criminal conduct in the text of a particular Guidelines provision, the Guidelines calculation should be performed based on U.S. criminal conduct, not foreign criminal conduct.

Moreover, the money laundering conspiracy conviction does not save the District Court's inflated Guidelines calculation, since the only "proceeds" that fell within the charged "specified unlawful activity," as alleged in the Information, were proceeds of U.S.-linked wire fraud. With limited exceptions not relevant here, Congress has *excluded* foreign fraud crimes from the scope of "specified unlawful activities." Thus, the maximum amount of "proceeds" that could have been laundered in violation of the money laundering statutes is the approximately $10 million in U.S.-linked OneCoin activity, and the money laundering Guidelines calculation was erroneously inflated.

As a result of these errors, the District Court imposed on Greenwood a substantively unreasonable sentence. A properly calculated Guidelines range would have been 97-121 months' imprisonment. The 240-month sentence imposed on Greenwood—a non-violent fraud defendant with no criminal history who agreed to extradition, accepted responsibility, and pled guilty—was excessive. It far outstripped the sentences imposed on defendants in other high-profile cases, as well as other OneCoin defendants, and failed to take proper account of ▮Redacted▮ ▮ horrific conditions of confinement Greenwood suffered while incarcerated, ▮Redacted▮.

The sentence should be vacated, and the Court should remand for resentencing.

ARGUMENT

## I. THE DISTRICT COURT'S ERROR DRAMATICALLY INFLATED THE GUIDELINES RANGE

Over objection, the District Court calculated Greenwood's Guidelines range based not only on the U.S. criminal conduct for which he accepted responsibility, but also foreign conduct that fell outside the offenses of conviction and relevant conduct. The result was a Guidelines

calculation that was literally off the chart. The sentence should be vacated.

## A. Standard of Review

This Court reviews the District Court's interpretation of the Guidelines *de novo*. *United States v. Broxmeyer*, 699 F.3d 265, 281 (2d Cir. 2012).

## B. The Sentencing Court Impermissibly Found that the "Offense of Conviction" Included Worldwide Conduct

### 1. The District Court Erroneously Converted Wire Fraud into an Extraterritorial Crime

The District Court's decision that global OneCoin conduct was part of the wire fraud "offense of conviction" was wrong and contrary to this Court's caselaw establishing that the wire fraud and wire fraud conspiracy statutes do not have extraterritorial reach. Binding precedent establishes—and the prosecution below conceded—that wire fraud and wire fraud conspiracy are both statutes without extraterritorial reach. In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court stated that "[i]t is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* at

255 (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)). This presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." *Id*. The result is that without an "affirmative intention of the Congress clearly expressed," a statute does not have extraterritorial effect. *Id*.

The Court explained, "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. Moreover, "to haul essentially foreign allegedly fraudulent behavior into American courts, the use of the . . . wires must be *essential*, rather than merely incidental, to the scheme to defraud." *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (quotations omitted) (emphasis added); *see Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124-25 (2013) (stating that conduct that merely "touch[es] and concern[s] the territory of the United States" is insufficient to "displace the presumption against extraterritorial application" of statutes).

21

Because the wire fraud statute contains no affirmative indication that it applies extraterritorially, this Court has held that it is a purely domestic law. In *European Community. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016), the Court analyzed 18 U.S.C. § 1343 and concluded that it did not "overcome *Morrison*'s presumption against extraterritoriality," and instead reaches only U.S. domestic conduct. *Id.* at 139, 140-41; *see also United States v. Hawit*, 2017 WL 663542, at *4 (E.D.N.Y. Feb. 17, 2017) ("As the parties recognize, the federal wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially.").

The District Court's statement that the non-extraterritorial wire fraud and wire fraud conspiracy "offenses of conviction" included foreign conduct that had no connection to U.S. wires impermissibly transgressed the statutes' domestic scope, and constituted error requiring vacatur of the sentence.

## 2. Artful Pleading Cannot Expand the Scope of the Offenses of Conviction

Although the prosecution below conceded that the wire fraud and wire fraud conspiracy statutes were domestic in reach, it nevertheless convinced the District Court that in this case, the wire fraud is global

22

because the prosecution says it is global. *See* A.70-71. This was reversible error. There is no authority for the proposition that the prosecution can change the scope of a non-extraterritorial criminal statute with artful Information-drafting. Permitting such a result violates the "basic principle that within our federal constitutional framework . . . the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them[] resides wholly with the Congress," *Whalen v. United States*, 445 U.S. 684, 689 (1980), not prosecutors. Nor could Mr. Greenwood's allocution accepting responsibility for a domestic wire fraud crime expand the reach of that statute. *See Kaplan v. S.A.C. Cap. Advisors, L.P.*, 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015) (Marrero, J.) ("[A]n indictment is simply an allegation—a charge by the Government as to what conduct a defendant has committed. When a defendant pleads guilty and allocutes to criminal conduct, it is only that specific conduct which the guilty plea incorporates.").

