# No. 23-7199 (L);
## No. 24-368 (Con)

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

❖━━━━❖━━━━❖

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

KARL SEBASTIAN GREENWOOD; MARK S. SCOTT,

*Defendants-Appellants*

RUJA IGNATOVA, AKA CRYPTOQUEEN; KONSTANTIN IGNATOV, AKA SEALED
DEFENDANT 1; DAVID R. PIKE; FRANK SCHNEIDER; IRINA DILKINSKA,

*Defendants.*

❖━━━━❖━━━━❖
―――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 17-CV-630, HON. EDGARDO RAMOS

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANT-APPELLANT MARK S. SCOTT

Arlo Devlin-Brown
S. Conrad Scott
Nicholas G. Miller
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1249

May 29, 2024      *Counsel for Defendant-Appellant Mark S. Scott*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ISSUES PRESENTED...........................................................................4

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF THE CASE...............................................................5

    A.    Factual History ...................................................................5

    B.    Procedural History...............................................................8

        1.    Scott is convicted notwithstanding the limited evidence on essential elements of both charges.........................................8

        2.    Scott moves for a judgment of acquittal or a new trial.............12

        3.    The District Court sentences Scott to 10 years' imprisonment and to forfeit nearly $400 million......................15

SUMMARY OF ARGUMENT ...............................................................15

ARGUMENT ..........................................................................................18

I.    Scott Is Entitled to a New Trial Because His Convictions Rest on Perjury..............................................................................................18

    A.    Due Process Prohibits the Government from Using Testimony It Knows or Should Know To Be False. ............................19

    B.    Konstantin's Perjury Necessitates a New Trial...................................22

        1.    Konstantin repeatedly perjured himself....................................22

        2.    The Government knew or should have known that Konstantin's testimony was false. ............................................26

        3.    Konstantin's perjury was material. ............................................28

    C.    The District Court Abused Its Discretion by Excluding Evidence that Konstantin's Testimony Was Perjury. .........................35

i

II.    The District Court Abused Its Discretion by Excluding Evidence Scott Did Not Know OneCoin Was a Fraud. ...........................................................37

    A.    The District Court Abused Its Discretion by Excluding Emails Supporting Scott's Belief that OneCoin Was Legitimate. .................38

    B.    The District Court Abused Its Discretion by Quashing the Witness Subpoena Directed at Neil Bush. ..........................................39

III.    The Money-Laundering Conspiracy Conviction and Sentence Are Impermissibly Extraterritorial. .......................................................................41

    A.    Scott's Money-Laundering Conspiracy Conviction Rests on Extraterritorial Conduct. ........................................................................42

    B.    The District Court Erred by Declining To Instruct the Jury on Extraterritoriality. ...................................................................................46

    C.    Scott's Sentence Impermissibly Reflects Non-U.S. Conduct. ............49

IV.    The Bank-Fraud Conspiracy Conviction Cannot Stand. ...............................50

    A.    The Government Failed to Adduce Sufficient Evidence that Scott Conspired to Defraud a Federally Insured Bank. ......................50

        1.    The Armenta/Fates transactions. ..................................................51

        2.    The CryptoReal transaction .......................................................52

    B.    The Government Failed to Establish Venue. ......................................55

        1.    The District Court erred in instructing the jury as to venue. .......................................................................................55

        2.    The Government failed to prove venue. ...................................56

CONCLUSION ...................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcorta v. Texas*,
    355 U.S. 28 (1957) (per curiam)........................................................19

*Bascuñán v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019) ......................................................44, 47

*Beckanstin v. United States*,
    232 F.2d 1 (5th Cir. 1956) ................................................................24

*Chowdhury v. WorldTel Bangl. Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014) ..............................................................39

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)...........................................................................36

*Drake v. Portuondo*,
    321 F.3d 338 (2d Cir. 2003) ............................................................25

*Drake v. Portuondo*,
    553 F.3d 230 (2d Cir. 2009) ...............................................21, 33, 36

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014) ............................................................43

*Giglio v. United States*,
    405 U.S. 150 (1972)......................................................................18, 19

*Juniper v. Davis*,
    74 F.4th 196 (4th Cir. 2023) ............................................................34

*Kyles v. Whitley*,
    514 U.S. 419 (1995)...........................................................................34

*Loughrin v. United States*,
    573 U.S. 351 (2014)...........................................................................50

*Mooney v. Holohan*,
    294 U.S. 103 (1935) (per curiam).....................................................19

*Morrison v. Nat'l Aus. Bank Ltd.*,
　　561 U.S. 247 (2010)................................................42, 45, 48

*Napue v. Illinois*,
　　360 U.S. 264 (1959)..........................................19, 21, 33, 34, 35

*Nestlé USA, Inc. v. Doe*,
　　593 U.S. 628 (2021).......................................................43

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
　　572 F. App'x 60 (2d Cir. 2014) ..........................................44

*Phillips v. United States*,
　　849 F.3d 988 (11th Cir. 2017) ..........................................28

*RJR Nabisco, Inc. v. Eur. Cmty.*,
　　579 U.S. 325 (2016).......................................................42

*Shih Wei Su v. Filion*,
　　335 F.3d 119 (2d Cir. 2003) ...........................................20

*United States v. Agurs*,
　　427 U.S. 97 (1976)..............................................18, 19, 20

*United States v. Aquart*,
　　912 F.3d 1 (2d Cir. 2018) ..........................................21, 28

*United States v. Auernheimer*,
　　748 F.3d 525 (3d Cir. 2014) ...........................................55

*United States v. Beech-Nut Nutrition Corp.*,
　　871 F.2d 1181 (2d Cir. 1989) ..........................................55

*United States v. Bouchard*,
　　828 F.3d 116 (2d Cir. 2016) ...........................................54

*United States v. Cabrera*,
　　13 F.4th 140 (2d Cir. 2021) ...........................................48

*United States v. Certified Env't Servs., Inc.*,
　　753 F.3d 72 (2d Cir. 2014) ............................................32

*United States v. Crisci*,
  273 F.3d 235 (2d Cir. 2001) (per curiam) .......................................... 50

*United States v. Davis*,
  689 F.3d 179 (2d Cir. 2012) ............................................................. 56

*United States v. Epskamp*,
  832 F.3d 154 (2d Cir. 2016) ............................................................. 48

*United States v. Facen*,
  812 F.3d 20 (2d Cir. 2016) ............................................................... 55

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) ............................................................. 21

*United States v. Flores*,
  945 F.3d 687 (2d Cir. 2019) ............................................................. 50

*United States v. Freeman*,
  650 F.3d 673 (7th Cir. 2011) ....................................................... 29, 34

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) ............................................................. 36

*United States v. Gatto*,
  986 F.3d 104 (2d Cir. 2021) ............................................................. 38

*United States v. Han*,
  230 F.3d 560 (2d Cir. 2000) ............................................................. 46

*United States v. Kirk Tang Yuk*,
  885 F.3d 57 (2d Cir. 2018) ............................................................... 55

*United States v. Kwong*,
  69 F.3d 663 (2d Cir. 1995) ............................................................... 47

*United States v. Laurent*,
  33 F.4th 63 (2d Cir. 2022) ............................................................... 42

*United States v. Mickens*,
  926 F.2d 1323 (2d Cir. 1991) ........................................................... 48

*United States v. Monteleone*,
   257 F.3d 210 (2d Cir. 2001) ........................................................................21, 23

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020) ........................................................................44, 48

*United States v. Perez*,
   962 F.3d 420 (9th Cir. 2020) .......................................................................48, 49

*United States v. Persico*,
   645 F.3d 85 (2d Cir. 2011) ................................................................................36

*United States v. Prevezon Holdings Ltd.*,
   122 F. Supp. 3d 57 (S.D.N.Y. 2015) .................................................................43

*United States v. Requena*,
   980 F.3d 30 (2d Cir. 2020) ................................................................................47

*United States v. Seijo*,
   514 F.2d 1357 (2d Cir. 1975) ............................................................................32

*United States v. Sessa*,
   711 F.3d 316 (2d Cir. 2013) ..............................................................................28

*United States v. Spinelli*,
   551 F.3d 159 (2d Cir. 2008) ........................................................................25, 33

*United States v. Stewart*,
   433 F.3d 273 (2d Cir. 2006) ........................................................................19, 20

*United States v. Vega*,
   826 F.3d 514 (D.C. Cir. 2016) ..........................................................................27

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ................................................................................48

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ............................. 19, 20, 21, 26, 28, 30, 32, 33, 34

*United States v. Walters*,
   910 F.3d 11 (2d Cir. 2018) ................................................................................21

*United States v. Zvi*,
  168 F.3d 49 (2d Cir. 1999) ...................................................................43

*Wearry v. Cain*,
  577 U.S. 385 (2016).............................................................................28

**Statutes**

18 U.S.C. § 20(1) ..........................................................................50, 54

18 U.S.C. § 1343 .................................................... 1, 3, 12, 17, 43, 45, 48

18 U.S.C. § 1344 ................................................................31, 37, 50, 51

18 U.S.C. § 1956(a) ....................................................................9, 17, 37

18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i) ...........................................42

18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i), (c)(1) ...................................1

18 U.S.C. § 1956(a)(2)(B)(i), (c)(1) ......................................................1

18 U.S.C. § 1956(c)(1).....................................................................1, 9

18 U.S.C. § 1956(c)(7).......................................................................43

18 U.S.C. § 1956(f) ...........................................................................43

18 U.S.C. § 1961(1) ...........................................................................43

18 U.S.C. § 3231 .................................................................................4

28 U.S.C. § 1291 ..............................................................................4, 6

**Other Authorities**

Fed. R. Crim. P. 30(d)........................................................................47

Fed. R. Evid. 401 ..............................................................................40

Fed. R. Evid. 402 ..............................................................................40

Fed. R. Evid. 801(c)(2) ................................................................39, 40

Fed. R. Evid. 803 ..............................................................................35

U.S.S.G 2B1.1(a) ................................................................50

U.S.S.G. 2B1.1(b)(1) ......................................................49, 50

U.S.S.G. 2B1.1(b)(2) ......................................................49, 50

U.S.S.G. 2B1.1(b)(10) .......................................................50

U.S.S.G. 2S1.1 ..................................................................49

U.S.S.G. 2X1.1(a) .............................................................50

## INTRODUCTION

Mark Scott was a partner at the law firm Locke Lord LLP when a longtime client introduced him to Ruja Ignatova, who claimed to be the founder of a new cryptocurrency, "OneCoin." Ruja[1] sought Scott's advice about how to shield her assets from a "law suit" or "divorce." Scott agreed to help, and he set up offshore funds that held some $400 million for her. But OneCoin turned out to be a fraud, and prosecutors charged not only the principals who orchestrated that scheme, but also Scott, whom they accused of conspiring to launder its proceeds.

To convict Scott of money-laundering conspiracy, the Government needed to prove not only that the money Scott managed represented the "proceeds" of the charged "specified unlawful activity," —*i.e.*, wire fraud under 18 U.S.C. § 1343— but also that he *knew* that the money was proceeds of a crime. 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i), (c)(1). The central dispute at trial was thus whether Scott knew that OneCoin was a fraud. The Government's documentary evidence on that score was slight, consisting largely of a pair of emails Scott received in which third parties suggested that OneCoin *could be* a fraud or was under investigation, plus evidence that Scott sought to obscure Ruja's relationship to the Funds, which was what she hired him to do, and which by itself is not money laundering.

---

[1] To avoid confusion, this brief refers to Ruja Ignatova and her brother, Konstantin Ignatov, by their first names. Citations to "Dkt." refer to the proceedings below.

1

At trial, prosecutors called a single cooperating witness: Ruja's brother, Konstantin Ignatov. Konstantin identified Scott as a "money launderer" for OneCoin and placed him in a protracted July 20, 2016, meeting in Sofia, Bulgaria, with Ruja and OneCoin's head money launderer, Irina Dilkinska. There was little else linking Scott to the fraudulent OneCoin business. But Konstantin was a perjurer. He not only admittedly lied on the stand about other subjects, but also fabricated his account of that meeting, which Dilkinska could not have attended because she was in India at the time. When Scott tried to expose Konstantin's lies with emails indicating that Dilkinska was traveling at the time, the Government failed to correct its witness's false testimony and persuaded the District Court to exclude those emails as hearsay based on what the Government now concedes was a misreading of precedent.

Compounding the prejudice from Konstantin's perjury and the exclusion of those emails, the District Court also erred by excluding evidence tending to show Scott did not know that OneCoin was a fraud and that Ruja's riches were ill-gotten. Scott sought to introduce emails showing that he believed a Locke Lord colleague who was expert in cryptocurrency matters was advising Ruja and OneCoin on regulatory issues, which tended to show that Scott believed that OneCoin was legitimate. Scott also subpoenaed a witness whose involvement in a transaction the Government asserted to be "fake" gave him comfort that the transaction was

legitimate.  The District Court excluded those emails as hearsay and quashed the subpoena on the mistaken ground that the legitimacy of that transaction was not in dispute.  Both decisions were erroneous, and together they prevented Scott from showing that he lacked the knowledge required to convict him of either money-laundering or bank-fraud conspiracy.

Those errors are reason enough to reverse Scott's convictions, but they were not the only ones to mar Scott's trial.  OneCoin was no doubt a massive fraud abroad.  But the Government provided strikingly little evidence about conduct carried out in the United States or directed at U.S. investors, without which the OneCoin scam could not have been a wire fraud in violation of 18 U.S.C. § 1343—the "specified unlawful activity" underlying the money-laundering charge.  The Government thus failed to prove a money-laundering conspiracy.  Likewise, the District Court erred by sentencing Scott based on the total funds he handled, not the minimal amount that was even arguably the proceeds of a domestic wire fraud.  Nor can Scott's bank-fraud conspiracy conviction stand, as the Government failed to show that Scott either lied to a federally insured bank or knew that any alleged co-conspirator would do so.  This Court should reverse.

## ISSUES PRESENTED

1.     Whether due process requires a new trial because the Government's lead witness repeatedly perjured himself, the Government at minimum should have known the testimony was false, and the perjury was material.

2.     Whether the District Court abused its discretion by excluding key evidence supporting Scott's state-of-mind defense on the erroneous grounds that statements not offered for their truth were hearsay and that witness testimony about the legitimacy of a transaction was unnecessary even though the Government asserted that the transaction was "fake."

3.     Whether Scott's conviction and sentence for money-laundering conspiracy are improperly extraterritorial, where the alleged underlying fraud took place almost entirely overseas.

4.     Whether the Government presented sufficient evidence to prove a bank-fraud conspiracy or that venue for that count was proper in the Southern District of New York.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Scott appeals from a final judgment of the District Court. That appeal is timely because the District Court entered judgment on February 2, 2024, SPA-39, and Scott filed his notice of appeal

4

on February 7, 2024, A-867; *see also* SPA-46 (February 12, 2024, amended judgment); A-868 (February 26, 2024, amended notice of appeal).

## STATEMENT OF THE CASE

Scott appeals from a judgment of conviction, following a jury trial, and sentence imposed by the U.S. District Court for the Southern District of New York (Hon. Edgardo Ramos). SPA-39, SPA-4.

### A.    Factual History

In 2015, Mark Scott was a partner in the Florida offices of the law firm Locke Lord LLP, representing primarily domestic and international private-equity clients in corporate transactions. SPA-2; A-740. In 2015, a longtime client, Gilbert Armenta, introduced Scott to his "friend and client," Ruja Ignatova. A-672. Ruja claimed to have created a new cryptocurrency, OneCoin, and had started a related business, based in Sofia, Bulgaria, selling "trading packages" that combined educational material with "tokens" convertible into cryptocurrency—OneCoin— which she promised would be "the Bitcoin killer." A-86-87.

OneCoin was "profitable," and Ruja sought Scott's legal advice about how to protect her "personal assets … from several risks[,] [b]e it a law suit, be it divorce and so on." A-494-95, 673. She also requested advice because, she explained, OneCoin sat at the intersection of "two tricky fields": (1) cryptocurrency, the regulatory environment for which was uncertain and rapidly evolving, and

5

(2) "network marketing" (also known as multilevel marketing), the sales technique OneCoin used to sell "trading packages," which was often "confuse[d] with Ponzi [schemes] and other illegal ways of doing business." A-673. Ruja requested help "operat[ing] [her] business as much as possible within legal frameworks," noting that she would "take extremely serious" the "risk [of] not being 'legal' in USA." *Id.* Ruja also explained that she had "several other businesses," *i.e.*, "[s]ome private equity like investments" that she "treat[ed] differently as personal assets." *Id.* For these assets, she "look[ed] for anonymity and asset protection." *Id.*

While Scott's London-based Locke Lord colleague Robert Courtneidge advised Ruja on cryptocurrency regulation and marketing, A574-75, 580-629, Scott set about creating "complete privacy" for her assets, A-675. He created the Fenero Funds, a series of British Virgin Islands ("BVI") investment funds that he duly registered with authorities there, and engaged Apex Group, a nonbank fund administration company, as the Funds' administrator. SPA-3; A-178-79, 675-89. Starting in August 2016, Ruja invested approximately €354 million in those funds through companies that she controlled but which third parties, like OneCoin lawyer Irina Dilkinska, nominally owned. A-718, 768. Several of these companies made their investments in the Funds from large European banks. A-231, 768. Scott agreed to manage the Funds, naming their management company after himself and reporting

6

his and the Funds' foreign bank accounts and his Fund-related income to U.S. authorities. A-178, 382.

This arrangement was short-lived. The Funds invested €7.3 million in a European credit-card-related business, A-195, and agreed to loan $60 million to CryptoReal Investment Trusts, a Ruja-affiliated company, to help finance the acquisition of an oil field in Madagascar from Barta Holdings, an entity affiliated with a Hong Kong energy magnate, A-741-46. After wiring half that amount to a Hong Kong bank account belonging to Barta, A-420, Apex began demanding that Scott provide more information about the Funds' investors, A-202, 208. In response, Scott provided additional documentation, including letters of comfort that he drafted for foreign lawyers to sign and a contract showing that one of his investors provided marketing services for OneCoin. SPA-3-4. After Apex continued to stall, Scott terminated Apex as the Funds' administrator. A-747-67.

After that frustrating experience, Scott began requesting additional "know your customer" information from Ruja. A-781-82. Ruja failed to respond to these requests and complained that Scott was moving too slowly. A-780-81. Scott then arranged with Ruja and her London-based family office to turn the Funds over to a trust and end his own involvement. A-780-84. By the following summer, the Funds had returned practically all their money, and Scott's brief involvement with Ruja came to an end. A-388-89.

Subsequent events made clear that OneCoin was not a "Bitcoin killer," as its promoters had claimed, A-86, but a fraud. The purported blockchain did not exist, a fact known only to Ruja, her co-founder Sebastian Greenwood, and select OneCoin IT workers. A-134-36; *see also* A-97. OneCoins could not be traded on an internal exchange, and their price was not determined by computational or market forces. SPA-2. Ruja disappeared in October 2017, A-98; she remains a fugitive.

### B.    Procedural History

#### 1.    Scott is convicted notwithstanding the limited evidence on essential elements of both charges.

Scott was arrested on September 5, 2018, and charged with one count of conspiracy to commit money laundering. A-45. More than a year later, and less than a month before trial, the Government filed a superseding indictment also charging him with conspiracy to commit bank fraud. A-50.

His trial spanned 11 days and 17 witnesses, only two of whom testified to ever meeting Scott. The Government presented extensive evidence that OneCoin was a Europe-based cryptocurrency scam, as well as the testimony of two U.S. witnesses who lost a combined $54,000 after being sold "trading packages" by an acquaintance and a son, respectively. A-64, 247. The Government also presented evidence that Apex believed that it was deceived by Scott's lack of transparency about the ultimate sources of the Funds' capital (though cross-examination established that Scott had actually disclosed, in account-opening information, that Ruja was involved in the

8

Funds' creation, A-209-11, and that OneCoins were being used to pay some of the purchase price for the oil field, A-198-99, A-211-12); that the Funds moved approximately $400 million, SPA-3; and that Scott derived approximately $50 million in compensation, A-520.

There was remarkably little evidence, however, that Scott knew that Ruja's OneCoin wealth "represent[ed] the proceeds of some form of unlawful activity," *i.e.*, a federal, state, or foreign felony. *See* 18 U.S.C. § 1956(a), (c)(1). The Government sought to fill in that gap partly by calling to the stand Ruja's brother Konstantin Ignatov. Konstantin identified Scott as "one of the main money launderers for OneCoin," A-80, *see also* A-116, 149, and testified that Scott traveled to Sofia and met at length on July 20, 2016, with Ruja and Dilkinska, OneCoin's head money launderer, *see* A-81, who told Konstantin "she had to stay a long time … until Mark Scott understood everything that has to be done," A-109-10. Scott sought to introduce emails in which Dilkinska stated that she was traveling that week (and thus could not have met with Scott), but the District Court excluded them as hearsay. A-144-45, 147-48.