The District Court's view that a mere allegation that there was a "unitary scheme" can expand the scope of a domestic statute to impose punishment for extraterritorial conduct is also inconsistent with this

Court's application of the *Morrison* presumption in *Bascuñán v. Elsaca*, 927 F.3d 108 (2d Cir. 2019). Where a statute is presumptively not extraterritorial—as is wire fraud—and the prosecution seeks extraterritorial application, courts must look "to the statute's 'focus'" to "determine whether the case involves a domestic application of the statute." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). This Court in *Bascuñán* found that the focus of the wire fraud statute is the use of wires, not the scope of the scheme:

> There are three "essential elements" to mail or wire fraud: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) *use of the mails or wires to further the scheme*." [*United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (emphasis added)]. These elements make clear that the regulated conduct is not merely a "scheme to defraud," but more precisely *the use of the mail or wires in furtherance of a scheme to defraud*.

*Bascuñán*, 927 F.3d at 122 (emphasis in original). Properly understood, Greenwood's wire fraud offense of conviction, therefore, encompasses *the targeting of the U.S. OneCoin market through the use of U.S. wires*, or fraud perpetrated *from within the U.S.* (regardless of where it was targeted) *using those wires*; it does not, as the District Court found, include within its scope all conduct occurring anywhere and targeting

24

anyone so long as the prosecution declares it to be a "unitary" OneCoin scheme.

The analysis is no different for the conspiracy to commit wire fraud charge, since only a U.S. crime can be an object of a conspiracy under Section 1349. As this Court has stated, "conspiracy and complicity statutes . . . do not create new substantive offenses, but merely allow liability for other legal violations. Accordingly, courts have repeatedly ruled that the extraterritorial reach of . . . conspiracy is coterminous with that of the underlying criminal statute." *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018) (internal citations omitted). Or, as the Fourth Circuit explained, "[i]n some abstract sense, [an agreement to defraud people around the world using wires] is a 'conspiracy' to commit 'wire fraud.' But this extraterritorial 'wire fraud' is not the crime of wire fraud under the United States Code. And since it is not a crime, it cannot be the object of a conspiracy under the United States Code." *United States v. Elbaz*, 52 F.4th 593, 605 n.6 (4th Cir. 2022). The Court concluded: "So the actual criminal conspiracy here is just the agreement to commit *domestic* wire fraud—a *subpart* of the broader agreement." *Id.* (emphasis added).

25

The only conduct that is part of the "offense of conviction," therefore, for Guidelines purposes, are those portions of OneCoin's operations that used U.S. wires—that is, OneCoin sales to U.S. victims, OneCoin sales to U.S. and foreign victims accomplished through U.S. bank accounts or entities, and OneCoin sales to U.S. and foreign victims induced by conspirators from the United States. Those transactions are readily quantifiable, amount to approximately $10 million, and would have resulted in a Guidelines range of approximately 10 years' imprisonment. Instead, the District Court's erroneous decision to include all conduct worldwide in the "offense of conviction," inflated the initial Guidelines calculation to Offense Level 53—ten levels beyond the top of the Guidelines table—and resulted in a sentence approximately double the top of the correctly-calculated Guidelines range. Likewise, the District Court's erroneous analysis of the scope of the wire fraud crimes resulted in a forfeiture order of $300 million, rather than the no-more-than $10.2 million constituting the "proceeds" of those non-extraterritorial U.S. wire fraud crimes.

### 3. The District Court Erred by Relieving the Prosecution of Its Burden of Proof

The District Court's concern that it would be too difficult for the prosecution to present evidence to parse—in the Court's words "chop up"—domestic crimes from foreign conduct erroneously eliminated the prosecution's burden of proof.

It is well-settled that "[a]s to the facts that support the application of a Guideline, the burden of proving such facts is on the government [and] the standard for proving such facts is a preponderance of the evidence." *United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011). The prosecution's evidence must also be "specific" both to the quantity and to the defendant. *Id.* at 162 (quoting *United States v. Shonubi ("Shonubi II")*, 103 F.3d 1085, 1090 (2d Cir. 1997)); *Shonubi II*, 103 F.3d at 1089-90 (stating that "specific evidence" requirement is necessary to "safeguard" against the Guideline's "insistence that a defendant should be punished for unconvicted 'relevant conduct'").