Without more evidence that Scott knew OneCoin was a fraud, the Government was left to emphasize an April 2016 email with the subject line "media and false accusations," which Dilkinska sent Scott complaining that a "guy is writing such stupid things," A-789, and linking to a blog post in which a Texas accountant

opined that OneCoin "show[ed] many of the hallmarks" of a pyramid or Ponzi scheme, *e.g.*, A-792. Although there was no evidence that Scott ever clicked the link or responded to the email, the Government read the entire blog post to the jury, A-348-51, and used it to argue that Scott definitively knew that OneCoin was a scam, A-523. The Government placed similar reliance on an October 2016 email in which an employee of Ruja's family office referred to an unspecified investigation into OneCoin and to OneCoin's difficulties maintaining banking relationships, A-103, 360, 775. No other document and no other witness suggested Scott knew or even should have known that OneCoin was a fraud.

The remainder of the Government's case was entirely circumstantial and relied on inferences about Scott's mental state based on, *inter alia*, his knowledge that Ruja's investments in the Funds were routed through other corporate entities, his failure to fully disclose to Apex the ultimate source of all the money he invested, his purported use of encrypted communications, his denial when questioned by the FBI that the Funds' money came from Ruja, and the compensation he received. A-520-26 (summation). But that evidence was largely consistent with Scott's key defense: namely, that he was simply helping Ruja protect her assets and shield them from public scrutiny, knowing nothing about the illicit sources from which they were derived. A-673.

The Government also presented little evidence in support of its eleventh-hour bank-fraud conspiracy charge. There was no evidence, for example, showing that Scott made any false statement to any bank. Instead, the Government's presentation focused on two sets of transactions in which banks were allegedly deceived.

The first (the "Armenta Transactions") concerned $10 million in wires that Armenta made to the Fenero Funds. To facilitate those wires, Armenta told his banks that the transfers were, among other things, "for investment" into nonexistent funds and to provide "capital investment" in a renewable-energy company. A-70, 277, 517, 634, 638-71, 720-23. While Scott understood that Armenta owed Ruja money and that the "investments" were intended to repay her, A-680-83, there was no evidence that he knew about Armenta's misrepresentations. Indeed, the evidence at trial made clear that Armenta was also deceiving *Scott* about his investments (including by sending him forged bank letters and wire orders) and that Scott returned the money after Armenta refused to answer due-diligence inquiries. A-276, 281, 507-09.

The second (the "CryptoReal Transaction") concerned the aforementioned loan to CryptoReal to finance the acquisition of a Madagascar oil field. *See supra* p. 7; *infra* Parts II.B, I.A.2. The Government argued that Scott's statement to Apex that the transaction was a "Loan to CryptoReal Investment Trust Ltd. (BVI)/Martin Breidenbach for Acquisition of Madagascar Oil Field," A-420, was incorrect, either

11

because it was not a bona fide loan or because the underlying oil-field deal was "fake," A-57-58, 519-20; *cf.* A-367. Apex, however, is not a bank or any other "financial institution" for purposes of 18 U.S.C. § 1343, *see id.* § 20, and there was no evidence that Scott knew that Apex would relay this statement to the Funds' Cayman Islands bank, or that *that* bank would in turn relay it to a U.S. bank as part of a transaction to wire money to a Hong Kong bank, A-420.

## 2. Scott moves for a judgment of acquittal or a new trial.

After the jury convicted Scott, A-567, he filed two motions to set aside his convictions. The first sought a judgment of acquittal or new trial under Federal Rules of Criminal Procedure 29 and 33, arguing among other things that his money-laundering conspiracy conviction was improperly extraterritorial and that the Government had not proved that he ever agreed to defraud a bank. Dkt. 217.

The second was a supplemental Rule 33 motion for a new trial based on newly discovered evidence of perjury. Dkt. 410. While his first motion was pending, evidence emerged that Konstantin had lied when he testified at trial that, after being detained by Customs and Border Patrol officers in San Francisco, he threw his laptop in a trashcan on the Las Vegas Strip. A-99-100. In fact, Konstantin sent the laptop back to Europe, where his girlfriend destroyed it. A-812; Dkt. 412 at 17. Duncan Arthur, a OneCoin employee turned whistleblower, spotted that lie and brought it to the attention of an investigator at the Manhattan District Attorney's Office, which

12

had jointly investigated and prosecuted the case. A-811-12. After that investigator "regrettably forgot" to share that revelation with defense counsel, Dkt. 412 at 17, Arthur informed defense counsel directly, Dkt. 410. When prosecutors asked him about his laptop testimony, Konstantin "immediately admitted" that he lied. *Id.* at 1.

Scott then received additional evidence confirming that Konstantin also fabricated his account of the supposed July 20 meeting: a copy of Dilkinska's passport showing that she was in India from July 19-22. A-823-24. Indian authorities subsequently confirmed that Dilkinska was there on those dates. A-821. The Government conceded that Konstantin's account of the meeting was incorrect, that it should have known that this testimony was incorrect, and that it misstated the law in persuading the District Court that an email in which Dilkinska stated that she would be traveling that week was inadmissible hearsay. Dkt. 445, at 20, 34, 38; *see also* Dkt. 461 at 30-31. It maintained, however, that Scott had not proved that Konstantin's testimony was *intentionally* false or that it knew or should have known that Konstantin was *intentionally* lying. Dkt. 445 at 31-34, 38-39.

The District Court denied Scott's motions. The District Court upheld Scott's money-laundering conspiracy conviction, holding that the wire-fraud statute reaches any conduct having more than "tangential and limited use of some U.S. wires" and concluding that the Government satisfied that requirement by putting on what the District Court viewed as some evidence that OneCoin targeted and victimized U.S.

13

investors, regardless of whether the vast majority of OneCoin activity took place outside the United States. SPA-26-29. The District Court likewise sustained Scott's bank-fraud conspiracy conviction on the grounds that, among other things, Scott "knew" that Armenta would lie to his banks and that any misrepresentations he made to Apex would reach a correspondent bank in New York. SPA-16-19. Finally, as to Konstantin's perjury, the District Court concluded that the perjury about the laptop was immaterial because it concerned "a purely collateral matter" that was not the principal focus of Konstantin's testimony and was not "primarily determinative of Scott's guilt," and because Konstantin was cross-examined on "much more significant topics" such as the July 20 meeting. SPA-32.

Without conducting an evidentiary hearing, the District Court held that Scott had not shown by a preponderance that Konstantin's testimony about the meeting was perjury. SPA-36. Even if that testimony was perjury, the District Court concluded that it was immaterial because Konstantin "provided no information as [to] what was discussed at the Meeting," and because "ample other evidence existed both of Scott's involvement with Ruja and Dilkinska and, more generally, of his guilt." *Id.* Accordingly, the District Court concluded that Konstantin's meeting perjury was "merely cumulative or impeaching" and that it "would [not] be a manifest injustice to let the guilty verdict stand." SPA-37. The District Court declined to consider whether it erred in excluding Dilkinska's emails and concluded

14

that any error would have been harmless because "Konstantin disclaimed any knowledge of the substance of the Meeting." *Id.*

### 3. The District Court sentences Scott to 10 years' imprisonment and to forfeit nearly $400 million.

The District Court sentenced Scott principally to 10 years' imprisonment and ordered him to forfeit approximately $393 million. SPA-47. That sentence relied on the court's ruling, made in sentencing co-defendant Sebastian Greenwood, who co-founded OneCoin with Ruja, that the Guidelines sentencing range should be based on "the totality of the illicit activity," regardless of whether that conduct occurred inside or outside the United States. Greenwood App. 115-16, ECF 47; A-853. Scott timely appealed after the District Court entered judgment and again after the District Court entered an amended judgment correcting typographical errors in the original judgment (but omitting the forfeiture). SPA-39, 46; A-867, 878.

## SUMMARY OF ARGUMENT

**I.** Scott's convictions are tainted by perjury. The Government's leading witness, cooperator Konstantin Ignatov, lied on the stand both about his destruction of a OneCoin laptop and about a surreptitious meeting at which OneCoin head money launderer Irina Dilkinska allegedly met at length with Scott to explain what Scott "had to do." This meeting represented some of the Government's strongest evidence of the key factual dispute at trial: whether Scott knew that OneCoin was a fraud. The Government concedes that the laptop testimony was perjury. Even

15

without an evidentiary hearing, the record leaves no doubt that the meeting testimony was not just false (which the Government also concedes) but perjurious. The Government also admits that it should have known at trial that the meeting testimony was false. But the Government both failed to correct the false testimony and persuaded the District Court to exclude (on admittedly incorrect grounds) key evidence that would have demonstrated that testimony's likely falsity. Because there is at least a reasonable likelihood that Konstantin's perjury could have affected the jury's verdict, Scott deserves a new trial.

**II.** The District Court also abused its discretion by excluding admissible evidence bearing directly on the key dispute at trial: whether he knew OneCoin was a fraud. Scott sought to introduce emails showing that a Locke Lord cryptocurrency specialist advised Ruja and OneCoin on regulatory issues, which suggested that Scott reasonably thought OneCoin was legitimate, but the District Court erroneously excluded those emails as hearsay. The District Court also quashed a defense subpoena for a witness involved in an oil field transaction in which Scott participated, reasoning that the evidence was unnecessary because the legitimacy of the transaction was not in dispute. That was also error because the Government's theory with respect to bank-fraud conspiracy was partly that this transaction was a sham. In combination, those errors deprived Scott of the opportunity to substantiate

16

his principal defense: That he, like many others, had been fooled into believing that OneCoin was legitimate.

**III.** Scott's conviction and sentence for money-laundering conspiracy are impermissibly premised on extraterritorial conduct. To convict Scott of money-laundering conspiracy, the Government needed to prove that he agreed to transact in funds that were the proceeds of "specified unlawful activity." 18 U.S.C. § 1956(a). His indictment alleged that this specified unlawful activity was the OneCoin scheme, which it alleged violated the federal wire-fraud statute, 18 U.S.C. § 1343. But the wire-fraud statute does not apply extraterritorially, and the Government failed to prove that the OneCoin scheme involved sufficient U.S. conduct. The District Court also erred by failing to instruct the jury on the issue of extraterritoriality, and by sentencing Scott based on the total amount of money that moved through the Fenero Funds regardless of its source, rather than the minimal amount the Government arguably proved to be the proceeds of U.S. wire-fraud activity.

**IV.** The evidence was insufficient to sustain Scott's bank-fraud conspiracy conviction or to establish venue in the Southern District of New York. The Government presented no evidence that Scott made false statements to any federally insured bank or agreed with anyone else to do so. The District Court upheld this conviction based on unsupported conjecture that Scott must have known both that a co-conspirator would lie to his bank and that statements Scott made to Apex would

17

be relayed thirdhand to a U.S. bank. Furthermore, the District Court plainly erred by instructing the jury that venue for this count could be based on any act by anyone in furtherance of the conspiracy.

## ARGUMENT

## I. Scott Is Entitled to a New Trial Because His Convictions Rest on Perjury.

The Supreme Court has long "made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam)). Scott's trial violated that fundamental precept. The Government's lead witness and sole cooperating witness, Konstantin Ignatov, lied under oath about both his destruction of his OneCoin laptop, A-99-100, and the "much more significant topic[]" of the protracted, secretive meeting Scott supposedly had with Ruja and Dilkinska on July 20, 2016, SPA-32; *see* A-109-10. Even though the Government "should have known[] of the perjury," *United States v. Agurs*, 427 U.S. 97, 103 (1976), it failed to correct it and urged the District Court to erroneously exclude evidence tending to show that he was lying. Because there is some "reasonable likelihood that the false testimony could have affected the judgment of the jury," *id.*, Scott is entitled to a new trial, and the District Court abused its discretion in

18

concluding otherwise.  *See United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (standard of review).

**A.    Due Process Prohibits the Government from Using Testimony It Knows or Should Know To Be False.**

Due process prohibits the Government from "knowingly us[ing] false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio*, 405 U.S. at 153; *Mooney*, 294 U.S. at 112-13.  When prosecutors use false testimony, they not only engage in "prosecutorial misconduct, but more importantly … corrupt[] … the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104.

The prohibition on the use of false testimony is not limited to cases in which prosecutors knowingly elicit perjured testimony on subjects directly bearing on the defendant's guilt or innocence.  As the Supreme Court has explained, the Government may neither use "false testimony [that] goes only to the credibility of the witness," nor allow such "false evidence to go uncorrected when it appears." *Napue*, 360 U.S. at 269; *see also Alcorta v. Texas*, 355 U.S. 28, 30-31 (1957) (per curiam).  Indeed, for that prohibition to apply, the Government need not know for certain that its witness's testimony is false:  Convictions obtained using testimony that the Government "should have known" to be false also violate due process. *Agurs*, 427 U.S. at 103; *see also, e.g.*, *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (reversing convictions where government should have known of

19

witness's false testimony), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023).

Under this Court's precedents, whether perjury by a prosecution witness requires a new trial depends both on the materiality of the witness's testimony and "the government's awareness of the false testimony prior to the conclusion of the trial." *Stewart*, 433 F.3d at 297; *see Wallach*, 935 F.2d at 456. If "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is *any reasonable likelihood* that the false testimony *could have affected the judgment of the jury*." *Wallach*, 935 F.2d at 456 (quotation marks omitted and emphasis added). Under that standard, when "the government knowingly permitted the introduction of false testimony[,] reversal is 'virtually automatic.'" *Id.* (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)). Such a "strict standard of materiality," *Agurs*, 427 U.S. at 103, "serves the dual purposes of discouraging prosecutorial misconduct and providing relief from an unfair conviction," *Stewart*, 433 F.3d at 297, so "prejudice is readily shown" whenever "a prosecutor elicits testimony he knows or should know to be false, or allows such testimony to go uncorrected," *Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003).

If, however, the Government had no reason to be aware of the perjury at the time of trial, "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant

20

would most likely not have been convicted." *Wallach*, 935 F.2d at 456 (quotation marks omitted and alterations adopted). Yet even that more demanding standard requires the defendant to show only that there is a "significant chance" that "skilled counsel" could have used the perjury to induce "reasonable doubt in the minds of enough of the jurors to avoid a conviction." *Id.* (quotation marks omitted).

Some of this Court's cases supplement *Wallach*'s two-factor test with two more factors: that "the witness actually committed perjury" (i.e., gave testimony that was intentionally false, not simply confused or mistaken) and "the perjured testimony remained undisclosed" during trial. *See United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011) (quoting *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000)); *see also, e.g.*, *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018); *United States v. Walters*, 910 F.3d 11, 29 (2d Cir. 2018); *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). Although these requirements are in some tension with precedent prohibiting the use of "false testimony," *e.g.*, *Napue*, 360 U.S. at 269; *Drake v. Portuondo*, 553 F.3d 230, 242 n.7 (2d Cir. 2009) ("*Drake II*"), the Court need not resolve any "tension" in these standards, *Ferguson*, 676 F.3d at 282, because the evidence conclusively proving that Konstantin was lying emerged only after the trial and because—as the next Section explains— Konstantin actually committed perjury.

21

**B.      Konstantin's Perjury Necessitates a New Trial.**

Konstantin lied on the stand, and the Government knew or should have known it.  Those lies bore directly on both the credibility of a key government witness and Scott's purported knowledge that OneCoin was a criminal scheme.  And, given the Government's otherwise thin showing about Scott's mental state and its frustration of Scott's attempts to cross-examine Konstantin, those lies were material.  Due process requires a new, fair trial.

### 1.      Konstantin repeatedly perjured himself.

While testifying against Scott, Konstantin gave false testimony on multiple occasions.

*First*, he falsely testified that, fearing "that somebody might find more evidence connecting [him] to OneCoin," he threw his laptop in a garbage can on the Las Vegas Strip.  A-99-100.  In fact, he sent the laptop back to London, from whence it was returned to Bulgaria, where his girlfriend destroyed it.  A-811-12; Dkt. 412 at 17.  Because he told government investigators a version of the same story, Konstantin's testimony that he was "truthful in [his] meetings with the government," A-100, was necessarily also false.  Dkt. 461 at 8 & n.7.

*Second*, he also repeatedly gave demonstrably false testimony about a meeting that Scott supposedly had with Ruja and Dilkinska in Sofia, Bulgaria, on July 20, 2016.  Konstantin testified that after Scott arrived at OneCoin's offices, Konstantin

escorted him to Ruja's office, and that Ruja then directed Konstantin "to bring [Dilkinska]" and to send everyone else on that floor of OneCoin's offices home for the day "so that [Dilkinska], [Scott], and Ruja are alone." A-109-10. He testified that this was the only time Ruja ever directed him to clear the floor. A-110. Although Konstantin did not attend the meeting, he testified that Dilkinska told him the following week that "she had to stay … for a long time … until Mark Scott understood everything that has to be done or he has to do." *Id.*; *see also* A-147. Konstantin doggedly adhered to the same account on cross-examination. A-124, 147. But that testimony was also false. After trial, Scott obtained a copy of Dilkinska's passport, which showed—and Indian authorities confirmed—that Dilkinska was in fact in India from July 19-22, and thus could not have met with Scott in Sofia on July 20 or stayed with him "for a long time" so he "understood" what "he has to do." *See* A-821, 823-24.

Nor was that testimony simply "incorrect," as the Government has maintained. Dkt. 445 at 52. It was *perjury*: "false testimony concerning a material matter with the willful intent to provide false testimony." *See Monteleone*, 257 F.3d at 219. Indeed, when prosecutors confronted him about the laptop testimony, Konstantin readily admitted that he had lied. Dkt. 412 at 16-17. Konstantin's testimony about the supposed July 20 meeting was also perjury. On the stand, Konstantin wove a vivid, incriminating tale that explained how Scott supposedly

23

learned "everything that has to be done," and which was apparently calculated to make Konstantin's sole encounter with Scott seem sinister and conspiratorial. Moreover, when cross-examined, Konstantin stubbornly maintained that he was "pretty sure" and "almost a hundred percent" sure that Dilkinska was present for the meeting, and he doubled down on his claim that Dilkinska "told [him] the week afterwards that [she and Scott] spent a lot of time together."  A-124.  Even after being shown emails in which Dilkinska had told Scott that she would be traveling away from Sofia that week, Konstantin continued to insist that he was "confident" and a "hundred percent sure" that Dilkinska was present.  A-147-48; *see* A-630.  His insistence on a demonstrably false account belies the idea that he was merely mistaken or confused about Dilkinska's presence.  *Cf. Beckanstin v. United States*, 232 F.2d 1, 4 (5th Cir. 1956) (no evidence that witness had willful intent to swear falsely when he corrected false statement immediately on questioning).

The District Court concluded otherwise, finding that Scott had not shown that Konstantin had *willfully* lied, rather than simply testifying falsely due to confusion or mistake.  SPA-34-35.  That decision was procedurally and substantively incorrect.

*First*, the District Court abused its discretion by resolving this factual dispute against Scott without conducting the evidentiary hearing Scott repeatedly requested.  *See* Dkt. 410 at 7 (requesting hearing); Dkt. 433 at 29 (same); Dkt. 461 at 39 (same); A-840-41, 851 (same).  This Court has made clear that a district court must conduct

24

an evidentiary hearing when a defendant's false-testimony claim turns on disputed, material facts. *See United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008); *Drake v. Portuondo*, 321 F.3d 338, 346-47 (2d Cir. 2003) ("*Drake I*"). Particularly in light of Scott's strong showing that Konstantin had lied, Dkt. 410 at 7, the District Court thus erred by finding that Konstantin had not lied without giving Scott an adequate opportunity to prove that he had.

*Second*, even absent an evidentiary hearing, the District Court also clearly erred in concluding that Scott had not shown by a preponderance that Konstantin committed perjury. SPA-35. As noted, it defies belief that Konstantin's stubborn insistence on that vivid, detailed, highly inculpatory narrative was merely confused or mistaken. In finding otherwise, the District Court apparently credited the Government's arguments that Konstantin's testimony had been equivocal, that Konstantin may have confused details between two different meetings, or that Dilkinska could have attended the meeting by phone. SPA-35 (citing Dkt. 441 at 41). Those arguments are unsupported by the record. While Konstantin *initially* stated on cross-examination that he was "pretty sure" Dilkinska was present, he proceeded to repeatedly affirm that he was "a hundred percent sure" she was there. A-147-48. Konstantin could not have mixed up the details of two separate meetings when, by his own account, he met Scott only once, A-80-81, 109, and documentary evidence indicates that it was exceedingly unlikely that Dilkinska met Scott when

25

he visited Sofia again that September, A-769, *see* Dkt. 461 at 4-7. Finally, there is no evidence suggesting that Dilkinska attended the July 20 meeting by phone, and that explanation cannot be squared with Konstantin's testimony that Dilkinska told him she had to "stay … for a long time" and "spent a lot of time together" with Scott. A109-10, 124. The record provides no basis to excuse Konstantin's perjury as a simple mistake.