For example, in a drug trafficking case, this Court stated that such "specific evidence" would include "drug records, admissions or live testimony" not "speculation." *Archer*, 671 F.3d at 162 (describing *United States v. Shonubi ("Shonubi I")*, 998 F.2d 84, 89-90 (2d Cir. 1993)); *see*

27

*Shonubi II*, 103 F.3d at 1090 (clarifying that the Court meant "the [*defendant's*] admissions and records of [*defendant's*] drug transactions" (emphasis in original)). In *Archer*, a visa fraud case, this Court reversed a sentencing enhancement because the prosecution had flunked the "specificity test"—the prosecution had attempted to justify the enhancement by extrapolating from the four fraudulent visa applications proven at trial to another one hundred and seventy applications by using purportedly common characteristics. 671 F.3d at 163-64. The Court noted the obvious flaw that the four applications at trial were not proven to be a representative sample: "There is, instead, good reason to think that the applications presented at trial were not random but were instead the most egregious cases." *Id.* at 163. And the similar characteristics were not self-evidently incriminating. *Id.* at 164. In short, "[w]ithout some further explanation or context, the conclusion that many of the applications must be false is no more than supposition." *Id.*

The District Court's adoption of the prosecution's global "offense of conviction" theory based in part on its fear that requiring the prosecution to demonstrate the link between victims and losses and U.S. wires would be "un-administrable" erroneously relieved the prosecution of its

28

established burden of proving sentencing facts. It should go without saying that when the prosecution cannot satisfy its burden of proof, the defendant deserves less punishment, not more. There was no "specific evidence" tying loss numbers, the number of victims, or Greenwood's role to U.S.-linked activity; instead, the District Court permitted the sentencing to proceed based on "no more than supposition." *Archer*, 671 F.3d at 164.

### 4. The District Court's Global "Offense of Conviction" Theory Erroneously Punished Greenwood for Foreign Crimes

The District Court's adoption of the prosecution's avowed effort to punish presumed foreign crimes together with the U.S. wire fraud violation, rather than distinguishing them, also violated the fundamental principle that U.S. courts do not enforce the penal laws of other sovereigns. As stated in 1888 by the Supreme Court: "The penal laws of a country . . . cannot be enforced by the courts of another country. Chief Justice MARSHALL stated the rule in the most condensed form, as an incontrovertible maxim, 'the courts of no country execute the penal laws of another.'" *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 289-90 (1888)

(citation omitted) (quoting *The Antelope*, 10 Wheat. 66, 123), *overruled on other grounds by Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268 (1935).

This principle (and a related one—the revenue rule[4]) have "been defended on several grounds, including respect for sovereignty, concern for judicial role and competence, and separation of powers." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001). As Judge Learned Hand explained:

> To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring).

Cases in the Supreme Court and this Circuit recognize the endurance and significance of this rule in the international context. *See*

---

[4] The revenue rule originated from "a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001).

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 413-14 (1964) (acknowledging the principle "that a court need not give effect to the penal or revenue laws of foreign countries"); *United States v. Federative Republic of Brazil*, 748 F.3d 86, 92 (2d Cir. 2014) ("Recognizing the pronouncement of criminal rules to be a significant expression of national sovereignty, 'the common law' had thus long understood 'that acts were punished as crimes only by the state or nation whose laws were violated.'" (quoting Robert A. Leflar, Note, *Extrastate Enforcement of Penal and Governmental Claims*, 46 Harv. L. Rev. 193, 195 (1932))).

The law is clear that U.S. courts must not undertake to impose punishment for violations of foreign penal statutes, but the District Court's Guidelines calculation based on global OneCoin conduct, as well as its forfeiture order, did just that. The sentence and forfeiture order should be vacated.

## C. The District Court Contravened *Azeem*'s Rule Against Including Foreign Crimes in "Relevant Conduct"

Not only is foreign conduct outside the scope of the domestic wire fraud and wire fraud conspiracy offenses of conviction, but pursuant to this Court's binding precedent, it is also outside the scope of "relevant

conduct" and cannot be included in the Guidelines calculation. Because the District Court erroneously included it, the sentence must be vacated.