### 2.    The Government knew or should have known that Konstantin's testimony was false.

Likewise, the record makes clear that the Government knew or should have known that Konstantin's testimony about the meeting was false. At the time of trial, the Government possessed multiple communications indicating that when Scott visited Sofia, Dilkinska was in fact in India. These included not only Dilkinska's emails informing Scott that she would be or was traveling that week, A-630-33, but also messages recovered from Greenwood's electronic devices specifically indicating that Dilkinska was in India, A-815-19. The Government has thus already conceded, based on its possession of the Greenwood messages, that "there is evidence that the Government should have known … that Ignatov[] had misremembered certain details about the July 2016 Meeting and that his testimony about Dilkinska being present at the meeting was inaccurate" Dkt. 445 at 38. Put simply, the Government has admitted that it should have known that Konstantin's testimony was false. That is enough to trigger *Wallach*'s "any reasonable

likelihood" standard for analyzing the materiality of perjured testimony by a government witness. *See United States v. Vega*, 826 F.3d 514, 530 (D.C. Cir. 2016) ("Hair-splitting distinctions in degree of falsity and inaccuracy should not be the currency of federal prosecutors.").

Indeed, it was nearly certain that before the end of trial, the Government *actually knew* that Konstantin's testimony was highly unlikely to be true. Konstantin admittedly lied repeatedly to federal agents, and prosecutors had recently moved to revoke his bail because he "simply cannot be trusted" to comply with the conditions of his release. *See* ECF No. 90 at 1, *United States v. Ignatov*, 17-CR-630 (S.D.N.Y. June 27, 2019). More importantly, Konstantin's testimony about the July 20 meeting was also inconsistent with what the Government knew about Dilkinska's whereabouts at that time. After Konstantin testified about the July 20 meeting, Scott attempted to introduce a July 17 email (DX-550) in which Dilkinska told Scott she was "traveling for the whole week." A-144, 147-48. He also made a *Brady* request for any material "tending to show that [Konstantin] did not testify accurately" about the July 20 meeting, and asked the Government if it would object to the admission of DX-550 as well as July 20 email (DX-552) in which Dilkinska told Scott she was "traveling too." A-808; *see* A-632. After initially assenting to the introduction of DX-550, the Government stated that after having "discussed this further," it would oppose the introduction of both emails. A-807-08. The Government then

27

successfully urged the District Court to exclude the emails as inadmissible hearsay, A-372-73—a position it has since admitted was incorrect, at least as to DX-550, Dkt. 445 at 10, 20. Although the District Court refused to conduct an evidentiary hearing on the Government's knowledge of the falsity of Konstantin's meeting testimony, *but see* Dkt. 433 at 30 (requesting such a hearing), the record thus leaves little doubt that the Government at least *should have known* that testimony was false.

### 3. Konstantin's perjury was material.

Because Konstantin's testimony was perjury and because the Government should have known that testimony was false, Scott is entitled to a new trial as long as there is at least a "reasonable likelihood that the perjury could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456 (quotation marks omitted). Particularly given the thin evidence about Scott's state of mind, the repeated and at times highly inculpatory perjury of a star cooperating witness was easily "sufficient to undermine confidence in the verdict." *See Wearry v. Cain*, 577 U.S. 385, 392 (2016). The District Court erred in concluding otherwise.[2]

---

[2] Although the decision whether to grant a new trial is reviewed for abuse of discretion, *Aquart*, 912 F.3d at 24-25, whether perjury by a government witness is material is a mixed question reviewed de novo, *Phillips v. United States*, 849 F.3d 988, 993 (11th Cir. 2017); *see United States v. Sessa*, 711 F.3d 316, 321 (2d Cir. 2013) (court "conducts its own independent examination of the record" to assess significance of *Brady* material (quotation marks omitted)).

### a) *Konstantin's perjury could have affected the judgment of the jury.*

Konstantin was a key witness for the prosecution. As the only cooperating OneCoin conspirator to testify against Scott, Konstantin played a crucial role in presenting and explaining the OneCoin scheme, the personalities involved, and why OneCoin was fraudulent. *See, e.g.*, A-81-94, 102-04, 105-09. That testimony was necessary for the jury to understand what Armenta or Dilkinska did for OneCoin, and why Scott's contacts with them were supposedly incriminating. And by the Government's own account, Konstantin's testimony—which included narrating various documents that he neither sent nor received—was important to "help the jury view [that] evidence with some context surrounding it." A-95. Like the perjured co-defendant in *United States v. Freeman*, 650 F.3d 673, 682 (7th Cir. 2011), Konstantin's testimony was material partly because it "filled in many necessary details that gave flesh and context to the government's evidence." Indeed, his frequently lurid testimony about events that postdated Scott's involvement with Ruja—Ruja's disappearance, run-ins with organized crime, and apartments full of cash, A-99, 102-04—helped taint anyone with any connections to Ruja or OneCoin.

Konstantin's testimony was even more important, however, because he was the only witness who even came close to providing evidence that Scott knew OneCoin was a fraud. Konstantin placed Scott near the center of the OneCoin scheme, as "one of the main money launderers for OneCoin." A-80. By testifying

29

about Scott's purported lengthy meeting in suspicious circumstances with OneCoin's head money launderer, in which she told Scott "everything that has to be done or he has to do," A-109-10, Konstantin supplied a narrative link connecting Scott to the OneCoin fraud and suggesting why Scott would have known that OneCoin was fraudulent. Moreover, Konstantin testified that Dilkinska panicked when she heard a rumor that Scott was cooperating with federal authorities, with the clear implication that Scott supposedly knew that the two were engaged in criminal misconduct. A-122; *see* A-524 (highlighting that testimony in summation). Konstantin's testimony thus played an important role in portraying Scott as someone who was not just hiding Ruja's money, but doing so with a bad conscience.

In that context, Konstantin's perjury likely played a substantial role in shaping the jury's judgment. Had the jury known that Konstantin was a liar, it would have destroyed the credibility of a key prosecution witness at the outset of trial and called into question Konstantin's identification of Scott as a "money launderer." That alone is reason to conclude that his perjury was material. *See Wallach*, 935 F.2d at 458-59 (evidence that key witness who "tied all the pieces" of the Government's case together was lying readily met "reasonable likelihood" standard for new trial). The fact that Konstantin had fabricated his account of Scott's supposedly sinister July 20 meeting with Dilkinska would have been even more devastating to the Government's case, as it would have eliminated one of the key pieces of evidence

30

supporting the Government's theory that Scott knew that OneCoin was a fraud.[3] Without that evidence, and lacking any direct proof that Scott knew that OneCoin was a fraud, the Government would have been forced to place even greater reliance on such circumstantial and unconvincing evidence as Scott's receipt of an email derisively referencing a Texas accountant's accusatory blog post, *see supra* pp. 9-10, and the uncontested fact that Scott tried to conceal Ruja's assets, A-673. The jury could have readily acquitted on such limited evidence.

Lastly, the Government all but confirmed the importance of Konstantin's testimony when it took every opportunity to shore up his dubious credibility. In opening, the Government acknowledged that Konstantin was a criminal but emphasized his purported reformation, noting that he had "accepted responsibility" for his crimes and agreed to testify, and inviting the jury to scrutinize whether his testimony was consistent with the rest of the evidence. A-58. Then, on direct examination, the Government both introduced his cooperation agreement and elicited testimony about what the agreement required ("to be truthful here in [his]

---

[3] That testimony was also relevant to Scott's bank-fraud conspiracy conviction, because the Government's bank-fraud theory was in significant part that Scott and his alleged co-conspirators lied to banks to prevent the discovery of their alleged money-laundering scheme. The Government thus recognized that the two charges were related and based on "much of the same evidence." A-520, 526. Thus, any uncertainty about whether Scott knew he was laundering the proceeds of crime would also have introduced considerable uncertainty about whether he ever joined any agreement for the purpose of knowingly carrying out an artifice or scheme to defraud a bank. *See* 18 U.S.C. § 1344.

31

testimony") and the consequences if he did "not tell the truth in testifying" ("risk[ing] [his] whole cooperation agreement"), A-100-01—actions that at best steered close to improper bolstering, *see United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 85-86 (2d Cir. 2014). The Government's focus on the credibility of their cooperating witness made sense not just because his credibility was questionable, but also because his testimony was important to the Government's case. "Had it been brought to the attention of the jury that [Konstantin] was lying after he had purportedly" accepted responsibility and promised to tell the truth, "his entire testimony may have been rejected …." *Wallach*, 935 F.2d at 457. Given the importance of Konstantin's testimony to the Government's case, the revelation that he was lying could easily "have exerted a compelling impact on his credibility as to the unsubstantiated aspects of his testimony," and "created a sufficient doubt in the minds of enough jurors to affect the result." *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975).

### b) *In concluding otherwise, the District Court erred in at least three different ways.*

Despite ostensibly assuming that the Government should have known about Konstantin's perjury and thus applying the "any reasonable likelihood" standard, the District Court nevertheless concluded that Konstantin's perjury was immaterial. SPA-31-32, 35-37. That was error for three key reasons.

32

*First*, the District Court applied the wrong legal standard in analyzing whether Scott had shown that there was "any reasonable likelihood" that Konstantin's perjury could have affected the judgment of the jury. *See Wallach*, 935 F.2d at 456. Although that standard applies with particular rigor in cases in which the Government knowingly uses perjured testimony—reversal is "virtually automatic," *id.*—the District Court held without conducting an evidentiary hearing that this was not such a case. SPA-35-36. For the reasons given *supra* pp. 24-25, the resolution of that factual question without a hearing was error. *See Spinelli*, 551 F.3d at 166.

Moreover, despite stating that it was applying *Wallach*'s "any reasonable likelihood" standard, the District Court concluded that Scott was not entitled to a new trial based on Konstantin's fabricated meeting testimony because, it reasoned, "competent, satisfactory, and sufficient evidence in the record supports the jury verdict" and it would not "be a manifest injustice to let the guilty verdict stand." SPA-37. The District Court thus disregarded the relaxed "any reasonable likelihood" standard and instead applied the far more rigorous standards that apply for Rule 33 motions generally and for *Napue* claims where the Government has no reason to know of the perjury. That too was error, and suggests that the District Court never analyzed the materiality of Konstantin's most significant perjury under the correct standard. *See Drake II*, 553 F.3d at 241 n.6 (noting that "any reasonable likelihood" standard for *Napue* claims differs from ordinary harmless-error review).

33

*Second*, the District Court erred in concluding that Konstantin's testimony was merely cumulative impeachment evidence outweighed by "ample other evidence … of Scott's involvement with Ruja and Dilkinska and, more generally, of his guilt." SPA-36. While there was no doubt ample evidence that Scott communicated with Ruja and Dilkinska, there was scant evidence that Scott knew that Ruja derived her money from crime. *See supra* pp. 9-10, 29-31. To the extent there was such evidence, much of it came from Konstantin himself, making his credibility highly material to the case and to the jury's judgment. *See Napue*, 360 U.S. at 269; *Wallach*, 935 F.2d at 458. While it is true that Scott *attempted* to impeach Konstantin on his meeting perjury during cross-examination, even effective cross-examination does not necessarily render evidence of a Government witness's perjury "cumulative." *See Freeman*, 650 F.3d at 681-82. And Scott's cross-examination of Konstantin was far from effective because Konstantin, even with DX-550 in hand, adhered with remarkable consistency to his perjured account and because the District Court erroneously prevented Scott from introducing evidence necessary to impeach that testimony. *See infra* Part I.C.

*Finally*, the District Court erred by analyzing the materiality of Konstantin's laptop and meeting perjury separately and failing to consider the cumulative effect of that perjury. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (*Brady* materiality analyzed collectively, not item-by-item); *Juniper v. Davis*, 74 F.4th 196,

213 (4th Cir. 2023) (same under *Napue*). Had it done so, it would not necessarily have disregarded the laptop perjury as merely touching on a collateral matter, but rather may have recognized how that perjury threatened to undercut the Government's entire case. Because Konstantin lied, the jury was entitled to disregard his testimony entirely, A-557; had they known that he was a serial fabulist, there is at least a reasonable likelihood they would have done just that.

### C. The District Court Abused Its Discretion by Excluding Evidence that Konstantin's Testimony Was Perjury.

Scott was unable to undermine Konstantin's false testimony about the July 20 meeting before the jury. As noted, Scott attempted to introduce two emails—DX-550 and DX-552—in which Dilkinska stated that she would be or was traveling the week that Scott was in Sofia. *See supra* pp. 27-28. The District Court accepted the Government's representations that the "case law … require[d]" independent corroboration of Dilkinska's statements and excluded the emails. A-374; *see* A-372-74.

That decision was error. Under Federal Rule of Evidence 803(3), an out-of-court statement about intent or plan is admissible "as tending to prove the doing of the act intended," notwithstanding the general prohibition against hearsay. Fed. R. Evid. 803, advisory committee note. Although additional corroboration is required when such a statement is offered to show that "*a third person* acted in accordance with an intention attributed to him by the declarant," no such corroboration is

35

required to show that *the declarant* did so. *United States v. Persico*, 645 F.3d 85, 101 (2d Cir. 2011) (emphasis added). Dilkinska's statements that she would be traveling that week, A-630, or was in the process of traveling, A-632, were thus admissible as statements of her "then-existing state of mind … or emotional, sensory, or physical condition." The Government thus concedes that the exclusion of DX-550 was erroneous. Dkt. 445 at 10, 20. Because the decision to exclude those emails was legally erroneous, it was necessarily an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

That error was deeply prejudicial. The District Court acknowledged the "significan[ce]" of Konstantin's testimony about the July 20 meeting. SPA-32. As noted, while Scott attempted to impeach Konstantin about this testimony, he was unable to do so, because Konstantin continued to insist on his falsified account even after reading DX-550, and Scott was powerless to demonstrate Konstantin's mendacity to the jury. *See supra* pp. 29-35. This Court cannot be "sure that the [evidentiary] error did not influence the jury, or had but very slight effect." *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (quotation marks omitted).

Furthermore, this Court has recognized that the prosecution "'sharpens the prejudice'" from perjury when it "engages in conduct designed to inhibit the defense" in rebutting a lying prosecution witness by, for example, "objecting to efforts at impeachment." *Drake II*, 553 F.3d at 245 (quoting *Jenkins v. Artuz*, 294

F.3d 284, 294 (2d Cir. 2002) (alteration adopted)). In light of the importance of Konstantin's perjury, the Government's considered but legally incorrect efforts to thwart the introduction of DX-550 and 552 "sharpen[ed] the prejudice" of Konstantin's perjury. The combination of perjury and evidentiary error denied Scott a fair trial and cannot be excused as harmless error.

## II. The District Court Abused Its Discretion by Excluding Evidence Scott Did Not Know OneCoin Was a Fraud.

In addition to attempting to impeach Konstantin's perjured testimony about the July 20 meeting, Scott attempted to introduce evidence that he acted without the guilty mens rea required for either charged offense. That evidence included documentary evidence showing that he understood that his Locke Lord colleague Robert Courtneidge was advising Ruja and OneCoin on other issues—a fact that tended to show that Scott did not believe that OneCoin was a fraud. *See* 18 U.S.C. § 1956(a). Scott also sought testimony from a witness involved in the CryptoReal oil-field transaction, which tended to show that Scott did not lie to anyone—let alone join an agreement to "knowingly execute[], or attempt to execute[], a scheme or artifice" to defraud or obtain money by false pretenses from a bank, 18 U.S.C. § 1344—when he told Apex's London office that a wire transfer was for a "Loan to CryptoReal Investment Trust Ltd. (BVI)/Martin Breidenbach for Acquisition of Madagascar Oil Field." The District Court excluded the documentary evidence as hearsay and quashed the subpoena for witness testimony as unnecessary. Both

37

rulings were abuses of discretion, *see United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), that compromised Scott's ability to present a complete defense, and neither was harmless beyond a reasonable doubt.

### A. The District Court Abused Its Discretion by Excluding Emails Supporting Scott's Belief that OneCoin Was Legitimate.

As evidence that he did not know that OneCoin was a fraud, Scott sought to introduce emails showing that he knew that Courtneidge and Locke Lord were advising Ruja and OneCoin. A-326-27; A-574-629.[4] That evidence tended to suggest that Scott believed, like many others, that OneCoin was a legitimate cryptocurrency and business, because his law firm had conducted its due diligence on the clients and because they were receiving regulatory and other advice from a respected colleague.

The Government argued that the Courtneidge emails were inadmissible hearsay and that if Scott wanted to put on evidence about his state of mind, "[he] could testify." A-327. Despite acknowledging that "obviously [the emails] are arguably relevant" and that "Scott's state of mind is an important issue in this case," the District Court concluded that the emails were inadmissible hearsay. *Id.*

---

[4] Scott also sought to introduce other documents confirming that Courtneidge performed work for OneCoin, and that Locke Lord continued to represent Ruja after Scott resigned from the firm to manage the Funds. *See* A-326-28 (discussing DX-110, 151, 203, 214, 219, and 473).

That decision was legally erroneous and thus an abuse of discretion. *See Chowdhury v. WorldTel Bangl. Holding, Ltd.*, 746 F.3d 42, 54 (2d Cir. 2014) ("Whether certain evidence is hearsay is generally a question of law that is reviewed *de novo*."). Out-of-court statements are not hearsay if they are not offered for their truth. Fed. R. Evid. 801(c)(2). Here, it was evident that, as he explained, Scott was not offering those emails for their truth. As Scott explained, what mattered was not whether Courtneidge was *actually* advising Ruja on U.K. corporate-law issues, A-576, the legality of cryptocurrency casinos, A-577, or current issues in E.U. cryptocurrency regulation, A-580-626, but only that he *thought* Ruja and OneCoin were actually receiving advice from others at the firm and thus that he had reason to believe that OneCoin was not a fraud, A-314-15, 327-28. That was classic state-of-mind evidence, and the exclusion of these emails was therefore error.

## B. The District Court Abused Its Discretion by Quashing the Witness Subpoena Directed at Neil Bush.

The District Court likewise abused its discretion by thwarting Scott's efforts to prove that the Fenero Funds were lending money to CryptoReal to facilitate the acquisition of an oil field. In opening, the Government claimed that Scott ran "phony investment funds" and was not making legitimate investments but rather "simply taking in fraud dollars … and then sending the money … right back to OneCoin's leaders." A-57, 59. The Government thus made clear that its bank-fraud theory was, at least in part, that Scott had allegedly lied to banks about the purposes of

39

transactions that were supposedly "dummy transactions used as cover for moving OneCoin fraud money."  A-58; *see also* A-519.

To refute that allegation, Scott sought to call as a witness Neil Bush, a Texas businessman who sat on the boards of companies owned or controlled by the oil field's seller and who in effect had an option to purchase a share of the oil field at issue in the CryptoReal transaction—one of the few transactions that the Fenero Funds actually made.  A-368.  Bush's testimony was relevant, as it tended to show both that the oil-field transaction was a bona fide transaction *and*—given Bush's family connections—why Scott believed it to be so.  A-367.  That evidence was therefore admissible.  *Id.*; Fed. R. Evid. 401-02.  The District Court nevertheless quashed the subpoena on the ground that witness testimony on this issue was unnecessary because "no one is disputing that there was an oil field and that [a] loan was going to be made" to fund its acquisition.  A-370.

That premise was simply incorrect.  The Government put the legitimacy of the CryptoReal transaction squarely at issue in opening.  A-57-59.  Mid-trial, the Government shifted stances, and despite "not taking a position on t[he] motion" to quash, implied that its bank-fraud theory did not depend on whether there was actually an oil-field deal, but instead whether Scott had accurately characterized the payment as a "loan" to CryptoReal.  A-367.  After the subpoena was quashed, however, the Government argued vigorously that the Fenero Funds were a sham, not

40

"a real investment fund" and that they had made "fake investments" backed by "fake paperwork." A-519, 521, 523. The District Court's decision to quash the subpoena left Scott with little ability to rebut the Government's claims that his investments were "fake."