### 1. Foreign Conduct Is Not Included in the Guidelines' Definition of "Relevant Conduct"

#### (a) *United States v. Azeem* Holds that Foreign Conduct Is *Not* Included in "Relevant Conduct"

In *Azeem* this Court squarely held that foreign criminal conduct is outside the scope of Guideline Section 1B1.3's definition of "relevant conduct," and must not be included when calculating the offense level (absent a specific express inclusion of such conduct in a particular Guidelines enhancement). *Azeem*, 946 F.2d at 16-18. In *Azeem*, this Court reversed and remanded for resentencing to correct a district court's erroneous calculation of the Guidelines based on heroin trafficking to the United States and Egypt. *Id.* at 18. Azeem and largely the same accomplices trafficked one kilogram of heroin from Pakistan into New York and another three kilograms into Cairo. *Id.* at 14-15. In applying Section 1B1.3, the district court included all drugs trafficked into both New York and Egypt. *Id.* On appeal, the defendant argued that the sentencing court should not have included the Egypt transaction "because 1) it was not part of the same crime and 2) it was not a crime

against the United States." *Id*. at 15. This Court rejected the first argument, finding that both drug transactions—i.e., drugs trafficked into New York *and* Cairo—comprised the same course of conduct. *Id*. at 16.

As to the defendant's second argument, however, the Court "agree[d] that the Cairo transaction should not have been included in the base offense level calculation because it was not a crime against the United States." *Id*. at 16. Accordingly, the Court held that the district court should have calculated the Guidelines range based only on the one kilogram sent to New York, without factoring in the three kilograms sent to Egypt, even though they were part of the same scheme and course of conduct. *Id*. at 16-17.

In reaching this conclusion, the Court used as its "starting point" the "language of the Sentencing Guidelines themselves." *Id*. at 17. The Court explained that Section 1B1.3(a)(2) of the Guidelines "is broadly worded to include 'all such acts and omissions that were part of the same course of conduct or common scheme or plan,' but does not explicitly address the issue of foreign crimes and activities." *Id*. (quoting U.S.S.G. § 1B1.3(a)(2)). "However, the Guidelines elsewhere note that foreign *sentences* may not be used in computing a defendant's criminal history

33

category," but may be used for upward departures. *Id*. (emphasis in original) (referring to U.S.S.G. §§ 4A1.2(h), 4A1.3(a)). The Court thus concluded that the Guidelines' intentional choice to reference foreign crimes explicitly in some places but not in others demonstrates that the silence in Section 1B1.3(a)(2) means that foreign criminal conduct should *not* be included in base offense levels. *Id*. ("From these provisions, it follows that Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role.").

In addition to its dispositive textual interpretation, the Court explained sound policy reasons for its conclusion. It explained that courts should "avoid creating a new use for foreign crimes in sentencing." *Id*. If U.S. courts did otherwise, they would have "to perform a careful comparative analysis of foreign and domestic law" to determine whether foreign conduct was criminal under domestic law, foreign law, both, or neither. *Id*. Furthermore, "[w]ere a global approach required, we would soon find it necessary to determine the appropriate evidence that must be produced by the prosecution to show that the activity occurred and that it violated foreign law," and courts would quickly wade into a morass when confronted with foreign arrests that may have been

unconstitutionally obtained under United States law. *Id*. Thus, "[w]ithout a clear mandate from Congress, [the Court] decline[d] to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate." *Id*. at 18.

### (b) *Azeem*'s Rule Applies Generally, Including in Fraud Cases

*Azeem*'s rule applies to offense levels generally, even though *Azeem* involved narcotics offenses, because it rests on an interpretation of Section 1B1.3, which pertains to every offense's Guidelines calculation. *See id*. at 17. Specifically, *Azeem*'s textual analysis compared Section 1B1.3 of the General Application Principles of the Guidelines, which provides no language incorporating foreign criminal conduct into offense level computations, with Sections 4A1.2 and 4A1.3 (general provisions on computing criminal history and a policy statement regarding departures based on the inadequacy of the criminal history category), which expressly *do* incorporate foreign criminal *sentences* in certain circumstances that are inapplicable here. This Court's determination that the Guidelines' incorporation of foreign sentences in some contexts precluded incorporating foreign conduct elsewhere was thus a determination that applied to the Guidelines *generally*.

35

Indeed, in *United States v. Chunza-Plazas*, 45 F.3d 51 (2d Cir. 1995), this Court applied the rule of *Azeem* in a case involving fraudulent documents. The defendant was a former Colombian police officer who retired to New York City, where he was arrested and convicted of possessing fraudulent alien-registration cards—conduct carrying a Guidelines range of 0-6 months' incarceration. *Id.* at 52. At the prosecutors' request, the district court imposed a 16-level upward departure from the offense level based on evidence that the defendant, while a police officer in Colombia, had acted as a member of the Medellin cartel and committed violent and deadly acts, including assassination and terrorist acts, on behalf of Pablo Escobar and the cartel. *Id.* at 52-55. The district court imposed a sentence of five years—the statutory maximum. *Id.* at 55.