## III. The Money-Laundering Conspiracy Conviction and Sentence Are Impermissibly Extraterritorial.

Scott's money-laundering conspiracy conviction and his sentence cannot stand for the additional reason that Scott is impermissibly being punished for the OneCoin conspirators' overseas misconduct. OneCoin was conceived in and orchestrated from Bulgaria by European nationals; maintained satellite offices in Dubai and Hong Kong; targeted almost wholly non-U.S. victims through marketing materials produced in Europe and promotional events held in Europe; and relied on numerous prominent European and Asian banks. A-82, 85, 101. Of the approximately $4 billion the Government asserts the scheme took in, *e.g.*, Gov't Sentencing Submission at 3, ECF No. 570, *United States v. Greenwood*, No. 17-CR-630 (S.D.N.Y. Sept. 5, 2023), the Government at Scott's trial presented evidence of approximately $54,000 in losses to two U.S. investors—about 0.001% of the alleged total. A-66, 69, 247, 249; *cf.* A-81 (Konstantin's estimate that OneCoin made "over $2 billion"). The Government thus failed to show that the funds Scott handled were derived in any significant part from the fruits of domestic fraud. Because the Government failed to establish a substantial U.S. nexus for that underlying fraud,

41

and because the District Court never instructed the jury on extraterritoriality, Scott's conviction should be reversed.

### A. Scott's Money-Laundering Conspiracy Conviction Rests on Extraterritorial Conduct.

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). In keeping with that premise, courts presume "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quotation marks omitted). That presumption against extraterritoriality compels reversal of Scott's money-laundering conspiracy conviction, because the Government failed to provide sufficient evidence from which the jury could rationally find beyond a reasonable doubt that the funds Scott handled were derived from a domestic wire fraud. *See, e.g., United States v. Laurent*, 33 F.4th 63, 75 (2d Cir. 2022) (sufficiency challenge reviewed de novo).

Concealment money laundering requires proof that the money Scott managed "in fact involve[d] the proceeds of specified unlawful activity," or that he designed transactions to "conceal or disguise the nature ... of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i); *see* A-550-51 (jury charge). Only certain offenses, however, may serve as "specified unlawful activity."

42

18 U.S.C. § 1956(c)(7) (referencing 18 U.S.C. § 1961(1)).  Here, the Government charged a single "specified unlawful activity": "a wire fraud scheme involving a purported cryptocurrency known as 'OneCoin,' in violation of Title 18, United States Code, Section 1343."  A-50-51.  The District Court instructed the jury accordingly.  A-550.  Thus, it was "an essential element of the money laundering count[]," *see United States v. Zvi*, 168 F.3d 49, 56 (2d Cir. 1999), not just that OneCoin was a fraud, but that Scott transacted or conspired to transact in funds that were proceeds of a "wire fraud" prohibited by 18 U.S.C. § 1343.

The wire-fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially. *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325.[5]  OneCoin could thus be a "wire fraud" prohibited by Section 1343 only if it were shown to have involved a sufficient "domestic application" of the statute.  *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 633 (2021) (quoting *RJR Nabisco*, 579 U.S. at 337).  To make that showing, the Government needed to prove that "(1) the defendant used domestic … wires in furtherance of a scheme to defraud, and (2) the use of the … wires was a core component of the

---

[5] Although 18 U.S.C. § 1956(f) expressly provides for "extraterritorial jurisdiction over the conduct prohibited by this section" in certain circumstances, that provision applies only to extraterritorial money laundering.  It does not expand the jurisdictional reach of the underlying offenses that can constitute "specified unlawful activity" (e.g., wire fraud), which are not themselves "conduct prohibited by [§ 1956]."  *Id.*; *see United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 71-72 (S.D.N.Y. 2015).

scheme to defraud." *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *see also United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020). "[I]ncidental" use of domestic wires is insufficient; "the use of the … wires must be essential … to the scheme to defraud." *Id.*

At Scott's trial, the Government failed to prove "the centrality of the domestic use of wire transfers to the alleged foreign scheme." *Napout*, 963 F.3d at 181. Konstantin testified extensively about OneCoin's operations in Bulgaria, Dubai, Hong Kong, London, and South Korea. A-81-82, 104. But he said practically nothing about the United States, which he visited in February 2019, *after* the charged money-laundering conspiracy had ended, A-50, and in connection with a "*new* Ponzi scheme." A-99-100 (emphasis added). In any case, such "[e]vents merely incidental to the violation of a statute do not have primacy for the purposes of the extraterritoriality analysis." *Bascuñán*, 927 F.3d at 122. Konstantin never testified, nor did the Government introduce other evidence, that any of the limited number of foreign individuals who knew that OneCoin was a fraud ever sent wires to, or caused wires to be sent from, the United States. And what little evidence there was indicated that Ruja sought to avoid "not being 'legal' in U.S.A." A-673. There was thus nothing to suggest that the OneCoin scheme "was directed to (or from) the United States." *See Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61

(2d Cir. 2014) (summary order) (affirming dismissal of RICO claim predicated on extraterritorial fraud).

To the extent the Government showed any fraud activity within the United States, it consisted of testimony from two individual witnesses—William Horn of Tennessee and Linda Cohen of New York—who lost a combined $54,000 buying OneCoin months before the Fenero Funds were operational. A-66, 69, 247, 249. That amount represented an infinitesimal fraction of the entire OneCoin scheme. The Government provided no evidence linking the individuals who sold Cohen and Horn "trading packages" (Cohen's son and Horn's acquaintance) back to Ruja or the other OneCoin principals. And the Government offered little proof that Cohen's or Horn's money eventually made its way into the Funds. Evidence that minimal OneCoin activity may have leaked into the United States through a potentially lengthy chain of unindicted third parties does not show that the scheme was "domestic" for purposes of the federal wire-fraud statute. "[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel" based on such tenuous and comparatively slight connections to domestic misconduct. *See Morrison*, 561 U.S. at 266. Because the Government thus failed to prove that the funds Scott handled were "proceeds" of a "wire fraud" prohibited by 18 U.S.C. § 1343, his money-laundering conspiracy conviction should be reversed.

45

**B.**     **The District Court Erred by Declining To Instruct the Jury on Extraterritoriality.**

Scott's money-laundering conspiracy conviction should also be reversed because the District Court erred by failing to instruct the jury that it needed to find that the OneCoin fraud scheme had a sufficient U.S. nexus. *See United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000) (jury instructions reviewed de novo).[6]  On November 20, 2019, the District Court charged the jury and dismissed them, ordering them to return the next day to begin deliberations.  That evening, Scott requested a supplemental instruction on extraterritoriality, explaining that the wire-fraud instruction, as given, could allow the jury to improperly find that Scott managed the proceeds of a "wire fraud" even if the jury believed that substantially all the proven conduct relevant to the OneCoin fraud scheme took place outside the United States.  Dkt. 181.

The District Court declined to give that instruction, reasoning that there was "evidence in the record concerning domestic transactions that are part of the alleged wire fraud scheme," and speculating that, in addition to "[t]he two witnesses that did

_____

[6] This claim should be reviewed *de novo* because it was raised before the jury began its deliberations.  *See* Fed. R. Crim. P. 30(d) (challenge to instructions preserved if raised "before the jury retires to deliberate"); *United States v. Requena*, 980 F.3d 30, 48 (2d Cir. 2020) (objection reviewed only for plain error when not raised before jury "retired to deliberate").  The result is the same under plain-error review, however, because the District Court's error is evident on the face of the record and because—in light of the extensive evidence presented at trial about *foreign* fraud activity and meager connections to the United States, there is a considerable likelihood that error affected the jury's verdict.

testify—I'm sure more could have testified, I assume—each indicated that they were part of a larger group of people that invested in OneCoin." A-566. The District Court thus concluded that there was "certainly sufficient information for the jury to determine that venue is appropriate here, and that jurisdictionally there were or could have been wires … that traveled between states and foreign jurisdictions." *Id.*

The District Court erred by declining to give the requested supplemental instruction. A defendant is entitled to a jury instruction that accurately states the law and which "reflects any defense theory for which there is a foundation in the evidence." *United States v. Kwong*, 69 F.3d 663, 667 (2d Cir. 1995) (quotation marks omitted). There was a solid "foundation in the evidence" for Scott's defense that the Government had not shown that the OneCoin scheme involved sufficient domestic conduct. *See supra* Part III.A. And the proposed extraterritoriality instruction, Dkt. 181 at 2, accurately stated the law, which makes clear that the wire-fraud statute does not apply extraterritorially.

The District Court's decision not to give an extraterritoriality instruction based on its view of the evidence inappropriately intruded on the jury's factfinding role. Whether the defendant transacted in proceeds of the charged specified unlawful activity is an essential element of the offense of concealment money laundering. *See also United States v. Mickens*, 926 F.2d 1323, 1330 (2d Cir. 1991). It was therefore the jury's job to decide whether OneCoin was a wire fraud

47

prohibited by 18 U.S.C. § 1343. To fulfill that responsibility, the jury needed to decide whether the Government had shown that the fraud was sufficiently domestic to fall within the scope of the wire-fraud statute. *See Morrison*, 561 U.S. at 254 (noting that extraterritoriality is a "merits question"); *Napout*, 963 F.3d at 180-81 (finding domestic application of the wire fraud statute in light of the evidence adduced at trial).[7] By declining to give such an instruction based on its own view of the sufficiency of the evidence, the District Court appropriated a factual finding reserved to the jury by the Sixth Amendment. *See United States v. Perez*, 962 F.3d 420, 440, 444 (9th Cir. 2020) (reversing one count of conviction based on the district court's failure to properly instruct the jury on extraterritoriality). Moreover, in making that finding, the District Court manifestly erred in assessing the evidence and speculating that "more [witnesses] could have testified" had the Government called them. A-566. Given the exceedingly thin evidence regarding the use of U.S. wires as a part of the OneCoin scheme—a handful of wires totaling $54,000—that "constitutional error" was not harmless beyond a reasonable doubt. *Id.* at 441; *United States v. Cabrera*, 13 F.4th 140, 151 (2d Cir. 2021).

---

[7] *See also United States v. Epskamp*, 832 F.3d 154, 169 (2d Cir. 2016) (trial record contained sufficient evidence that charge was not extraterritorial); *United States v. Vilar*, 729 F.3d 62, 77 (2d Cir. 2013) (same).

48

### C.      Scott's Sentence Impermissibly Reflects Non-U.S. Conduct.

Scott also adopts by reference the arguments raised by Defendant-Appellant Sebastian Greenwood in Part I of his brief.  *See* Greenwood Br. 19-46, ECF 46.1; Fed. R. App. P. 28(i).  Greenwood explains why the District Court erred by including purely foreign conduct in the calculation of Greenwood's Guidelines sentencing range and forfeiture amount.  Those arguments apply equally to Scott, whose Guidelines sentencing range was dramatically inflated by the District Court's erroneous decision to calculate his base offense level using the total nearly $400 million Scott allegedly "laundered" rather than only the proceeds that the Government even arguably showed could have been derived from domestic wire-fraud activity.  A-853-54, 856; *see* U.S.S.G. 2B1.1(b)(1), 2S1.1.  For the reasons explained by Greenwood and which Scott raised below, *see* A-853-55; Dkt. 606 at 14-17, this was error.  Even if the Court affirms Scott's convictions, his sentence and the order of forfeiture should be vacated and the case remanded for resentencing.

Although the District Court imposed the same sentence for Scott's bank-fraud conspiracy conviction, resentencing is nevertheless required because the two counts were grouped for Guidelines purposes and the sentence determined based on the money-laundering conspiracy conviction alone.  Because the bank-fraud conspiracy charge was premised on statements Scott and Armenta allegedly made to induce banks to transfer their money to others, there was no actual or intended loss to a

49

financial institution from that alleged conspiracy. The 120-month sentence was thus

an order of magnitude greater than the recommended Guidelines sentencing range

for a "sophisticated" but zero-loss bank-fraud conspiracy. U.S.S.G 2B1.1(a), (b)(1)-

(2), (10), 2X1.1(a); *see also* A-826-27 (calculating 6-12 month Guidelines range for

codefendant who pleaded guilty to conspiracy to commit bank fraud).

## IV.  The Bank-Fraud Conspiracy Conviction Cannot Stand.

### A.  The Government Failed to Adduce Sufficient Evidence that Scott Conspired to Defraud a Federally Insured Bank.

Finally, this Court should also reverse Scott's conviction for bank-fraud

conspiracy because there is no evidence by which "any rational trier of fact could

have found the essential elements of th[at] crime beyond a reasonable doubt."

*United States v. Flores*, 945 F.3d 687, 710 (2d Cir. 2019) (emphasis omitted). To

convict Scott of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344,

the jury needed to find that he entered into an agreement to "knowingly execute[] …

a scheme or artifice" either (1) to defraud a bank or (2) to obtain money or other

property from a bank by false or fraudulent pretenses, representations, or promises.

*Id.*[8]  The defrauded bank must be federally insured. 18 U.S.C. § 20(1). Despite

---

[8] The District Court did not instruct the jury that it needed to agree on which prong of 18 U.S.C. § 1344 Scott supposedly conspired to violate. A-553. Circuit precedent forecloses the argument the bank-fraud conspiracy charge was duplicitous because the two "entirely distinct statutory phrases" of § 1344, *Loughrin v. United States*, 573 U.S. 351, 357 (2014), criminalize distinct offenses, *United States v. Crisci*, 273 F.3d 235, 238-39 (2d Cir. 2001) (per curiam), which is noted here only to preserve it for further review.

claiming that Scott "peddled lies to banks," A-58, the Government identified no such lies, relying instead on allegedly false statements that were made to Apex (which is not a bank) or which Scott was not shown to have known about, A-519-20, A-526-27. Such statements cannot sustain his conviction.

### 1. The Armenta/Fates transactions

Much of the Government's evidence on bank fraud concerned transactions in which alleged co-conspirator Gilbert Armenta transferred to the Fenero Funds money he held on Ruja's behalf in U.S. banks Morgan Stanley and Sabadell United. To effect those transfers, Armenta told his banks they were to fund an "investment into ZIIXI … and XII" and "for asset management." A-260. Armenta also told Morgan Stanley that Fenero was "a private equity firm that invests, among other things, in renewal [sic] energy (i.e. windmills)" and that the investment was being made for "working capital." A-264; A-652-53, 657, 670-71.

That evidence shows that *Armenta* lied to *his banks*, but not that Scott knew Armenta would tell such lies or suggested that he do so. At most, the Government showed that Scott knew that Armenta needed to send money to Ruja, A-680, and that Scott *later* sent Armenta a draft investment-management agreement, which arguably implied that Scott understood that Armenta would describe the transfers as investments, A-684-715. What was less clear, however, was why an unadorned statement that Armenta was investing in the Fenero Funds would have been

51

materially false. The District Court concluded that because Scott supposedly knew that Armenta's money was derived from OneCoin and that banks were blocking transactions involving OneCoin, he must have known that Armenta would lie to his banks to conduct the transaction. SPA-18. But that conclusion rests on three premises, none of which was substantiated: (1) that Armenta was required to affirmatively disclose that he was making these transfers as part of a plan to pay back Ruja; (2) that the banks would not have accepted a more cursory but accurate description (e.g., that the transfers were intended to fund BVI-registered funds); or (3) that the money Armenta sent was actually wired from OneCoin and not from some other source. Accordingly, Armenta's unilateral statements to his banks are not evidence that Scott conspired to commit bank fraud.

### 2. The CryptoReal transaction

The Government also pointed to the CryptoReal transaction, which it argued constituted bank fraud because Scott's statement to Apex that a wire was a "Loan to CryptoReal Investment Trust Ltd. (BVI)/Martin Breidenbach for Acquisition of Madagascar Oil Field" was allegedly false and because Apex passed that description to the Funds' bank, which relayed it in turn to the federally insured bank BNY Mellon. A-403, 420. The District Court concluded that this evidence was sufficient to prove bank fraud conspiracy because a jury could have concluded that the loan to CryptoReal was a sham and that Scott knew that the transfer would necessarily flow

52

through a New York bank. SPA-15-16 (citing GX-1391 (reproduced at A-716)). Both conclusions were erroneous.

*First*, the Government never proved that the statement that the transaction was a "loan" was materially false. The Government's argument that the transaction was not a bona fide loan turned on an email Scott sent Ruja stating that the proceeds of the transfer were "available cash." A-716, *see* A-361, 523. But that email is not at all inconsistent with the transaction's being a loan—the point of a loan is *often* to generate available cash for the recipient—and thus cannot yield a reasonable inference that the description of the transaction as a "loan" was incorrect.

*Second*, even if that description had been false, the Government did not prove beyond a reasonable doubt that Scott knew it would be relayed third-hand to BNY Mellon or any other U.S. bank. To be sure, the Government presented evidence that U.S.-dollar international transfers are *typically* processed through U.S. correspondent banking accounts, A-225, 256, 271, 419, and suggesting that Scott knew that U.S.-dollar investments *into* the Fenero Funds would pass through BNY Mellon, A-480. But the Government never proved that Scott had any particular knowledge or belief about how the outbound transfer would be handled, or that any misrepresentations he made to Apex—which is not a bank—would not only be relayed to the Funds' bank but also to *that bank*'s correspondent bank.

\* \* \*

53

Absent evidence that Scott conspired to defraud a federally insured bank, his conviction for bank-fraud conspiracy cannot be upheld on the theory that the jury could have concluded that he conspired to lie to some other "financial institution." 18 U.S.C. §§ 20, 1344. When Scott asked the Government to identify the particular institutions it claimed he defrauded, the Government responded that its bank-fraud conspiracy charge was based on transactions that "include[d] but [were] not limited to" the Armenta/Fates and CryptoReal transactions discussed above. Dkt. 160 at 3. At trial, the Government elicited testimony about whether a spate of *other* banks were federally insured, but never adduced evidence that Scott entered into any conspiracy to defraud or obtain property from those banks. *See* A-403, 418, 461. And while the Government presented evidence that Scott was not transparent with Apex about the ultimate ownership of the Funds' capital, omissions or misrepresentations made to Apex are by themselves insufficient to prove a conspiracy to defraud a financial institution. This Court has rejected similar efforts to stretch the bank-fraud statute to cover misrepresentations made to other nonbank financial institutions. *See United States v. Bouchard*, 828 F.3d 116, 124-25 (2d Cir. 2016) (fraud on bank-owned and funded nonbank mortgage lender insufficient). This Court should do the same here and conclude that the Government's evidence of bank-fraud conspiracy was so "nonexistent or … meager that no reasonable jury

54

could find guilt beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 20, 286 (2d Cir. 2016).

### B.   The Government Failed to Establish Venue.

To the extent the Court reverses Scott's money-laundering conspiracy conviction, it should also reverse his bank-fraud conspiracy conviction on the grounds that, at minimum, venue was improper.

### 1.   The District Court erred in instructing the jury as to venue.

The District Court's cursory instruction with respect to venue erroneously relaxed the Government's burden to prove venue for that count. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). "Venue in criminal cases is far more than a technicality ...." *United States v. Auernheimer*, 748 F.3d 525, 529 (3d Cir. 2014). In conspiracy prosecutions, venue is proper in a district in which an overt act in furtherance of the conspiracy took place *only if* "the act was performed (1) by any conspirator, and (2) was undertaken for the purpose of accomplishing the objectives of the conspiracy." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) (quotation marks omitted). Even then, it must be "reasonably foreseeable to each defendant charged ... that a qualifying overt act would occur in the district." *Id.* (quotation marks omitted). Yet the District Court omitted that requirement from the instructions it gave the jury, which directed the jury that it needed to find only that "any act in furtherance of the crime" occurred in

55

the District. A-554; *see also* A-519. The District Court's instruction effectively nullified that requirement, allowing the jury to find venue based on nothing more than evidence that *some third-party* bank took *some action* in Manhattan to effect a transfer.

### 2. The Government failed to prove venue.

For much the same reasons that the Government failed to provide sufficient evidence to sustain Scott's bank-fraud conspiracy conviction, it also failed to prove venue. Scott is a Florida resident. Although his financial transactions involved jurisdictions from the British Virgin Islands to Bulgaria, no transactions were conducted from or targeted New York. Accordingly, venue in the Southern District of New York could be proper only if it was foreseeable to Scott that conduct in furtherance of the transactions at issue would take place at least in part in that District. *See, e.g.*, *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (venue proper only if it has in some way "been freely chosen by the defendant" (quotation marks omitted)). But the Government proved neither that Scott should have known that his U.S.-dollar transactions would be cleared in this District—indeed, even the Morgan Stanley employee who testified could not recall where in New York her own bank processed transactions, A-262—nor that Scott had any notion whether Armenta (who had lied to him repeatedly) kept accounts in New York banks or through where those transfers would pass. Absent evidence that venue in New York

56

was in some sense foreseeable to Scott, the bank-fraud conspiracy conviction cannot stand.