This Court reversed. "Like Azeem's Egyptian conspiracy," the Court held, "Chunza's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation." *Chunza-Plazas*, 45 F.3d at 57. The Court followed the *Azeem* rule, therefore, where the offense at issue was a non-drug crime, *and* in a circumstance in which a careful comparative law analysis was not

required—the Court was "confident" that the defendant's activities in Colombia (murder and terrorist acts) were "prohibited by both domestic and Colombian law." *Id.* at 57.

### (c) This Court Has Reaffirmed the Rule of *Azeem* Even Where It Is Inapplicable

This Court has reaffirmed the *Azeem* rule even when distinguishing its applicability. In *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), the defendants were convicted of violating the Maritime Drug Law Enforcement Act ("MDLEA"). The Court found that the sentencing court erred by excluding 98% of hashish found on ships in Canadian waters when determining "the defendants' relevant conduct under U.S.S.G. § 1B1.3" because those drugs were destined for Canada, and only including the 2% of the drugs that were destined for the United States. *Id.* at 179. The MDLEA provides that it is a U.S. crime to engage in drug trafficking in the territorial waters of a foreign nation if that foreign nation consents to the U.S. prosecution of that conduct. In other words, the MDLEA is expressly extraterritorial. Thus, in *Greer*, this Court stated that, unlike in *Azeem*, "the crimes in this case are not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United States." *Id.* at 179-80. The Court's

holding—that the Guidelines calculation should have included the entire quantity of drugs—was therefore entirely "consistent with" *Azeem*. *Id*. at 179. Here, like *Azeem*—but unlike *Greer*—the wire fraud crimes to which Greenwood pled guilty do not "specifically cover[] conduct outside the United States." *See id*. at 179-80.

## 2. The Court's Global "Offense of Conviction" Theory Violates *Azeem*

The District Court here noted that it was unfamiliar with the rule of *Azeem* and believed it was a "close case" whether it applied. A.115. Nonetheless, because the District Court viewed the offense of conviction relating to OneCoin activity as a "unitary international scheme," the District Court decided that *Azeem* did not apply and that it should determine the Guidelines based on global OneCoin activity.

The District Court's effort to avoid the clear rule of *Azeem* was reversible error. Neither the rule nor analysis of *Azeem* hinges on the prosecution's discretionary choice to call an international fraud a unitary scheme, the same course of conduct, a common scheme or plan, inextricably intertwined, or any other label. As *Azeem* and *Chunza-Plazas* make clear, the Sentencing Guidelines do not include foreign conduct, regardless of whether that conduct was plainly illegal in the

foreign country where it took place, or whether it in fact constituted the "same course of conduct" or the "same crimes" as the U.S. offenses of conviction. *See Azeem*, 946 F.2d at 17; *Chunza-Plazas*, 45 F.3d at 57-58.

The prosecution led the District Court into this error by urging various meritless arguments to expand the scope of wire fraud and to undermine the rule of *Azeem*, all in service of their effort to police worldwide conduct. Their arguments were not only wrong, but they represent an about-face from the correct position the United States Attorney's Office previously presented to this Court.

Indeed, the USAO previously conceded that including foreign losses in the calculation of the offense level is not just reversible error but *plain error* pursuant to *Azeem*. In *United States v. Khododad*, 122 F.3d 1058, 1995 WL 595073 (2d Cir. Sept. 12, 1995) (unpublished), the defendant participated in stealing an "Old Masters painting" ("The Flemish Proverbs" by Peiter Brueghel The Younger) and "numerous other valuables from his friend," including rugs, in 1979, and was arrested when he attempted to sell the painting in New York in 1992. *Id.* at *1. He was convicted of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2315. *Id.* Although the indictment

referenced only the Brueghel painting, A.76-77, the district court expressly found, for purposes of sentencing, "that the theft of the painting and the theft of the rug[s] [were] part of *the same criminal conduct* and therefore clearly constitute[] relevant conduct." A.78 (emphasis added). The defendant argued on appeal that "the district court erred in calculating the loss attributable to his offense by considering property (precious rugs and other valuables) that was converted by him abroad and never transported into the United States." *Khododad*, 1995 WL 595073, at *3.

Despite the district court's express finding that the theft of all the items comprised "the same criminal conduct," and despite the defendant's failure to object in the district court to the inclusion of foreign conduct in the Guidelines calculation, the USAO "concede[d] that, in light of *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), a remand for resentencing is appropriate on this point." *Id.* In other words, the USAO conceded *plain error* and this Court remanded for resentencing "in accordance with our decision in *Azeem*." *Id.*

The rule of *Azeem*, based on a dispositive analysis of the text of the Sentencing Guidelines, is clear and apposite: foreign conduct should not

40

be included in the Guidelines calculation. Even if there were some ambiguity in the Guidelines or reason to question the binding authority of *Azeem*, the rule of lenity would require that ambiguity to be resolved in Greenwood's favor. *United States v. Parkins*, 953 F.3d 63, 66 (2d Cir. 2019) ("That principle—the rule of lenity—applies to the Sentencing Guidelines."). Greenwood's Guidelines calculation—and his resulting punishment—was dramatically inflated by the prosecution's and District Court's desire to punish foreign conduct that did not constitute a crime against the United States, on top of the already significant Guidelines range Greenwood would have faced for U.S.-linked conduct. This Court should vacate the sentence and remand for resentencing in accordance with the law.