*    *    *

The Government failed to prove that Scott conspired either to launder the proceeds of a wire fraud or to defraud a bank.  Even if the Government presented evidence to sustain those charges, the Government's reliance on perjured testimony, the District Court's erroneous exclusion of impeachment evidence, and its exclusion on legally and factually erroneous grounds of key defense evidence together deprived Scott of a fair trial.

## CONCLUSION

This Court should reverse or vacate Scott's convictions and sentence.

Date:  May 29, 2024

Respectfully submitted,

/s/ S. Conrad Scott
S. Conrad Scott
Arlo Devlin-Brown
Nicholas G. Miller
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 841-1249
Fax: (646) 441-9249
cscott@cov.com

*Counsel for Defendant-Appellant*
*Mark S. Scott*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this document complies with Local Rule 32(a)(4)(A) because this document contains fewer than 14,000 words. This document contains 13,598 words, as calculated using the Word Count feature in Microsoft Word 365, and excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

May 29, 2024

/s/ S. Conrad Scott
S. Conrad Scott

*Counsel for Defendant-Appellant*
*Mark S. Scott*

58

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, I caused the foregoing Brief of Defendant-Appellant Mark S. Scott and accompanying Appendix to be filed electronically using the Court's ACMS system. I further certify that all participants in the case are registered ACMS users, and that service on all parties will be accomplished electronically by the ACMS system. I further certify that I caused six paper copies of the Joint Brief and accompanying Appendix to be delivered to the Court by overnight hand delivery.

May 29, 2024                                /s/ S. Conrad Scott
                                            S. Conrad Scott

                                            *Counsel for Defendant-Appellant*
                                            *Mark S. Scott*

SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order Denying Post-Trial Motions (Sept. 14, 2023)
(Dkt. 577) ..................................................... SPA-1

Judgment (Feb. 2, 2024) (Dkt. 611) ................................. SPA-39

Amended Judgment (Feb. 12, 2024) (Dkt. 623) ...................... SPA-46

18 U.S.C. 1344 ................................................. SPA-53

18 U.S.C. 1956 ................................................. SPA-54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– *against* –

MARK S. SCOTT,

Defendant.

**OPINION & ORDER**

17-cr-630 (ER)

Ramos, D.J.:

Mark Scott was convicted on November 21, 2019 of conspiracy to commit bank fraud and conspiracy to commit money laundering.  Before the Court are Scott's motions for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33.  For the reasons set forth below, the motions are DENIED.

## I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.  The OneCoin Scheme

OneCoin was founded in 2014 by Ruja Ignatov ("Ruja") and Sebastian Greenwood.  Doc. 244 at 9.  It is headquartered in Sofia, Bulgaria and began operating in the United States in or around 2015.  *Id.* at 7.  OneCoin markets and sells a purported digital cryptocurrency by the same name.  *Id.*  Approximately 3.5 million people have invested in OneCoin cryptocurrency packages, and OneCoin has taken in over $2 billion in proceeds.  *Id.*  It is undisputed that OneCoin is a fake cryptocurrency:  it is in fact a global multi-level marketing pyramid scheme.  *See* Doc. 477 (Apr. 25, 2022 Hr'g Tr.) at 4:12–21; Trial Tr.[1] at 1904:17–18 (Def. Summation) ("OneCoin is a scam.  We're not going to fight that battle.").

---

[1] Docs. 185, 187, 189, 191, 193, 195, 197, 199, 201, 203, 205, 207, and 209 collectively comprise the full transcript of Scott's trial from November 4, 2019 to November 21, 2019.  The Court cites them collectively as "Trial Tr."

In other words, OneCoin was an elaborate fraud premised on innumerous misrepresentations.  For instance:

- OneCoin claimed that the cryptocurrency was "mined," and its value was based on market supply and demand:  as more members joined OneCoin, demand for the tokens, and therefore their price, grew.  Doc. 244 at 8.  The purported value of a OneCoin grew steadily, without ever decreasing, from €0.50 to approximately €29.95 in January 2019.  *Id.*  In fact, OneCoins were not mined, but were instead auto-generated and distributed to members as needed.  *Id.* at 9–10.  Moreover, the value of OneCoin was set internally, not based on market supply and demand.  *Id.* at 9.

- OneCoin alleged that it had a private "blockchain" (*i.e.*, digital ledger of tokens and transactions), which had even been externally audited.  *Id.* at 8.  In fact, the audit report was fake and had been created by OneCoin employees.  *Id.*

- OneCoin also purported that it would have public and foreign exchanges to allow investors to buy, sell, or trade OneCoins for fiat currency and that it would have an investment fund where investors could invest OneCoin in real assets.  *Id.* at 10.  In fact, none of these representations were true.  *Id.*

**B.  Scott's Involvement with OneCoin**

As financial institutions around the world began to recognize OneCoin as a fraud, they grew unwilling to provide banking services to OneCoin, preventing the organization from opening bank accounts in its name.  *Id.* at 11.  OneCoin needed to conceal the origin of its funds, as well as the purpose of the transfers into and out of its bank accounts.  *Id.* Gilbert Armenta, Ruja's boyfriend and a money launderer for OneCoin, introduced Scott to Ruja as someone who could provide a solution to OneCoin's banking troubles in 2015. *Id.* Scott, a corporate lawyer who was then a partner at an internationally recognized law firm, had extensive experience representing private equity funds, and he leveraged that experience to construct an elaborate, sophisticated money laundering operation for OneCoin.  *Id.*

In April 2016, before Scott received any OneCoin funds, Irina Dilkinska, OneCoin's chief money launderer, sent Scott an email of an article by a U.S.-based certified public accountant who detailed many indicia that OneCoin was a fraudulent pyramid scheme.  Doc. 412 at 10–11.  Scott was also informed that banks around the

2

world had blocked OneCoin's accounts and that the City of London Police were investigating OneCoin. *Id.* at 11. Nonetheless, Scott agreed to work with OneCoin.

     1. *Scott Set Up the Fenero Funds and Concealed All Traces of OneCoin Involvement*

From late 2015 to early 2016, Scott set up a series of investment funds in the British Virgin Islands and Cayman Islands (collectively, "the Fenero Funds"), each with its own offshore bank account in the Cayman Islands. Doc. 244 at 11–12. From May to October 2016, the Fenero Funds received wire transfers of €364 million and $10 million in alleged "investments." *Id.* at 13. The transfers originated from approximately ten different bank accounts, all for various shell corporations owned by OneCoin co-conspirators, held at banks in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. *Id.* On paper, the shell corporations were "investors" in the Fenero Funds, but the money they transferred into the Fenero Funds was in fact all money derived from OneCoin. *Id.* In total, Scott laundered approximately $400 million of OneCoin proceeds through the Fenero Funds. *Id.* at 6.

Scott worked to meticulously conceal from the banks any connection between OneCoin and the purported investors in the Fenero Funds. *Id.* at 15. He knew that any reference to OneCoin would, in his words, "kill this for us." Doc. 412 at 9. Indeed, when a series of loans and suspicious transactions triggered Apex Group Ltd. ("Apex")—an investment fund administrator that Scott hired, which was responsible for conducting anti-money laundering and "Know Your Customer" checks—to conduct enhanced due diligence on the Fenero Funds in July and August 2016, Scott repeatedly lied to hide the connection between OneCoin and the Fenero Funds. Doc. 244 at 15–16. When Apex sought additional information on the source of wealth for the investors in the Fenero Funds, Scott drafted fraudulent letters of comfort for two other attorneys to put on their letterhead and sign, created and sent backdated wire instruction letters, and forged a series of agreements to attempt to justify the large volume of transfers to and from the

3

**SPA-4**

Fenero Funds.  *Id.* at 16–17.  Scott went so far as to instruct Dilkinska to sign the documents with different pens and e-sign others to hide the forgeries.  *Id.* at 17.  Apex concluded the documents Scott provided were fraudulent and created to conceal the relationship with OneCoin.  *Id.*  Apex also held a series of emergency meetings and began to notify government agencies concerning OneCoin's involvement.  *Id.* at 16.  When Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex, during which he continued to lie to Apex about the source of the money in the Fenero Funds.  *Id.* at 17–18.

> *2.  Scott Lied to U.S. Federally Insured Banks to Effectuate Transfers of OneCoin Proceeds Into and Out of the Fenero Funds*

Three sets of fraudulent transactions were particularly relevant because of the involvement of U.S. federally insured banks.

> *a.  The CryptoReal Loan (July 2016)*

In July 2016, Scott disguised the transfer of OneCoin funds by "loaning" $30 million from the Fenero Funds to CryptoReal Investments Trust Ltd. ("CryptoReal").  *Id.* at 18.  Scott and another lawyer, Martin Breidenbach, represented to Apex that Breidenbach was the ultimate beneficial owner of CryptoReal (though the transfer was in fact of Ruja's funds and on her behalf), and that the loan was for CryptoReal to purchase an oil field in Madagascar from Barta Holdings Ltd. ("Barta").  *Id.*  Because Apex transferred the funds in U.S. dollars ("USD") between CryptoReal's DMS Bank account in the Cayman Islands and Barta's DBS Bank account in Hong Kong, the transfer used a USD correspondent account at Bank of New York Mellon ("BNY Mellon") in Manhattan. *Id. at* 18–19.  While neither Apex, DMS Bank (Cayman), or DBS Bank (Hong Kong) are federally insured, BNY Mellon is.  Doc. 218 at 26.

> *b.  The Armenta Investment Transactions (June & September 2016)*

In June 2016, Scott received transfers totaling approximately $5 million into the Fenero Funds from a U.S. Morgan Stanley account in the name of "Fates Group LLC,"

which was controlled by Gilbert Armenta.  Doc. 244 at 19; *see also* Doc. 160, Ex. B

(Gov't Oct. 7, 2019 Letter in Response to Scott's Request for Particulars).[2]  Similarly, in

September 2016, Scott received a transfer into the Fenero Funds of approximately $5

million from an account at U.S. Sabadell also in the name of "Fates Group LLC."  *Id.*

These transfers purported to be investments in the Fenero Funds, and Armenta

represented to Morgan Stanley and Sabadell that the Fenero Funds were a private equity

firm that invested in, among other things, renewable energy enterprises like windmills.

Doc. 244 at 19.  Despite knowing that his Fenero Funds were not legitimate investment

funds, Scott had Armenta sign an investment agreement purporting that the transfers to

the Fenero Funds were for investment purposes.  *Id.* at 37 (citing GX[3] 1140).  The

Government alleged that Scott was aware of and complicit in Armenta's

misrepresentations and knew that the funds were in fact OneCoin proceeds, not legitimate

investments.  *Id.*

### C.  Indictment and Arrest

On August 21, 2018, Scott was charged in a one count indictment for conspiracy

to commit money laundering, and an arrest warrant was issued the same day.  Docs. 6, 8.

He was arrested on September 5, 2018.  Doc. 11.

By superseding indictment, Scott was further charged with conspiracy to commit

bank fraud on October 8, 2019.  Doc. 143.  Count Two read in full:

> From at least in or about September 2015 through in or about 2018,
> in the Southern District of New York and elsewhere, MARK S.
> SCOTT, the defendant, and others known and unknown, willfully
> and knowingly did combine conspire, confederate, and agree to-
> gether and with each other to commit bank fraud, in violation of Ti-
> tle 18, United States Code, Section 1344.
>
> It was part and object of the conspiracy that MARK S. SCOTT, the
> defendant, and others known and unknown, willfully and

---

[2] The Government's October 7, 2019 letter was never filed on the docket, but it was emailed to the Court under seal when Scott attached it to his letter to the Court (Doc. 160).  The Court cites to the sealed exhibit.

[3] GX designates Government trial exhibits.  DX designates Defense trial exhibits.

> knowingly, would and did execute and attempt to execute a scheme
> and artifice to defraud a financial institution, the deposits of which
> were then insured by the Federal Deposit Insurance Corporation
> ("FDIC"), and to obtain moneys, funds, credits, assets securities,
> and other property owned by, and under the custody and control of,
> such financial institution, by means of false and fraudulent pre-
> tenses, representations, and promises, to wit, SCOTT and others
> misrepresented and omitted material facts to banks and other finan-
> cial institutions worldwide to cause those financial institutions, in-
> cluding FDIC-insured financial institutions in the United States, to
> transfer funds into and out of accounts associated with purported
> investment funds operated by SCOTT and others, in violation of Ti-
> tle 18, United States Code, Section 1344.

*Id.* ¶¶ 4–5.

### D. Trial

Scott's trial lasted from November 5, 2019 to November 20, 2019.  In addition to hundreds of exhibits, including dozens of Scott's own emails, the Government also offered the testimony of dozens of witnesses.  Doc. 244 at 6–7.  These witnesses included OneCoin victims; a money laundering expert; employees and directors of financial institutions; and a financial intelligence analyst who traced OneCoin's criminal proceeds through the Fenero Funds.  *Id.*  The Government also offered testimony from Konstantin Ignatov ("Konstantin"), Ruja's brother and one of OneCoin's top leaders, who testified as a cooperating witness for the Government.  *Id.*

The bulk of Konstantin's testimony on direct examination concerned OneCoin's operations, including an explanation of its fraudulent multi-level marketing structure. Doc. 412 at 15–16.  Konstantin also testified at a high level as to OneCoin's difficulties obtaining banking services and its use of money launders, including Scott, to circumvent those issues.  *Id.* at 16.  However, Konstantin had only met Scott once and had no substantive conversations with him.  *Id.*  The sole meeting occurred during a July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia ("the Meeting").  Trial Tr. at 243:24–247:7.  Konstantin testified that Scott arrived at the office around noon and made small talk with Konstantin (who was at the time operating as

Ruja's personal assistant); Konstantin got Scott something to drink and then escorted him into Ruja's office, at which point Konstantin left. *Id.* at 245:19–23. Ruja then asked Konstantin to bring in Dilkinska; he did so, and then left again. *Id.* at 245:24–246:6. Ruja then "called [Konstantin] again and told [him] to make sure that everybody on this floor leaves and goes home so that Irina [Dilkinska], Mark [Scott], and Ruja are alone." *Id.* at 246:8–10. Konstantin testified this was the only time Ruja ever cleared out an office floor. *Id.* at 246:11–13. Konstantin left with the others and did not participate in the meeting. *Id.* at 246:14–247:7. Indeed, Konstantin testified that his only knowledge of the discussions at the Meeting came second-hand from Dilkinska and Ruja and was merely that it lasted a "a long time . . . until Mark Scott understood everything that has to be done or he has to do." *Id.* at 246:25–247:1.

Konstantin also testified concerning events that transpired when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019. He testified that when he arrived at the airport, a OneCoin laptop he was carrying was seized and then returned by a border patrol officer a short time later. *Id*. at 205:4–206:16. After he got the laptop back, Konstantin testified he "put [the laptop] into a paper trash bag with other trash items, and [he] took it to a trash bin on a busy place in the Las Vegas Strip, and [he] threw it away into the trash bin there." *Id*. at 206:20–23. He said he did so because he "was afraid that somebody might find more evidence connecting [him] to OneCoin." *Id.* at 206:25–207:1.

On cross-examination, Scott extensively impeached Konstantin about Konstantin's purported dishonesty and especially about his limited interactions with Scott. Doc. 412 at 16–17 (citing Trial Tr. at 302–06, 324–46, 404–18). For instance, Scott confirmed that Konstantin had only met Scott once; never spoke with Scott by phone call, text message, or WhatsApp; and that their limited email communications were merely about logistics concerning meetings between Scott and Ruja. Trial Tr. at 301:22–307:4. Moreover, Konstantin's understanding that Scott was a money launderer

**SPA-8**

was based on information Dilkinska told him, but Konstantin did not have personal knowledge of Scott's involvement with OneCoin.  *Id.* at 404:19–405:8.  Additionally, Konstantin was not present for nor was ever told the content of the discussions at the Meeting.  *Id.* at 304:19–305:14.  And, when Scott's counsel thrice pressed Konstantin whether he was "a hundred percent sure that Ms. Dilkinska was at" the Meeting, Konstantin said he was "pretty sure" but not a hundred percent.  Trial Tr. at 304:3–18.

Scott was found guilty of both counts on November 21, 2019.  Doc. 182.

### E. Post-Trial

Scott moved for a judgment of acquittal or, in the alternative, a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 on February 4, 2020.  Doc. 217.  He alleged there was insufficient evidence to sustain a conviction on either count.  *Id.*  He further challenged whether venue was proper and alleged several errors with the jury instructions.  *Id.*

On June 29, 2021, Duncan Arthur, a former OneCoin associate turned whistleblower, spoke briefly with and then emailed Matthew Winters, an investigator with the Manhattan District Attorney's Office (which had jointly investigated and prosecuted OneCoin alongside the U.S. Attorney's Office for the Southern District of New York), who was at that time assigned to work with the City of London Police.  Docs. 433, 434-4, 434-15.  Arthur reported that he had read Konstantin's testimony from Scott's trial, and that Konstantin had lied:  specifically, he reported that Konstantin had not thrown the OneCoin laptop in the trash in Las Vegas as he testified but had in fact given it to Arthur to return it to OneCoin in Sofia.  Doc. 434-4.  Ten days later, on July 9, 2021, Arthur also reported Konstantin's perjury to Katri A. Stanley, a member of Scott's defense team at the law firm Covington & Burling LLP.  Aug. 23, 2021 Stanley Decl. ¶¶ 1–2.

Based on Arthur's allegations, on August 23, 2021, Scott filed a supplemental motion for a new trial pursuant to Rule 33.  Doc. 410.  He argued that, had the jury

known that Konstantin lied about the laptop, it would not have credited Konstantin's testimony nor, consequently, found Scott guilty of either offense. *Id.* Although Winters said he intended to immediately forward Arthur's email to the FBI, he inadvertently failed to do so until August 25, 2021—after Scott's supplemental motion. Doc. 434-4. The supplemental motion Scott filed was thus the first time that prosecutors became aware of the falsity of Konstantin's testimony about the laptop. Doc. 412 at 18–19.

On reply in support of his supplemental motion, Scott further argued that Konstantin also lied about the Meeting because Dilkinska had in fact been in India at the time when Konstantin testified that she was in Sofia meeting with Scott and Ruja. Doc. 433 at 14–16. Scott alleged that, after the Government's opposition to his supplemental motion was filed, "a source" provided Scott with a copy of Dilkinska's passport, and the stamps therein showed that she was in India during the same time that Konstantin alleged she was at the Meeting. *Id.* at 9. And on December 3, 2021, the Government confirmed to Scott the accuracy of the passport stamps; Dilkinska had arrived in India on July 19, 2016 and departed on July 22, 2016. *Id.* Scott further asked that the Court take into consideration that Konstantin breached his cooperation agreement by using a contraband cellphone at the Metropolitan Correctional Center ("MCC") and that the Government delayed in disclosing the violation to Scott. *Id.* at 10; Doc. 461 at 46.

## II.  LEGAL STANDARDS

### A.  Rule 29

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." To succeed on a Rule 29(a) motion, the defendant must show, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly

possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted). It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Guadagna*, 183 F.3d at 130). In assessing the sufficiency of the evidence supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017)). Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion. *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)). The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citation omitted); *see also United States v. Aleskerova*, 300 F.3d 286, 292–93 (2d Cir. 2002).

The Court's "deference to the jury's findings is especially important" in conspiracy cases, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Coplan*, 703 F.3d at 62 (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)). "In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of

its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).
"The record must . . . permit a rational jury to find: (1) the existence of the conspiracy
charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the
defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70
(2d Cir. 2008) (internal citations omitted). To prove a defendant joined a conspiracy, the
government must show that he "knew of the conspiracy" and "joined it with the intent to
commit the offenses that were its objectives." *United States v. Ceballos*, 340 F.3d 115,
123 (2d Cir. 2003) (internal citations omitted); *see also United States v. Lange*, 834 F.3d
58, 76 (2d Cir. 2016) ("On a charge of conspiracy, the Government must prove
(1) knowing participation or membership in the scheme charged and (2) some knowledge
of the unlawful aims and objectives of the scheme." (internal quotation marks and
citation omitted)). "The government's proof of an agreement does not require evidence of
a formal or express agreement; it is enough that the parties have a tacit understanding to
carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir.
1989) (internal quotation marks and citation omitted). "The government need not prove
the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply
the defendant's awareness of the 'general nature and extent' of the conspiracy." *United
States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (citation omitted). "[T]he elements of
a conspiracy may be proved by circumstantial evidence." *United States v. Svoboda*, 347
F.3d 471, 477 (2d Cir. 2003) (citation omitted). For example, a defendant's "knowing
and willing participation in a conspiracy may be inferred from . . . [his] presence at
critical stages of the conspiracy that could not be explained by happenstance, or a lack of
surprise when discussing the conspiracy with others." *In re Terrorist Bombings of U.S.
Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (quoting *Aleskerova*, 300 F.3d
at 293).