## D. The Money Laundering Conspiracy Charge Does Not Save the District Court's Inflated Guidelines Calculation

Greenwood's plea of guilty to a conspiracy to commit money laundering did not give the District Court license to include worldwide conduct in the Guidelines Calculation. The only "specified unlawful activity" that was the predicate for the money laundering conspiracy charge was wire fraud, and thus the only funds includable in a money laundering Guidelines calculation are laundered funds that *are the*

41

*proceeds of U.S.-connected wire fraud.* Since OneCoin's U.S.-linked conduct amounted to approximately $10.2 million, according to bank records—or "tens of million dollars," according to the prosecution's unproven estimate—the District Court's view that the amount of laundered funds totaled hundreds of million dollars was error and the sentence must be vacated.

The crime of "money laundering" is limited to engaging in financial transactions with the proceeds of a "specified unlawful activity," not with the proceeds of any activity, even if unlawful. *See, e.g.*, 18 U.S.C. § 1956(a)(1) ("Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity"); 18 U.S.C. § 1956(a)(2)(A) (criminalizing "intent to promote the carrying on of specified unlawful activity").

Here, the charged specified unlawful activity for the money laundering conspiracy count to which Greenwood pled guilty is not "global OneCoin activity," but rather, is the domestic substantive wire fraud count charged in Count Two. A.21-22 ("would and did conduct . . .

42

such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the wire-fraud scheme alleged in Counts One and Two of this Information . . . ."); A.23 ("with the intent to promote the carrying on of specified unlawful activity, to wit, the wire-fraud scheme alleged in Counts One and Two of this Information . . . .").[5]

At oral argument, the prosecution attempted to avoid the domestic limits of the specified unlawful activity it charged and instead argued that other, uncharged specified unlawful activities could support a broader money laundering Guidelines calculation. A.110-12. The prosecution's attempt to impose punishment based on uncharged allegations was a telling admission of the infirmity of its theory, as well as an attempt to impose punishment on Greenwood without fair notice of the charge against him. *Hamling v. United States*, 418 U.S. 87, 117 (1974)

---

[5] As noted above, although the Information also alleged that the Count One conspiracy to commit wire fraud was a predicate specified unlawful activity, a Section 1349 conspiracy is *not* a specified unlawful activity as that term is defined in Section 1956, and thus cannot be a money laundering predicate. *See* 18 U.S.C. § 1956(c)(7).

(stating that an indictment must "fairly inform[] a defendant of the charge against which he must defend").[6]

In addition, a close look at the definition of "specified unlawful activity" in the statute demonstrates Congress's clear choice to *exclude* fraud committed in violation of foreign laws from that definition. In other words, engaging in financial transactions in the United States with the proceeds of fraud committed in violation of a foreign country's laws is *not money laundering*. The definition of "specified unlawful activity" lists various U.S. criminal statutes, including Section 1343 (wire fraud) by cross-reference to the definition of "racketeering activity." 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1). The definition also contains a provision stating that various categories of offenses "against a foreign nation" are included in the definition of "specified unlawful activity," such as offenses "against a foreign nation" involving murder, extortion, bribery, and controlled substance offenses. 18 U.S.C. § 1956(c)(7)(B).

---

[6] In *United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992), this Court stated that the particular specified unlawful activity at issue is not a part of the "essential nature" of a money laundering conspiracy. *Id.* at 690-91. *Stavroulakis* did not analyze the constructive amendment or variance issues involved when the prosecution's theory shifts away from that contained in the applicable charging instrument.

Congress also chose to include in the definition offenses "against a foreign nation" that constitute "fraud" "*by or against a foreign bank.*" 18 U.S.C. § 1956(c)(7)(B)(iii) (emphasis added).