**SPA-12**

### B. Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted).  The Second Circuit has observed that to order a new trial under Rule 33, courts must be satisfied that "it would be a manifest injustice to let the guilty verdict stand."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'"  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134).  A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict."  *Ferguson*, 246 F.3d at 134.  In evaluating a Rule 33 motion, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether the defendant has met these onerous burdens.  *Id*.  Ultimately, "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  *United States v. Torres,* 128 F.3d 38, 48 (2d Cir. 1997) (internal citations and quotation marks omitted).

The Second Circuit has "frequently acknowledged that, even where newly discovered evidence indicates perjury," a Rule 33 motion "should be granted only with great caution and in the most extraordinary circumstances."  *United States v. Stewart*, 433 F.3d 273, 296–97 (2d Cir. 2006) (citations omitted).  Even if a witness has committed

12

perjury, "if the prosecution was not aware of the perjury [at the time of trial], a defendant can obtain a new trial only where the false testimony leads to a 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  *Id.* (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).  Where, however, the prosecution "knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Id* at 297 (quoting *Wallach*, 935 F.2d at 456).  And, where the prosecution *knowingly* introduces false testimony, reversal is "virtually automatic."  *Id.* (quoting *Wallach*, 935 F.2d at 456).

Courts are especially reluctant to grant a new trial where the newly discovered evidence underlying a Rule 33 motion would function solely as additional impeachment material.  "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal."  *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (citation omitted); *see also, e.g., United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks and citation omitted)).  Similarly, Rule 33 motions are not the appropriate vehicle to relitigate evidentiary disputes.  *United States v. Soto*, No. 12-cr- 556 (RPP), 2014 U.S. Dist. LEXIS 60191, at *21 (S.D.N.Y. Apr. 28, 2014).

III.   **ANALYSIS**

   **A.  Scott's Motion for Acquittal or a New Trial Pursuant to Rule 29 on the Conspiracy to Commit Bank Fraud Count is Denied**

To convict Scott on the charge of conspiracy to commit bank fraud, the Government had to prove that two or more persons entered a joint enterprise to commit

13

bank fraud, and Scott knowingly and intentionally joined the enterprise. *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70. A defendant commits bank fraud when he "knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false of fraudulent pretenses, representations, or promises." 18 U.S.C § 1344. A "financial institution" includes federally insured banks. 18 U.S.C § 20. A defendant need not specifically intend to deceive the financial institution to be convicted under § 1344(2) for obtaining bank property by means of a false representation. *Loughrin v. United States*, 573 U.S. 351, 356–57 (2014). The false representation may be made to a third party and need not be made to the bank nor even the entity with custody and control of the property obtained, so long as the false representation is the "means of" obtaining the property. *See id.* at 363–64. A defendant obtains property "by means of" a false representation when his false statement "is the mechanism naturally inducing a bank (or custodian) to part with its money." *Id.* at 365 (comparing a defendant passing a fraudulent check to a third-party to cash at the bank, which is bank fraud, to a defendant selling a counterfeit purse and receiving a check to cash at the bank as payment, which is not bank fraud, because the bank's involvement in the fraudulent scheme in the latter is fortuitous, and the misrepresentation need not ever reach the bank).

As discussed below, the Government satisfied its burden, and Scott's arguments to the contrary are unavailing. Accordingly, neither acquittal nor a new trial is warranted as to Count Two, conspiracy to commit bank fraud.

> 1. *The Government Provided Sufficient Evidence to Prove Scott Guilty of Conspiracy to Commit Bank Fraud*

In response to Scott's request for particulars, the Government identified that the transactions constituting bank fraud "include[d], but [we]re not limited to:" the July 2016 Fenero Funds loan to CryptoReal ("the CryptoReal Transaction") and the June and

14

**SPA-15**

September 2016 investments into the Fenero Funds by Fates Group LLC, an entity controlled by Gilbert Armenta ("the Armenta Transactions").  Doc. 160, Ex. B (emphasis in original).  Scott argues none of the three transactions constituted bank fraud.  Doc. 218 at 18–28.  The Court holds that the Government proved all three were bank fraud.

    *a.  The CryptoReal Transaction*

Scott argues that the CryptoReal Transaction could not properly be the basis for a conspiracy to commit bank fraud conviction for three reasons.  First, the Government failed to prove that the loan was not in fact for an oil field in Madagascar—in other words, the Government failed to prove that there was a false representation.  Doc. 218 at 26.  Second, he argues that, even if the loan was not for the purchase of an oil field, he did not make the false representation to BNY Mellon nor know that any New York correspondent account would be used.  *Id.* at 26–28.  Finally, on reply, Scott also argues that the false representation was not material, in that BNY Mellon would have processed the loan transaction even if Scott had explicitly stated that the money was OneCoin's.  Doc. 275 at 9–10.

The Government responds that the transfer was not a loan for an oil field, and Scott knew of both the misrepresentation and the use of the BNY Mellon New York correspondent account.  Doc. 244 at 35.  Moreover, BNY Mellon would not have transferred the funds through its correspondent account had it known that the funds were affiliated with OneCoin.  *Id.* at 34; Doc. 281 at 2.

At trial, the Government presented evidence that the money the Fenero Funds transferred to CryptoReal was not a loan, and that Scott was aware of that, including an email from Scott to Dilinska and other OneCoin associates wherein Scott stated that the allegedly loaned money was "considered available cash for obvious reasons."  *See, e.g.*, Doc. 281 at 4–6 (GX 1391); *see also* Trial Tr. at 1884:10–17 (Gov't Summation) ("[W]hen you make a real loan, when you loan money to someone, and it's real, that money is not available to you until they pay it back.  That's obvious.  That's common

sense.  But when it's a fake loan, and there is a fake loan agreement, and you're just sending the money where Ruja tells you to, the money is available.  It's available cash. Scott knew that.  You see it right here in this e-mail [GX 1391].").  In assessing the sufficiency of the evidence, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Coplan*, 703 F.3d at 62 (quoting *Chavez*, 549 F.3d at 124).  Accordingly, the Court finds that the Government sufficiently proved that Scott committed a false representation.

Further, Scott's awareness of the use of a New York correspondent account is irrelevant, as he need not have specifically intended to deceive BNY Mellon to be convicted under § 1344(2).  *See Loughrin*, 573 U.S. at 356–57.  Nonetheless, the Government also presented evidence that Scott knew that an international USD transaction like the CryptoReal Transaction would use a U.S. correspondent account. *See, e.g.*, Trial Tr. at 1471–77 (Direct Testimony of David Wildner, U.S. Head of Anti-Money Laundering and Counterterrorist Financing for BNY Mellon) (discussing multiple Fenero Fund transactions involving BNY Mellon correspondent accounts in New York); Doc. 244 at 35 (citing GX 1441, a May 2016 email Scott sent himself of incoming wire instructions from DMS bank, indicating that USD transactions would be processed through BNY Mellon's correspondent account in New York).  Crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was aware of the involvement of a New York correspondent account in the CryptoReal Transaction.

Finally, the Government further offered testimony that, when BNY Mellon discovered OneCoin was operating through the Fenero Funds and other proxies, it prohibited the use of its accounts in connection with further transactions with several of those proxies.  Trial Tr. at 1429:20–1444:11 (Wildner Direct).  Accordingly, Scott is

16

incorrect that, had he told BNY Mellon that the transaction was "payment to Ruja Ignatova [sic] for OneCoin proceeds," the bank would nonetheless have processed the transaction. *See* Doc. 275 at 10. As a result, crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott's false representation was material.

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the CryptoReal Transaction. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114. The Court will not substitute its own determination of the weight of the evidence and reasonable inferences for that of the jury, and Scott's motion as to the CryptoReal Transaction is therefore denied. *Guadagna*, 183 F.3d at 129.

     *b. The Armenta Transactions*

Scott argues that the Armenta Transactions could not properly be the basis for conspiracy to commit bank fraud for several reasons. First, he argues that the transactions and any associated misrepresentations were made solely by Armenta, and Scott was neither aware of, nor in any way colluding with, Armenta with regards to the misrepresentations. Doc. 218 at 18–21. In fact, Scott alleges Armenta was lying even to Scott about the transactions. *Id.* at 22–23. Furthermore, Scott argues that even Armenta's conduct itself did not constitute bank fraud because (1) he was not trying to "obtain" bank property but rather to transfer out his own property, (2) any misrepresentations were mere minor omissions, and (3) the misrepresentations were not material. *Id.* at 23–24. Scott relies on *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018) in support of his argument that Armenta's transactions could not constitute bank fraud if he merely sought to part with his own funds. *Id.* at 24.

The Government responds that Scott was aware of and complicit in Armenta's lies. Doc. 244 at 36–37. Further, the Government argues that the money was Ruja's, not Armenta's; but, even if it had been Armenta's money, Scott's reliance on *Perez-Ceballos*

is misplaced because as long as the funds were in the bank's custody, it was still bank fraud to lie in order to induce the bank to process the transfer. *Id.* at 37–39. Moreover, the banks would not have processed the alleged investment transactions had Scott and Armenta been honest about the relationship with OneCoin. *Id.*

> i. *Scott Conspired with Armenta to Make False Representations to Morgan Stanley and Sabadell in Order to Obtain Property in the Banks' Custody and Control*

The Government adduced sufficient evidence at trial to find that Scott conspired with Armenta to commit bank fraud. At trial, the Government presented evidence that Scott worked with Armenta to effectuate the transactions and was aware of the misrepresentations made to Morgan Stanley and Sabadell. Scott knew that the Fenero Funds were not legitimate investment vehicles, knew that banks were refusing to process transactions involving OneCoin, and knew that the origin of the funds in Armenta's Fates Group accounts was OneCoin (because Scott himself was the one to direct the transfer to Armenta). Doc. 244 at 36–37; *see also* Trial Tr. at 842:5–865:24 (Direct Testimony of Senem Firuz, Project Manager in Risk & Control for Morgan Stanley); 915:6–924:18 (Direct Testimony of Moshe Kishore, Commercial Relationship Banker at Iberia Bank, F/K/A Sabadell). Accordingly, Scott knew Armenta would only be able to transfer the OneCoin funds if Armenta lied to the banks. *Id.* Indeed, the fact that Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes, despite knowing that his Fenero Funds were not legitimate investment funds, demonstrates Scott's knowledge of and complicity in Armenta's misrepresentations to the banks. *See* Doc. 244 at 37 (citing GX 1140)

Further, the Court finds unavailing Scott's arguments that Armenta's representations were not false, but rather merely minor omissions. *See* Doc. 218 at 21–22. Scott suggests that, under the Government's theory, "any statement Mr. Armenta made short of telling the bank he was seeking to launder criminal funds would be bank fraud by omission." *Id.* at 21. But Scott and Armenta did not merely fail to inform

Sabadell and Morgan Stanley about the true nature of the transactions.  As noted above, they also affirmatively misrepresented that the Fenero Funds were legitimate private equity funds which were meant to invest in endeavors such as windmills and renewable energy.  Moreover, the false representations were also material in that the banks would not have processed the transactions had Scott and Armenta disclosed their relationship with OneCoin.  Doc. 281 at 2 (citing Trial Tr. at 229–31 (Konstantin Direct)); *see also* Trial Tr. at 842:5–865:2 (Firuz Direct); 915:6–924:18 (Kishore Direct).

Accordingly, crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott conspired with Armenta to make false representations to Morgan Stanley and Sabadell to induce the banks to effectuate the transfers to the Fenero Funds.

*ii.  Scott's Reliance on* Perez-Ceballos *is Misplaced*

Scott's argument that a bank fraud conviction was not proper because Armenta transferred money out of his own account, rather than transferring the bank's money into his account, is without merit.  Scott argues the transactions are like those in *Perez-Ceballos*, which were held to be insufficient to sustain a conviction for bank fraud.  Doc. 218 at 24.

Perez-Ceballos induced a federally insured bank to transfer her funds from her account at that bank to a brokerage account, the latter of which was not federally insured and which she had procured by extensive misrepresentations.  *Perez-Ceballos*, 907 F.3d at 865–66.  She was indicted for money laundering, as well as for bank fraud on the theory that her procurement of the brokerage account by misrepresentation exposed the insured bank to a risk of loss under 18 U.S.C. § 1344(1).  *Id.*  The jury acquitted Perez-Ceballos of money laundering but found her guilty of bank fraud.  *Id.*  The Firth Circuit reversed her bank fraud conviction on two bases:  (1) the Government failed to adduce evidence that any false statements were made to the insured bank, and (2) Perez-Ceballos did not expose the bank to any risk of loss where the Government's theory was predicated

19

on the funds being proceeds of money laundering, but Perez-Ceballos was acquitted of the money laundering charge. *Id.* at 868–69.

Besides the fact that *Perez-Ceballos* is not controlling in the Second Circuit, the Court finds Scott's conviction dissimilar from Perez-Ceballos' in several significant ways. First, Perez-Ceballos was charged only with bank fraud under 18 U.S.C. § 1344(1), defrauding a financial institution, and the Fifth Circuit therefore never considered whether her actions constituted bank fraud under § 1344(2), obtaining bank property by false representations. *Id.* at 867–68. Scott, however, was indicted under both theories, meaning a conviction could lie under either § 1344(1) or § 1344(2) (Doc. 143, ¶¶ 4–5); and the Government's arguments focus primarily on the latter (Doc. 244 at 37–39). Second, Scott does not argue that the alleged misrepresentations were not made directly to Morgan Stanley and Sabadell. *See* Doc. 218 at 21–22. Nor was he acquitted of money laundering. Doc. 182. Moreover, the critical deficiencies in Perez-Ceballos' prosecution for bank fraud were the Government's failures to adduce sufficient evidence of the false representations and risk of loss—not that the underlying transactions involved Perez-Ceballos' own funds, as Scott argues. *Compare Perez-Ceballos*, 907 F.3d at 868, *with* Doc. 218 at 24; *see also United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019) (citing *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019)) (holding that a voluntary transfer of funds from one's own account can constitute a scheme to obtain funds under the bank's custody and control and thus be the basis for a bank fraud conviction).

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the Armenta Transactions, and Scott's motion as to these transactions is also denied. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

**SPA-21**

*2. Venue was Proper*

Scott further argues that the Government failed to establish that venue was proper on the bank fraud count because it failed to prove an act in furtherance of the conspiracy took place within the Southern District of New York.  Doc. 218 at 25.  This argument is without merit.  In a conspiracy prosecution, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators," or where it was reasonably "foreseeable that such an act would occur."  *United States v. Svoboda*, 347 F.3d 471, 483–84 (2d Cir. 2003) (internal quotation marks and citations omitted).  For purposes of bank fraud, venue is proper where the transfer of funds through in-district bank accounts at financial institutions was part of the fraud scheme. *See United States v. Korolkov*, 870 F. Supp. 60, 63–64 (S.D.N.Y. 1994).  The Government need only establish venue by a preponderance of the evidence.  *United States v. Milton*, No. 21-cr-478 (ER), 2021 U.S. Dist. LEXIS 222150, at *8 (S.D.N.Y. Nov. 15, 2021) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)).

Here, the CryptoReal transaction was processed through BNY Mellon's Manhattan correspondent account.  Trial Tr. at 1472:15–1475:13 (Wildner Direct Testimony).  The Armenta Transaction involving Sabadell likewise went through a Manhattan correspondent account.  Trial Tr. at 913:5–14 (Kishore Direct Testimony). Moreover, the Government adduced evidence that Scott was aware that international USD transactions would use U.S. correspondent accounts.  *See, e.g.*, Trial Tr. at 1471–77 (Wildner Direct Testimony); Doc. 244 at 35 (citing GX 1441).  Accordingly, a reasonable jury could find that the Government established venue as to Count Two.  *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

*3. The Jury Instructions Were Proper, and No Constructive Amendment Occurred*

Finally, Scott argues that he is entitled to acquittal or a new trial under Rule 29 because the Court failed to instruct the jury (1) which financial institutions were federally insured and (2) that an omission can only constitute a material misrepresentation for

purposes of bank fraud where there is a duty to disclose.  Doc. 218 at 29–31; Doc. 275 at 16–17.  He alleges that the Government "invited jurors to convict on other bank fraud theories, never charged or specified in the Government's particulars letter," thus risking constructive amendment of the indictment, because the Court failed to instruct the jury that the Government's theory of bank fraud related only to Morgan Stanley, BNY Mellon, and Sabadell.  Doc. 275 at 16.  Scott expressed particular concern that the jury may have been confused by the abundance of evidence concerning Apex.  Doc. 477 at 9:20–10:10, 12:13–13:15.

Under the Fifth Amendment Grand Jury Clause, "a defendant has the right to be tried only on charges contained in an indictment returned by a grand jury."  *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).  "[W]hen the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," a constructive amendment occurs, and reversal is required.  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).  "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."  *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998)); *see also United States v. D'Amelio*, 683 F.3d 412, 416, 419 (2d Cir. 2012) (holding that constructive amendment occurs where the evidence or jury instructions at trial created a "substantial likelihood" that the defendant was convicted of a crime "distinctly different" from that for which he was indicted).  The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."  *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)).  Thus, the defendant must show that "the challenged evidence or jury instructions tied a defendant's conviction to 'behavior

22

*entirely separate* from that identified in the indictment.'"  *United States v. Bastian*, 770

F.3d 212, 223 (2d Cir. 2014) (emphasis added) (quoting *United States v. Danielson*, 199

F.3d 666, 670 (2d Cir. 1999)).

Here, the indictment does not limit the objects of the bank fraud conspiracy to

BNY Mellon, Sabadell, and Morgan Stanley.  *See* Doc. 143, ¶¶ 4–5.  Thus, Scott has not

demonstrated a "substantial likelihood" that he was convicted of a crime "distinctly

different" or "entirely separate" from that for which he was indicted.  *See Bastian*, 770

F.3d at 223; *D'Amelio*, 683 F.3d at 416, 419.  And the Government's letter of particulars,

to which Scott cites, stated that "[w]hile the Government has no obligation to prove any

particular transaction or misrepresentation, these transactions include, <u>but are not limited</u>

<u>to</u> [the CryptoReal Loan and Armenta Transactions]."  Doc. 160, Ex. B (emphasis in

original).  Accordingly, through the letter, Scott was provided notice of the core of the

criminality to be proven at trial, and the Government did not exceed the "significant

flexibility in proof" it was accorded.  *See Banki*, 685 F.3d at 118.  Moreover, at the charge

conference, though the Court declined to specify in the jury instructions that the only

three objects of the bank fraud scheme could be Morgan Stanley, BNY Mellon, and

Sabadell, it did instruct the jury that bank fraud could only arise in connection with a

federally insured financial institution.  Trial Tr. at 1639:1–1643:25 (Charge Conference);

*see also id.* at 2006:10–18 (Jury Instructions).  Consequently, the jury instructions did not

permit the jury to find Scott guilty of conspiracy to commit bank fraud based upon any

conduct related to Apex.

Finally, the Court also finds unavailing Scott's arguments that the jury instructions

were in error because the Court did not instruct that omissions could be false

representations for purposes of bank fraud only where a duty to disclose existed.  The law

does not limit false representations by omission only to those in situations where there is

a duty to disclose.  *See United States v. Zarrab*, No. 15-cr- 867 (RMB), 2016 U.S. Dist.

LEXIS 153533, at *42–45 (S.D.N.Y. Oct. 17, 2016).  The jury instructions were thus

proper.  Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

### B. Scott's Motion for Acquittal or a New Trial Under Rule 29 on the Conspiracy to Commit Money Laundering Count is Denied

To have convicted Scott of the crime of conspiracy to commit money laundering, the Government must have proven that two or more persons entered a joint enterprise to commit either[4] domestic or international concealment money laundering, and Scott knowingly and intentionally joined the enterprise.  *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70.  A defendant commits domestic concealment money laundering when he:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—. . . knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the ownership or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i).  A defendant commits international concealment money laundering when he:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—. . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(B)(i).  Under either theory, the Government must prove beyond a reasonable doubt that the defendant knew that (1) the property, funds, or monetary instrument at issue were the proceeds of unlawful activity, and (2) the transaction,

---

[4] Scott was indicted under both theories of conspiracy to commit money laundering.  Doc. 143 ¶¶ 1–3.  The jury could therefore find Scott guilty under either theory, without needing to find him guilty as to both, so long as it was unanimous as to which of the two types was proven.  Trial Tr. at 1989:18–1990:4 (Jury Instructions).

transportation, transmission, or transfer was designed to conceal or disguise the nature, location, ownership, or control of the proceeds.  *See United States v. Odiase*, 788 F. App'x 760, 762 (2d Cir. 2019) (citing *United States v. Huezo*, 546 F.3d 174, 178–79 (2d Cir. 2008)); *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009).  Both types of concealment money laundering also require that the funds at issue be proceeds of specified unlawful activity—here, wire fraud.  The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (alteration in original) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

Scott argues that he is entitled to an acquittal or new trial because the Government failed to prove:  (1) the existence of wire fraud because it failed to establish a sufficient nexus to the United States, and wire fraud has no extraterritorial application; (2) that Scott's transactions with the Fenero Funds were the proceeds of wire fraud; (3) that Scott knew the transactions were proceeds of wire fraud; and (4) that Scott knew the transactions were designed to conceal or disguise the proceeds.  *See* Doc. 218 at 34–42. Scott further challenges that the Court erred in failing to instruct the jury that wire fraud may not be based on entirely extraterritorial acts.  *Id.* at 42–43.  The Government argues that it satisfied its burden of proof as to each element of conspiracy to commit money laundering and the underlying wire fraud, and that the jury instructions were proper. Doc. 244 at 25–32.