That specific and circumscribed inclusion of *certain* foreign fraud crimes necessarily reflects a Congressional choice to *exclude* from the definition foreign frauds *other than* those directed at foreign banks. *See, e.g., Cantero v. Bank of Am.*, 49 F.4th 121, 138 (2d Cir. 2022) (articulating general rule that statute's enumeration of some items implies exclusion of not-listed items). Accordingly, a violation of, say, Ukrainian fraud law that is not "by or against a foreign bank" is not a specified unlawful activity. The same would be true if the Information claimed that the conspiracy intended to "launder" the "proceeds" of a fraud against the laws of "Bulgaria" or, more generally, "against the laws of a foreign nation," because such offenses (if they do not target foreign banks) are not "specified unlawful activities," and thus cannot generate "proceeds" or a U.S. money laundering conspiracy crime. For this reason, foreign OneCoin activity could not have generated "proceeds" supporting a U.S. money laundering charge, regardless of whether that money was sent to the U.S. or used to conduct financial transactions in the United States.

45

The Ninth Circuit's decision in *United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009), confirms this analysis. Lazarenko's money laundering convictions were predicated on financial transactions involving the proceeds of foreign *extortion*, not foreign fraud, and the definition of "specified unlawful activity" specifically includes "an offense against a foreign nation involving" "extortion." 18 U.S.C. § 1956(c)(7)(B)(ii). Thus, the Ninth Circuit upheld the money laundering counts against Lazarenko based on the underlying foreign extortion, even though it reversed his wire fraud convictions. *Lazarenko*, 564 F.3d at 1037-38.

Neither the wire fraud charges nor the money laundering charge permits the imposition of punishment, including forfeiture, based on foreign fraud or financial transactions using money generated by foreign fraud. The Court should vacate the sentence and forfeiture order and remand.

## II. THE SENTENCE WAS SUBSTANTIVELY UNREASONABLE AND EXCESSIVE

As a result of the District Court's erroneously inflated Guidelines calculation, the sentence imposed on Greenwood was substantively unreasonable and excessive. The Court imposed a 20-year sentence on a

46

46-year-old defendant who had already served five years in horrific conditions that far outstrip any humane version of incarceration. Greenwood entered prison a healthy man but suffered appalling conditions, Redacted and *years* of lockdown, including during the pandemic, Redacted

A.316, A.323-25.

## A. Standard of Review

The Court reviews a sentence for substantive unreasonableness and will reverse "if affirming it would . . . damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (internal quotation marks omitted).

## B. Greenwood's Substantively Unreasonable Sentence Should Be Vacated

The District Court's erroneously inflated Guidelines calculation, combined with its underweighting of the confinement Greenwood has

47

suffered, resulted in a substantively unreasonable twenty-year sentence that this Court should reverse.

The excessiveness of the sentence is illustrated by comparison to various other high-profile cases. For example, Elizabeth Holmes, the former CEO of Theranos, was convicted *after trial* of defrauding investors of hundreds of millions of dollars, was ordered to pay $452 million in restitution, and was sentenced to 135 months' imprisonment—just more than *half* of Greenwood's sentence.[7] Trevor Milton, the founder of Nikola, an electric truck company, was convicted *after trial* of fraud and sentenced to four years' imprisonment, even though the prosecution argued that his Guidelines range, like Greenwood's, was the statutory maximum (based on stacked counts) of 60 years' imprisonment.[8]

Compared to other OneCoin participants, Greenwood's sentence is also excessive. Mark Scott—Greenwood's co-defendant who was

---

[7] Dorothy Atkins, *Holmes Ordered To Prison, Hit With $425M Restitution*, LAW360 (May 16, 2023, 9:21 PM EDT).; Dorothy Atkins, Elizabeth Holmes Gets Over 11 Years For Theranos Fraud, LAW360 (Nov. 18, 2022, 5:14 PM EST).

[8] Pete Brush, *Nikola Founder Gets 4 Years After Proclaiming Innocence*, LAW360 (Dec. 18, 2023, 4:46 PM EST).

convicted *after trial* of laundering OneCoin money and suffered nothing like the horrific incarceration that Greenwood has suffered—was sentenced to ten years' imprisonment, half of Greenwood's sentence.[9] Gilbert Armenta—someone who participated in assisting Ruja Ignatova, OneCoin's founder, to hide and invest her money—was sentenced to five years' imprisonment despite violating his cooperation agreement by committing additional crimes (including a crime of violence—hiring people to use violence to retrieve money from another alleged participant in Armenta's business).[10] Irina Dilkinska, OneCoin's head of legal and compliance, was permitted to plead guilty with an agreement that *capped* her exposure at 10 years' imprisonment. Her sentencing is set for April 3, 2024. ECF 624.

The 20-year sentence imposed on Greenwood was particularly excessive in light of Greenwood's conditions of confinement since his 2018 arrest. *First*, Greenwood was subjected to the notoriously inhumane conditions at the Klong Prem prison Redacted

---

[9] Stewart Bishop, *Ex-BigLaw Atty Gets 10 Years For Laundering OneCoin Cash*, Law360 (Jan. 25, 2024, 5:15 PM EST).