The Court finds that the Government adduced sufficient evidence at trial to find that Scott knowingly concealed or disguised proceeds of wire fraud through the Fenero Funds transactions.  Scott first argues that the Government's sole evidence of domestic wire fraud was the testimony of two U.S. OneCoin victims, who collectively wired OneCoin approximately $50,000.  Doc. 218 at 35–36.  But as the Government estimated OneCoin's sales at millions (if not billions) of dollars, such a miniscule percentage of

OneCoin sales in the United States is insufficient because a domestic application of wire fraud requires that a "substantial amount of conduct [occur] in the United States."  *Id.* (citing *United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017)).  Scott misrepresents the trial evidence.  The Government's evidence demonstrated that OneCoin was not a purely extraterritorial wire fraud scheme; rather, it included testimony from two U.S. victims of OneCoin about their investments in the scheme and the promoters who introduced them to OneCoin, testimony regarding OneCoin meetings and conferences in the United States promoting OneCoin (including a trip by Konstantin to Las Vegas to conduct OneCoin-related meetings), and individuals transmitting wires internationally in connection with OneCoin's U.S. activities.  *See, e.g.*, Trial Tr. at 73:20–75:12, 79:17–84:16 (Direct Testimony of William Horn, OneCoin victim) (testifying that he made multiple wire transfers for OneCoin packages from his account at the American Bank and Trust of the Cumberlands, and he told the bank, per OneCoin's instructions, that the wire was for educational material); Trial Tr. at 791:8–18, 796:4–797:23, 798:22–802:23, 809:15–810:2 (Direct Testimony of Linda Cohen, OneCoin victim) (testifying that she purchased multiple OneCoin packages from her HSBC bank account and that the loss of the money she sent to OneCoin prevented her from retiring).  Accordingly, OneCoin's use of United States wires constitutes an execution of the wire fraud scheme in the United States.  *See Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) ("We therefore hold that a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud."); *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) (citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) and collecting cases involving international wire fraud schemes prosecuted in the United States based on their use of interstate wires in furtherance of the fraudulent scheme).  Scott's cited authority does not require that the Court parse the percentage of fraudulent

proceeds obtained in the United States, as compared to abroad.  Rather, it simply states

that a fraud carried out entirely outside the United States, with absolutely no domestic

nexus except a tangential and limited use of some U.S. wires, is insufficient for domestic

application of wire fraud.  *Gasperini*, 2017 WL 2399693, at *8.  And here, OneCoin

specifically targeted victims in the United States and carried out elements of its fraudulent

scheme in the United States (Trial Tr. at 73:20–75:12, 79:17–84:16 (Horn Direct), 791:8–

18, 796:4–797:23, 798:22–802:23, 809:15–810:2 (Cohen Direct)), which is sufficient for

domestic application of wire fraud, *Hayes*, 99 F. Supp. 3d at 421.  Thus, the Government

sufficiently proved a nexus to the United States.

Second, Scott argues that the Government needed to establish that the transfers

into the Fenero Funds were specifically of the proceeds of the wire fraud against

OneCoin's *U.S.* victims.  Doc. 218 at 36–38.  But Scott cites no authority in his principal

brief, nor on reply, for the assertion that the Government was required to conduct

financial tracing at such a level of detail.  *See id.*; Doc. 275 at 14–15.  This alone is reason

to reject Scott's argument.  Moreover, the Government offered evidence at trial that both

Horn and Cohen wired money to a U.S.-based OneCoin depository account, which

subsequently directly and indirectly transferred money to the Fenero Funds.  *See* Doc.

281 at 3; Trial Tr. at 1691:21–1695:19 (Direct Testimony of Rosalind October, Senior

Financial Analyst in the Major Economic Crimes Bureau of the Manhattan District

Attorney's Office).[5]  The Court thus need not decide whether Scott's conviction would

have been deficient had the Government not offered such evidence.

Third, Scott argues that the Government failed to prove he knew that the Fenero

Funds transfers were the proceeds of unlawful activity (*i.e.*, wire fraud).  Doc. 218 at 39–

40.  Specifically, he argues that, because wire fraud has no extraterritorial application,

---

[5] Based on the same mistaken arguments that the Government failed to demonstrate that the U.S. victims'
money was traceable to the Fenero Funds, Scott also argues in passing that the Government failed to
sufficiently establish venue under 18 U.S.C. § 1956(i).  Doc. 218 at 42.  Because a reasonable juror could
have credited the Government's evidence tracing the victims' funds, Scott's argument as to venue fails.

only OneCoin's conduct in the U.S. and its proceeds therefrom was cognizable as unlawful for purposes of a money laundering conviction. *Id.* at 40.  Consequently, Scott argues that the Government therefore needed to prove that he specifically knew that the transfers were of proceeds from OneCoin's *U.S.* activities, but it failed to prove that Scott knew OneCoin had any U.S. connection. *Id.*  Again, Scott cites no authority for the proposition that the OneCoin funds were proceeds of unlawful activity only insofar as the wire fraud was against U.S. victims, nor that the Government therefore needed to prove his knowledge at such a level of detail.  And, again, this alone is reason enough to reject Scott's argument.  Moreover, the argument is inconsistent with the law.  First, to satisfy its burden to prove scienter under the money laundering statute, the Government needed only to prove that Scott knew he was "dealing with the proceeds of some crime, even if he [did] not know precisely which crime." *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 74 (S.D.N.Y. 2015) (internal brackets omitted) (quoting *United States v. Tillman*, 419 F. App'x 110, 111–12 (2d Cir. Apr. 15, 2011) (summary order)).  Therefore, even if the only the money cognizable as proceeds of wire fraud was that obtained from the U.S. victims, the Government did not need to prove that Scott knew the Fenero Funds transfers were proceeds specifically of wire fraud (*i.e.*, from U.S. victims), as opposed to other unlawful activity.  *See id.*  And the Government presented ample evidence that Scott knew that OneCoin funds were the product of fraud and criminal activity.[6]  *See* Doc. 244 at 25–27.  Furthermore, wire fraud considers the larger fraudulent scheme, not merely individual transactions, and global money laundering and fraud schemes with domestic actors, wires, or effects can thus be properly reached through the wire fraud statute.  *See United States v. Napout*, 963 F.3d 163, 180–81 (2d Cir. 2020); *Bascuñán*, 927 F.3d at 123.

---

[6] Scott maintains that he believed OneCoin was a reputable organization. Doc. 218 at 39–40.  But, on a Rule 29 motion, the Court must view the evidence in the light most favorable to the Government and credit every inference that could have been drawn in the Government's favor.  And a reasonable juror could easily have found that Scott knew OneCoin was a fraud, so the Court will not disrupt the jury's assessment of the weight of the evidence.  *See id.; Espaillet*, 380 F.3d at 718.

Consequently, Scott is incorrect that only the money from U.S. victims was cognizable as the proceeds of wire fraud where the global OneCoin scheme was indisputably fraudulent and intentionally targeted, in part, the United States, using U.S. wires and with at least some U.S.-based actors.  Accordingly, the Government need not have proven that Scott knew the Fenero Fund transfers were proceeds of OneCoin's U.S. activity.

Fourth, Scott argues that the Government failed to prove that he knew the Fenero Funds transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.  Doc. 218 at 40–42.  But the Government offered overwhelming evidence at trial that Scott meticulously concealed any connection between the Fenero Funds and OneCoin because he recognized that, in his words, "the link to OneCoin will kill us."  Doc. 244 at 27–28 (citing GX 1041, 1289, 1434).  And Scott created a highly complex and sophisticated structure to receive and transfer OneCoin proceeds, involving layering the funds through multiple international bank accounts and forging papers to create an inaccurate paper trail that concealed the transactions' true nature and source—conduct the Government's expert described as prototypical money laundering behavior.  *See id.* (citing GX 1175, 1177, 1209, 1388, 1391, 2270, 2276, 2602, 2602-A); Trial Tr. at 459:12–461:21, 463:13–481:9 (Direct Testimony of Donald Semesky, Anti-Money Laundering Compliance and Investigations Independent Consultant).  Accordingly, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott knew the transactions were designed to conceal the nature, source, and ownership of the funds.

Finally, the Court also finds unavailing Scott's arguments that the jury instructions were in error because it did not grant his request for a supplemental jury instruction that "in order for proceeds to be the proceeds of a specified unlawful activity, the funds have to be proceeds of a fraudulent scheme that occurred in the United States."  Doc. 181 (Nov. 20, 2019 Def. Request for Suppl. Jury Instruction) at 2; Doc. 218 at 43.  But, as

discussed above, such a jury instruction misstates the law.  *See Napout*, 963 F.3d at 180–81; *Bascuñán*, 927 F.3d at 123; *Prevezon Holdings Ltd.*, 122 F. Supp. 3d at 74.  The jury instructions were thus proper.  Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

Thus, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was guilty of conspiracy to commit money laundering.  Scott's motion for an acquittal or new trial under Rule 29 is denied.

**C.  Scott's Motion for a New Trial Pursuant to Rule 33 is Denied**

In addition to the grounds for relief under Rule 29, Scott's opening motion also requests a new trial under Rule 33 in the interests of justice.  *See* Doc. 218.  By supplemental motion, Scott further moves for a new trial in light of the new evidence of Konstantin's perjury and post-trial misconduct.  Doc. 410.  The Court finds Scott's Rule 33 arguments meritless and declines to exercise its discretion to order a new trial, as it does not have "a real concern that an innocent person may have been convicted."  *See McCourty*, 562 F.3d at 475; *Torres,* 128 F.3d at 48.

*1.  Konstantin's Perjury Regarding the Laptop Does Not Warrant a New Trial*

At trial, Konstantin testified that, when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019, a OneCoin laptop was seized and then returned by a border patrol officer.  Trial Tr. at 205:9–207:7.  Upon its return, Konstantin testified he put the laptop into a paper trash bag with other trash items and threw it into a trash bin on a busy place in the Las Vegas Strip.  Trial Tr. at 206:20–23.  In the summer of 2021, Scott discovered Konstantin had lied about throwing away the laptop, as Konstantin had in fact given it to one of his associates, Duncan Arthur, to return to Bulgaria.  Doc. 434-4.  Scott argues this newly discovered evidence of perjury entitles him to a new trial because Konstantin was a key government witness, the jury would not have credited any of Konstantin's testimony had it known of this perjury, and it

therefore would not have found Scott guilty.  Doc. 410.  The Government, however, argues that Konstantin's testimony regarding the disposition of the laptop—which occurred after Scott's crimes—was not material to the jury's verdict, and Scott extensively impeached Konstantin at trial, so evidence of any perjury related to the laptop would merely have been cumulative.  Doc. 412.

Rule 33 motions, including those based on newly discovered evidence of perjury, are disfavored and granted only sparingly and with great caution in the most extraordinary circumstances.  *Stewart*, 433 F.3d at 296–97; *Ferguson*, 246 F.3d at 134; *Gambino*, 59 F.3d at 364.  Accordingly, where the Government was unaware of the perjury at the time of trial, the motion will be denied absent a "firm belief" the defendant would most likely not have been convicted but for the perjury.  *Stewart*, 433 F.3d at 296–97 (quoting *Wallach*, 935 F.2d at 456).  If the Government knew or should have known of the perjury before the conclusion of the trial, the motion will be granted if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id* at 297 (quoting *Wallach*, 935 F.2d at 456).  And, if the Government knew of the perjury when offered, reversal is "virtually automatic."  *Id.* (quoting *Wallach*, 935 F.2d at 456).  Moreover, Rule 33 motions will not be granted where the newly discovered evidence is merely cumulative or impeaching.  *Forbes*, 790 F.3d at 406–07; *Wong*, 78 F.3d at 79.

The Government does not dispute that Konstantin's testimony regarding the laptop was perjurious (not merely mistaken), nor that the perjury is newly discovered, and Scott could not have discovered the perjury before or during the trial.  *See* Doc. 412 at 22.  Additionally, Scott does not argue that the Government knew of Konstantin's perjury, merely that it *should* have known (Doc. 433 at 17), though the Government argues that it did not and could not have known of the perjury before Arthur's disclosure in the summer of 2021 (Doc. 445 at 60–61).  Accordingly, at minimum, Scott must establish a

**SPA-32**

"reasonable likelihood" that Konstantin's perjury regarding the laptop could have affected the jury's verdict.  *See Stewart*, 433 F.3d at 297.  He has failed to do so.

The entirety of Konstantin's testimony regarding the laptop was such a small part of his testimony as to be negligible—covering, at most, one or two pages of his testimony, which spanned over three hundred pages in the trial transcript.  *Compare* Trial Tr. at 205:25–207:1 (laptop testimony), *with* 125:4–446:23 (Konstantin Direct, Cross, Redirect, and Recross).  Moreover, the disposition of the laptop was a purely collateral matter and was thus unlikely to have impacted the jury's determination of Scott's guilt. In fact, given that Konstantin's testimony focused primarily on the nature and conduct of OneCoin's operations rather than of Scott's participation, and given the overwhelming additional evidence that the Government presented at trial (as discussed above), the Court does not find that Konstantin's testimony, even taken as a whole, was primarily determinative of Scott's guilt.  The Court's conclusion is reinforced by Scott's extensive impeachment of Konstantin, including on much more significant topics more relevant to the jury's determination of Scott's guilt.  *See, e.g.*, Trial Tr. at 301:22–307:4 (Konstantin had limited interaction with Scott, was not present at the Meeting nor ever told what was discussed, and he could not be "a hundred percent sure" that Dilkinska was present); 404:19–413:18 (Konstantin lacked personal knowledge of Scott).  The newly discovered evidence of perjury concerning the laptop would therefore have been merely cumulative or impeaching and is not a basis to grant Scott a new trial.  *See Forbes*, 790 F.3d at 406–07; *Wong*, 78 F.3d at 79.  Accordingly, Scott's motion for a new trial pursuant to Rule 33 on the basis of the newly discovered evidence of Konstantin's perjury regarding the laptop is denied.[7]

_____

[7] Scott asks in the alternative for an evidentiary hearing.  Doc. 410 at 7.  The Court does not find that such hearing is necessary as there is no dispute as to the relevant facts and therefore denies the request.

2. *No Other Basis for a New Trial Under Rule 33 Exists*

Scott makes several other wide-ranging arguments under Rule 33, none of which the Court finds availing.  Scott argues that Konstantin also perjured himself with regard to the Meeting—the July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia.  Doc. 433 at 14–16; *see also* Doc. 461 at 11–18.  Although Konstantin did not participate in the Meeting, nor consequently testify regarding what was discussed, he did testify that after Scott arrived at the office, he made small talk with Scott and escorted him into Ruja's office; Ruja then had Konstantin bring in Dilkinska, clear the floor, and leave.  Trial Tr. at 245:19–246:15.  Scott argues this testimony has "now conclusively been established as an outright lie" because Dilkinska was in India between July 19 and July 22, as corroborated by her passport stamps and the Indian authorities, and Konstantin's testimony was too detailed to be a mistake.  Doc. 433 at 15.  And the alleged perjury impacted the jury's verdict because the Meeting was the only time Konstantin met Scott face-to-face and the only alleged meeting between Scott and Dilkinska, so the jury would not have found Scott guilty without Konstantin's testimony.  *Id.* at 16, 22.

Scott also argues that he made a specific *Brady* request the day after Konstantin's testimony for information regarding the Meeting and Dilkinska's whereabouts, but the Government inadequately responded and instead opposed the introduction of two emails ("the Emails") into evidence that would have made clear that Dilkinska was in India during the Meeting.  *Id.* at 17.  Relatedly, Scott argues the Court's exclusion of the Emails was erroneous and provides a further basis for a new trial.  *Id.* at 23–27.  Accordingly, Scott argues that Konstantin's perjury and the Government's failure to correct require a new trial.  *Id.* at 27–30.  Finally, Scott also argues that Investigator Winters' delay in forwarding Arthur's information to the Government and to Scott, as well as the Government's delay disclosing Konstantin's post-trial breach of his cooperation

# SPA-34

agreement via his use of an illicit phone at the MCC, further warrant a new trial in the interests of justice.  *Id.* at 30–34.

The Government responds that Scott has not established that Konstantin perjured himself about the Meeting, rather than being merely mistaken about the exact details of the timing; and the alleged perjury is cumulative impeachment that does not require a new trial.  Doc. 445 at 38–51.  Further, at least one of the Emails was properly excluded, but the Emails and passport stamps are, in any event, not "newly discovered," and evidentiary disputes are not proper bases for Rule 33 motions.  *Id.* at 25–29.  Moreover, it argues it did not violate any of its disclosure obligations regarding Dilkinska's whereabouts during the Meeting.  *Id.* at 58–59.  Nor did it suppress or withhold any information regarding the laptop or MCC phone but in fact acted promptly.  *Id.* at 60–61.

> a.  *Scott Has Not Established that Konstantin Committed Perjury with Regards to the Meeting, nor that the Government Knew of the Alleged Perjury, or that a New Trial is Warranted Because of It*

The Court does not find that Scott has established Konstantin's testimony regarding the Meeting was perjurious; but, even if it was, the Court does not find that Rule 33 requires a new trial.  Newly discovered[8] evidence of perjury may be the basis for a new trial under Rule 33.  *See Stewart*, 433 F.3d at 296–97.  "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide

---

[8] The Government argues that Scott's arguments as to the Meeting are untimely because Scott attended the Meeting and therefore knew all along that Konstantin's testimony about Dilkinska's presence was mistaken.  Doc. 445 at 33.  Because Scott was on notice of the facts at the time of the testimony during trial, it argues that the evidence of Konstantin's purported perjury cannot now be newly discovered and therefore is not timely.  *Id.* at 33–38.  Scott responds that newly discovered evidence is required to file a timely Rule 33 motion (here, Arthur's new evidence about the laptop), but once a timely motion has been filed, he can raise arguments other than those about the new evidence, and the Court therefore need not find that evidence of the purported Meeting perjury is newly discovered.  Doc. 461 at 19.  But Scott argues that Dilkinska's passport *is* new evidence, which the Government only disclosed to Scott in December 2021 and which Scott could not have previously discovered through the exercise of due diligence because it was obtained through international law enforcement channels not available to the defense.  *Id.* at 20.

Ultimately, the Court need not decide whether Scott's argument is untimely notwithstanding the timeliness of his broader Rule 33 motion because the argument is, in any event, not meritorious.  But the Court emphasizes that the Government's position is without merit.  The Government has not shown that Scott had access to Dilkinska's passport at trial nor even that it knew the passport would be relevant evidence.

false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Ng Lap Seng*, No. 15-cr-706 (VSB), 2018 U.S. Dist. LEXIS 83441, at *46–47 (S.D.N.Y. May 9, 2018) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). The defendant bears the burden to prove perjury by a preponderance of the evidence. *Id.* at *47 (citing *Cunningham v. Bennett*, No. 02-cv-4635 (ARR), 2005 WL 1162475, at *8 (E.D.N.Y. May 16, 2005)). Scott has not done so here. While the passport stamps and confirmation from the Indian authorities do evidence that Konstantin's testimony was wrong about Dilkinska being in Sofia at the Meeting, they do not necessarily prove that the testimony was perjury—that Konstantin gave false testimony *with willful intent*. Konstantin indicated on cross that he was "pretty sure" that Dilkinska was there, but he did not answer in the affirmative when Scott repeatedly asked if he was "a hundred percent sure." Trial Tr. at 304:3–18. And the Government points to evidence suggesting that Konstantin may have merely been mistaken of the date of the meeting—that Scott met with Ruja and Dilkinska in September 2016, not July 2016, or Dilkinska attended by phone rather than in person. Doc. 445 at 41. In turn, Scott insists that it is "exceedingly unlikely" that Scott met Dilkinska in September 2016, even considering the evidence to which the Government points. Doc. 461 at 13. But, even if it is true that Scott did not meet Dilkinska in September 2016, the Court remains unpersuaded that Scott has satisfied his burden of proving by a preponderance of evidence that Konstantin willfully lied about the Meeting. Accordingly, Scott is not entitled to a new trial based on this alleged perjury. *See Np Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at *46–48.