[10] Stewart Bishop, *CryptoQueen's Ex-Beau Gets 5 Years For OneCoin Laundering*, Law360 (Feb. 16, 2023, 9:06 PM EST).

Redacted

[12]

*Second*, once Greenwood agreed to extradition to the United States, the horrific conditions of his confinement continued unabated. Those conditions—none of which was challenged by the prosecution—included three abysmal years at the MCC, including the aftermath of Jeffrey Epstein's death and the pandemic. Following the closure of the MCC, Greenwood was held at the MDC, where he suffered similarly grim conditions. In total, Greenwood's five years of pre-sentencing incarceration has included approximately two and a half years of

[11] Redacted

[12] *Id.*

lockdown—confinement to his cell with a single cellmate for twenty-three or more hours each day. *See United States v. Chavez*, 22-cr-303 (JMF), 2024 WL 50233, at *5 (S.D.N.Y. Jan. 4, 2024) ("[I]nmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as 'lockdowns'; instead, it refers to them as 'modified operations.'"); *id.* ("[C]onfining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane.").

The sentence imposed was excessive and took no reasonable account of those mitigating factors. By contrast, courts in this Circuit have repeatedly decried the conditions in those prisons and found that the unfairly punitive conditions they present warrant treating time spent there as the equivalent of twice the time spent at other prisons. *See United States v. Aracena de Jesus*, 20-Cr-19 (PAE), Dkt. 29, Tr. at 36:16-37:11 (S.D.N.Y. July 1, 2020) (imposing six months' imprisonment rather than the recommended range of 30-37 months in part because of the "horrific conditions" at MCC during the pandemic; "time in the MCC was

way harder than anyone intended when [defendant was] detained"); *United States v. Ramirez*, 20-cr-29 (JPO), Dkt. 47, Tr. at 19:2-17 (S.D.N.Y. Oct. 20, 2020) (finding that time served during the pandemic at MDC is "twice as punitive as it would otherwise be" and imposing 18 months' rather than three years' imprisonment); *United States v. Nunez*, 19-cr-691 (CM), Dkt. 28, Tr. at 16:8-15 (S.D.N.Y. May 5, 2021) (finding that defendant had "done far more time" than the actual number of months he was incarcerated as a result of the inhumane conditions at the MCC and MDC, "conditions that should not exist at any incarcerative facility in the United States of America").

As Judge Furman in the Southern District of New York recently summarized:

> For years, the conditions in the federal jails that serve this District (and the Eastern District of New York) have been a major, growing, and widely understood problem. The conditions at the [MCC] in Manhattan got so bad that, in August 2021, after a single visit by the Deputy Attorney General, the Department of Justice ordered the facility shuttered. Meanwhile, the only other federal detention center that serves this District—the [MDC] in Brooklyn—has had its own share of problems. In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast. Since that time, the dockets of this Court and the Eastern District have been filled with cases

in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care.

*Chavez*, 22-cr-303 (JMF), 2024 WL 50233, at *1 (collecting cases and articles). Greenwood has been subjected to all of this.

Greenwood has suffered severe—Redacted—punishment over the course of five years, and the District Court's imposition of a sentence of 20 years' imprisonment, based on global conduct that dramatically and erroneously inflated his Guideline range, was substantively unreasonable. The sentence should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should vacate the sentence and forfeiture order and remand with instructions to resentence Greenwood consistent with the text of the Sentencing Guidelines and the Second Circuit's rule of *Azeem* that only permits applying the Guidelines to U.S.-linked activity and losses.

Dated:     February 21, 2024
New York, New York

Respectfully submitted,

/s/ Justin S. Weddle

JUSTIN S. WEDDLE
JULIA I. CATANIA
BRIAN WITTHUHN
WEDDLE LAW PLLC
37 West 20th Street, Suite 1206
New York, NY 10011
(212) 997-5518
jweddle@weddlelaw.com

HOWARD LEADER
534 West 112th Street
New York, NY 10025
(646) 533-7696
howard.leader@gmail.com

*Attorneys for Karl Sebastian Greenwood*

54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(C) because it contains 10,277 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word in 14-point Century Schoolbook font, a proportionally-spaced typeface.

Dated:     New York, New York
           February 21, 2024

                              By:   /s/ Justin S. Weddle_____

                                    Justin S. Weddle

                                    Weddle Law PLLC
                                    37 West 20th Street, Suite 1206
                                    New York, NY 10011
                                    212-997-5518
                                    jweddle@weddlelaw.com