Moreover, even if Konstantin *had* perjured himself with respect to his testimony about the Meeting, "[p]erjury in and of itself is insufficient to justify relief under Rule 33"; the defendant must further establish the requisite level of materiality (which depends on the extent of the Government's knowledge of the perjury). *Ng Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at *47–48. Here, Scott argues that the Government knowingly

offered false testimony and a new trial is therefore "virtually automatic" under *Wallach*.
Doc. 461 at 25–29.  And, while the Government suggests that *at most* it should have
known Dilkinska was not in Sofia on July 20, 2016, but it insists it did not know
Konstantin intentionally testified falsely.  Doc. 445 at 45.  Scott responds that the
language of *Wallach* does not require that Government knew Konstantin *intentionally*
testified falsely, so long as it knew the testimony was false (even if accidental), and he
further argues that *Wallach* is triggered even if the Government merely *should have*
known the testimony was false.  Doc. 461 at 25–29.  But *Wallach* says:

> Where the prosecution knew or should have known of the perjury,
> the conviction must be set aside "if there is any reasonable likeli-
> hood that the false testimony could have affected the judgment of
> the jury."  Indeed, if it is established that the government knowingly
> permitted the introduction of false testimony reversal is "virtually
> automatic."

935 F.2d at 456 (internal citations omitted).  Accordingly, the plain language of *Wallach*
belies Scott's arguments that reversal is virtually automatic even if the Government only
should have known of even unintentionally false testimony.  *See id.*  Reversal is therefore
not "virtually automatic" here, and the Court instead considers whether Scott has
established that there exists "any reasonable likelihood that the false testimony could
have affected the judgment of the jury."  *Id.*

But the Court does not find such likelihood exists.  On cross, Scott elicited from
Konstantin his lack of definitive certainty of Dilkinska's presence at the Meeting, and,
even on direct, Konstantin only ever testified that the Meeting occurred but provided no
information as what was discussed at the Meeting.  *See* Trial Tr. at 246:14–247:7, 304:3–
18.  Moreover, ample other evidence existed both of Scott's involvement with Ruja and
Dilkinska and, more generally, of his guilt.  *See, e.g.*, Doc. 445 at 48–51.  Consequently,
the newly discovered evidence of Konstantin's alleged Meeting-related perjury would, at
most, have been cumulative impeachment material.  *See Forbes*, 790 F.3d at 406–07
("Relief under Rule 33 based on newly discovered evidence may be granted only upon a

showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." (quotation marks omitted)); *Wong*, 78 F.3d at 79 ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks omitted)). The Court does not believe "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414, and is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict," *Ferguson*, 246 F.3d at 134.

> b. *Neither the Court's Exclusion of the Emails Nor the Government's Alleged Disclosure Violations Require a New Trial*

Scott's arguments as to the exclusion of the Emails and his allegations of the Government's disclosure violations are no more successful. First, the Court notes that Rule 33 motions are not the appropriate vehicles to relitigate evidentiary disputes. *See Soto*, 2014 U.S. Dist. LEXIS 60191, at *21. Accordingly, it need not reconsider at this time whether the Emails were properly excluded. Second, the Court does not find that the exclusion, even if in error, had any impact on the jury's verdict since, as discussed above, Konstantin disclaimed any knowledge of the substance of the Meeting. And Scott has not satisfied the requirement to show under Rule 33 "a manifest injustice." *See United States v. Mejia*, 948 F. Supp. 2d 311, 319 (S.D.N.Y. 2013) ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not met his 'heavy burden' under Rule 29, [*United States v.*] *Broxmeyer*, 616 F.3d [120,] 125 [(2d Cir. 2010)], nor demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33, *Sanchez*, 969 F.2d at 1414.").

Finally, Scott makes three accusations of Government misconduct with respect to its disclosures: (1) the Government's delay in disclosing pretrial one of its batches of pretrial *Brady* materials with documents from Greenwood's electronic devices, (2)

37

# SPA-38

Winters' delay forwarding Arthur's statement concerning Konstantin's laptop, and (3) the Government's delay disclosing Konstantin's use of the MCC phone in violation of his cooperation agreement.  Doc. 461 at 42–47.  Although he does not argue that any of the three instances of alleged misconduct independently require a new trial under Rule 33, he asks the Court to consider his other Rule 29 and Rule 33 arguments in light of this "pattern" of misconduct.  *Id.* at 42.  Even if the Court were to find that the Government did not disclose the Greenwood documents, Arthur's statement, or Konstantin's use of a cellphone in the MCC as expeditiously as it could have, Scott has not established that any of those delays prejudiced him or rendered the jury's verdict unjust.  Thus, the Court does not find that these three allegations of misconduct, even if true, alter its holdings as to Scott's arguments for acquittal or for a new trial.

Accordingly, none of Scott's arguments satisfy his heavy burden under Rule 33 to convince the Court that "a real concern that an innocent person may have been convicted."  *McCourty*, 562 F.3d at 475 (quoting *Ferguson*, 246 F.3d at 134).  Considering the totality of the circumstances, *see Ferguson*, 246 F.3d at 134, the Court does not find that "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414 (citation omitted).  Rather, the Court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

## IV.   CONCLUSION

For the reasons set forth above, Scott's motions are DENIED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 218 and 410.

It is SO ORDERED.

Dated:   September 14, 2023
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case      (form modified within District on Sept. 30, 2019)
　　　　　　　　 Sheet 1

# UNITED STATES DISTRICT COURT
## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| MARK S. SCOTT | Case Number:  S10 17-cr-630-1 (ER) |
| | USM Number:  01119-138 |
| | Arlo Devlin-Brown, Esq and David M Garvin, Esq. |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
　 which was accepted by the court.

☑ was found guilty on count(s)   1 and 2
　 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1956(h) | Conspiracy to Commit Money Laundering | 9/5/2018 | 1 |
| 18 USC 1349 | Conspiracy to Commit Bank Fraud | 9/5/2018 | 2 |

　　　 The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   open and underlying      ☐ is   ☑ are dismissed on the motion of the United States.

　　　 It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

　　　　　　　　　　　　　　　　　　　　　　1/25/2024
　　　　　　　　　　　　　　　　　　　Date of Imposition of Judgment

　　　　　　　　　　　　　　　　　　　Signature of Judge

　　　　　　　　　　　　　　　　　　　Edgardo Ramos, U.S.D.J.
　　　　　　　　　　　　　　　　　　　Name and Title of Judge

　　　　　　　　　　　　　　　　　　February 2, 2024
　　　　　　　　　　　　　　　　　　　Date

# SPA-40

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   2   of   7  

DEFENDANT:   MARK S. SCOTT
CASE NUMBER:   S10 17-cr-630-1 (ER)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
120 years on count 1 and 120 years on count 2 to run concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:
The Court respectfully recommends that Mr. Scott be designated to FPC Miami

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑  before 2 p.m. on _____4/30/2024_____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to  _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

## SPA-41

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
            Sheet 3 — Supervised Release

|  | Judgment—Page | 3 | of | 7 |
|---|---|---|---|---|

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

  3 years on count 1 and 3 years on count 2 to run concurrently.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# SPA-42

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|---|

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____   Date  _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___5___ of ___7___

DEFENDANT: MARK S. SCOTT
CASE NUMBER: S10 17-cr-630-1 (ER)

## SPECIAL CONDITIONS OF SUPERVISION

You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

You must provide the probation officer with access to any requested financial information.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

It is recommended that you be supervised by the district of residence.

## SPA-44

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
　　　　　　　　　　Sheet 5 — Criminal Monetary Penalties

| | | | Judgment — Page | 6 | of | 7 |

DEFENDANT: MARK S. SCOTT
CASE NUMBER: S10 17-cr-630-1 (ER)

### CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# SPA-45

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  MARK S. SCOTT

CASE NUMBER:  S10 17-cr-630-1 (ER)

Judgment — Page ___7___ of ___7___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __200.00__  due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
Forfeiture in the amount of $392,940,000.00.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Case 1:17-cr-00630-ER   Document 623   Filed 02/12/24   Page 1 of 7

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case                                                    (NOTE: Identify Changes with Asterisks (*))
                       Sheet 1                        (Form modified within District on Sep. 30, 2019)

# UNITED STATES DISTRICT COURT
## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| MARK S. SCOTT | ) Case Number:  S10 17-cr-630-1 (ER) |
| | ) USM Number:  01119-138 |
| **Date of Original Judgment:**  2/2/2024 | ) Arlo Devlin-Brown, Esq and David M Garvin, Esq. |
| *(Or Date of Last Amended Judgment)* | ) Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)  1 and 2 _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1956(h) | Conspiracy to Commit Money Laundering | 9/5/2018 | 1 |
| 18 USC 1349 | Conspiracy to Commit Bank Fraud | 9/5/2018 | 2 |

     The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)  open and underlying  ☐ is  ☑ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/25/2024
Date of Imposition of Judgment

_____
Signature of Judge

Edgardo Ramos, U.S.D.J.
Name and Title of Judge

February 12, 2024
Date

**SPA-47**

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __7__

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
120 months* on count 1 and 120 months* on count 2 to run concurrently.

☑    The court makes the following recommendations to the Bureau of Prisons:
The Court respectfully recommends that Mr. Scott be designated to FCI Miami Satellite Prison Camp*.

☐    The defendant is remanded to the custody of the United States Marshal.*

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____  ☐  a.m.  ☐  p.m.  on _____ .

    ☐    as notified by the United States Marshal.

☑    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑    before 2 p.m. on ___4/30/2024_____ .

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case    Case 1:17-cr-00630-ER    Document 623    Filed 02/12/24    Page 3 of 7
                        Sheet 3 — Supervised Release                                                        (NOTE: Identify Changes with Asterisks (*))

Judgment—Page    3    of    7

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

  3 years on count 1 and 3 years on count 2 to run concurrently.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
      imprisonment and at least two periodic drug tests thereafter, as determined by the court.
          ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future
              substance abuse. *(check if applicable)*
4.    ☐   You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of
          restitution. *(check if applicable)*
5.    ☑   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
          directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
          reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# SPA-49

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|

DEFENDANT:   MARK S. SCOTT
CASE NUMBER:   S10 17-cr-630-1 (ER)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

# SPA-50

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___5___ of ___7___

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## SPECIAL CONDITIONS OF SUPERVISION

You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

You must provide the probation officer with access to any requested financial information.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

It is recommended that you be supervised by the district of residence.

# SPA-51

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

| | | | Judgment — Page | 6 | of | 7 |
|---|---|---|---|---|---|---|

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ 0.00 | $ 0.00 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐ the interest requirement is waived for  ☐ fine  ☐ restitution.

    ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA-52**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___7___ of ___7___

DEFENDANT:  MARK S. SCOTT
CASE NUMBER:  S10 17-cr-630-1 (ER)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☑  Lump sum payment of $ ___200.00___ due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐  C,  ☐  D, or  ☐  F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# SPA-53

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 63. Mail Fraud and Other Fraud Offenses (Refs & Annos)

18 U.S.C.A. § 1344

§ 1344. Bank fraud

Currentness

Whoever knowingly executes, or attempts to execute, a scheme or artifice--

**(1)** to defraud a financial institution; or

**(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## CREDIT(S)

(Added Pub.L. 98-473, Title II, § 1108(a), Oct. 12, 1984, 98 Stat. 2147; amended Pub.L. 101-73, Title IX, § 961(k), Aug. 9, 1989, 103 Stat. 500; Pub.L. 101-647, Title XXV, § 2504(j), Nov. 29, 1990, 104 Stat. 4861.)

Notes of Decisions (438)

18 U.S.C.A. § 1344, 18 USCA § 1344
Current through P.L. 118-62. Some statute sections may be more current, see credits for details.

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-54

§ 1956. Laundering of monetary instruments, 18 USCA § 1956

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1956

§ 1956. Laundering of monetary instruments

Effective: December 23, 2022

Currentness

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

**(A)(i)** with the intent to promote the carrying on of specified unlawful activity; or

**(ii)** with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

**(B)** knowing that the transaction is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

**(2)** Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

**(A)** with the intent to promote the carrying on of specified unlawful activity; or

# SPA-55

**(B)** knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

**(3)** Whoever, with the intent--

**(A)** to promote the carrying on of specified unlawful activity;

**(B)** to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

**(C)** to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

**(b) Penalties.--**

**(1) In general.**--Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of--

**(A)** the value of the property, funds, or monetary instruments involved in the transaction; or

**(B)** $10,000.

# SPA-56

**(2) Jurisdiction over foreign persons.**--For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and--

**(A)** the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

**(B)** the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

**(C)** the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

**(3) Court authority over assets.**--A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

**(4) Federal receiver.**--

**(A) In general.**--A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

**(B) Appointment and authority.**--A Federal Receiver described in subparagraph (A)--

**(i)** may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;

**(ii)** shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

**(iii)** shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant--

**(I)** from the Financial Crimes Enforcement Network of the Department of the Treasury; or

## SPA-57

**(II)** from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.

**(c)** As used in this section--

**(1)** the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

**(2)** the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

**(3)** the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

**(4)** the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

**(5)** the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

**(6)** the term "financial institution" includes--

**(A)** any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

**(B)** any foreign bank, as defined in section 1 [1] of the International Banking Act of 1978 (12 U.S.C. 3101);

**(7)** the term "specified unlawful activity" means--

**(A)** any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

# SPA-58

**(B)** with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--

**(i)** the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

**(ii)** murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16);

**(iii)** fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)); [2]

**(iv)** bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

**(v)** smuggling or export control violations involving--

**(I)** an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

**(II)** an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774);

**(vi)** an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or

**(vii)** trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or harboring a person, including a child, for commercial sex acts;

**(C)** any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act (21 U.S.C. 848);

**(D)** an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities

# SPA-59

of States and private entities), section 541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to border tunnels), section 641 (relating to public money, property, or records), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 922(l) (relating to the unlawful importation of firearms), section 924(n), 932, or 933 (relating to firearms trafficking), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 1006 [3] (relating to fraudulent Federal credit institution entries), 1007 [3] (relating to Federal Deposit Insurance transactions), 1014 [3] (relating to fraudulent loan or credit applications), section 1030 (relating to computer fraud and abuse), 1032 [3] (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnaping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States), section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services), section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices), section 2339A or 2339B (relating to providing material support to terrorists), section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization) of this title, section 46502 of title 49, United States Code, a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food and Nutrition Act of 2008 (relating to supplemental nutrition assistance program benefits fraud) involving a quantity of benefits having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing Act of 1949 (relating to equity skimming), any felony violation of the Foreign Agents Registration Act of 1938, any felony violation of the Foreign Corrupt Practices Act, section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons), or section 104(a) of the North Korea Sanctions Enforcement Act of 2016 (relating to prohibited activities with respect to North Korea);

# SPA-60

## ENVIRONMENTAL CRIMES

**(E)** a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.);

**(F)** any act or activity constituting an offense involving a Federal health care offense; or

**(G)** any act that is a criminal violation of subparagraph (A), (B), (C), (D), (E), or (F) of paragraph (1) of section 9(a) of the Endangered Species Act of 1973 (16 U.S.C. 1538(a)(1)), section 2203 of the African Elephant Conservation Act (16 U.S.C. 4223), or section 7(a) of the Rhinoceros and Tiger Conservation Act of 1994 (16 U.S.C. 5305a(a)), if the endangered or threatened species of fish or wildlife, products, items, or substances involved in the violation and relevant conduct, as applicable, have a total value of more than $10,000;

**(8)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(9)** the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

**(d)** Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

**(e)** Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

**(f)** There is extraterritorial jurisdiction over the conduct prohibited by this section if--

**(1)** the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

§ 1956. Laundering of monetary instruments, 18 USCA § 1956

---

**(2)** the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

**(g) Notice of conviction of financial institutions.**--If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

**(h)** Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**(i) Venue.--(1)** Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in--

**(A)** any district in which the financial or monetary transaction is conducted; or

**(B)** any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

**(2)** A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

**(3)** For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

**(j) Seven-year limitation.**--Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for a violation of this section or section 1957 if the specified unlawful activity constituting the violation is the activity defined in subsection (c)(7)(B) of this section, unless the indictment is found or the information is instituted not later than 7 years after the date on which the offense was committed.

## CREDIT(S)

(Added Pub.L. 99-570, Title I, § 1352(a), Oct. 27, 1986, 100 Stat. 3207-18; amended Pub.L. 100-690, Title VI, §§ 6183, 6465, 6466, 6469(a)(1), 6471(a), (b), Title VII, § 7031, Nov. 18, 1988, 102 Stat. 4354, 4375, 4377, 4378, 4398; Pub.L. 101-647, Title I, §§ 105 to 108, Title XII, § 1205(j), Title XIV, §§ 1402, 1404, Title XXV, § 2506, Title XXXV, § 3557, Nov. 29, 1990, 104 Stat. 4791, 4792, 4831, 4835, 4862, 4927; Pub.L. 102-550, Title XV, §§ 1504(c), 1524, 1526(a), 1527(a), 1530, 1531, 1534, 1536, Oct. 28, 1992, 106 Stat. 4055, 4064 to 4067; Pub.L. 103-322, Title XXXII, § 320104(b), Title XXXIII, §§ 330008(2), 330011(l), 330012, 330019, 330021(1), Sept. 13, 1994, 108 Stat. 2111, 2142, 2145, 2146, 2149, 2150; Pub.L. 103-325, Title IV, §§ 411(c)(2)(E), 413(c)(1), (d),

# SPA-62

§ 1956. Laundering of monetary instruments, 18 USCA § 1956

Sept. 23, 1994, 108 Stat. 2253 to 2255; Pub.L. 104-132, Title VII, § 726, Apr. 24, 1996, 110 Stat. 1301; Pub.L. 104-191, Title II, § 246, Aug. 21, 1996, 110 Stat. 2018; Pub.L. 104-294, Title VI, §§ 601(f)(6), 604(b)(38), Oct. 11, 1996, 110 Stat. 3499, 3509; Pub.L. 106-569, Title VII, § 709(a), Dec. 27, 2000, 114 Stat. 3018; Pub.L. 107-56, Title III, §§ 315, 317, 318, 376, Title VIII, § 805(b), Title X, § 1004, Oct. 26, 2001, 115 Stat. 308, 310, 311, 342, 378, 392; Pub.L. 107-273, Div. B, Title IV, §§ 4002(a)(11), (b)(5), (c)(2), 4005(d)(1), (e), Nov. 2, 2002, 116 Stat. 1807, 1809, 1812, 1813; Pub.L. 108-458, Title VI, § 6909, Dec. 17, 2004, 118 Stat. 3774; Pub.L. 109-164, Title I, § 103(b), Jan. 10, 2006, 119 Stat. 3563; Pub.L. 109-177, Title III, § 311(c), Title IV, §§ 403(b), (c)(1), 405, 406(a) (2), 409, Mar. 9, 2006, 120 Stat. 242 to 244, 246; Pub.L. 110-234, Title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c) (1)(A)(i), (B)(ii), May 22, 2008, 122 Stat. 1096, 1097, 1109; Pub.L. 110-246, § 4(a), Title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c)(1)(A)(i), (B)(ii), June 18, 2008, 122 Stat. 1664, 1857, 1858, 1870; Pub.L. 110-358, Title II, § 202, Oct. 8, 2008, 122 Stat. 4003; Pub.L. 111-21, § 2(f)(1), May 20, 2009, 123 Stat. 1618; Pub.L. 112-127, § 6, June 5, 2012, 126 Stat. 371; Pub.L. 114-122, Title I, § 105(c), Feb. 18, 2016, 130 Stat. 101; Pub.L. 114-231, Title V, § 502, Oct. 7, 2016, 130 Stat. 956; Pub.L. 117-159, Div. A, Title II, § 12004(a)(4), June 25, 2022, 136 Stat. 1328; Pub.L. 117-263, Div. E, Title LIX, § 5904(a), Dec. 23, 2022, 136 Stat. 3441.)

Notes of Decisions (755)

## Footnotes

1    So in original. Probably should read "section 1(b)".

2    So in original. The second closing parenthesis probably should not appear.

3    So in original. Probably should be preceded by "section".

18 U.S.C.A. § 1956, 18 USCA § 1956
Current through P.L. 118-62. Some statute sections may be more current, see credits for details.

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    9