# 23-7199(L)

## 24-368(CON)

*To Be Argued By*:
KEVIN MEAD

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 23-7199(L), 24-368(CON)

◆◆◆

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

KARL SEBASTIAN GREENWOOD, MARK S. SCOTT,

*Defendants-Appellants*,

RUJA IGNATOVA, also known as Cryptoqueen, KONSTANTIN IGNATOVA, also known as Sealed Defendant 1, DAVID R. PIKE, FRANK SCHNEIDER, IRINA DILKINSKA,

*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

KEVIN MEAD,
JULIANA MURRAY,
JAMES LIGTENBERG,
*Assistant United States Attorneys,*
*Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The OneCoin Fraud and Money Laundering
        Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  The Government's Case Against
        Scott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        1.  Scott's Knowing Participation in the
            Scheme . . . . . . . . . . . . . . . . . . . . . . . .  8

        2.  Konstantin Ignatov's Testimony . . . . .  13

    C.  The Defense Case and Verdict . . . . . . . . . .  16

    D.  Scott's Post-Trial Motions . . . . . . . . . . . . .  16

    E.  Scott's Sentencing . . . . . . . . . . . . . . . . . . .  21

    F.  Greenwood's Plea . . . . . . . . . . . . . . . . . . . .  21

    G.  Greenwood's Sentencing . . . . . . . . . . . . . . .  22

ARGUMENT:

POINT I—The District Court Did Not Abuse Its
      Discretion in Denying Scott's Motion for a New
      Trial Based on Konstantin's Purported
      Perjury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  25

ii

PAGE

1. New Trial Motions Alleging
   Perjury . . . . . . . . . . . . . . . . . . . . . . . . 25

2. Evidentiary Hearings on New Trial
   Motions . . . . . . . . . . . . . . . . . . . . . . . . 27

3. Standard of Review . . . . . . . . . . . . . . 28

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 29

1. Konstantin's Perjury Regarding the
   Disposal of His Laptop Was Not
   Material . . . . . . . . . . . . . . . . . . . . . . . . 29

2. Konstantin's Testimony Regarding the
   July 2016 Meeting Does Not Necessitate
   a New Trial. . . . . . . . . . . . . . . . . . . . . . 32

   a. The District Court Did Not Clearly
      Err in Concluding that Konstantin's
      Testimony Regarding the Meeting
      Was Not Perjury . . . . . . . . . . . . . . 32

   b. The District Court Did Not Abuse Its
      Discretion in Concluding that
      Konstantin's Testimony Regarding
      the Meeting Was Not
      Material . . . . . . . . . . . . . . . . . . . . . 34

      i. The Government Did Not Know
         or Have Reason to Know that
         Konstantin's Testimony Was
         Perjury . . . . . . . . . . . . . . . . . . 35

iii

PAGE

        ii.   Konstantin's Testimony
Regarding the Meeting Was Not
Material, Regardless of the
Applicable Standard . . . . . . . .  39

    3.   The District Court's Exclusion of the
Dilkinska Emails Was Harmless . . . .  45

    4.   The District Court Did Not Abuse Its
Discretion by Declining to Hold an
Evidentiary Hearing . . . . . . . . . . . . . .  46

POINT II—The District Court Acted Well Within Its
Discretion In Excluding Prior Out-of-Court
Statements as Hearsay . . . . . . . . . . . . . . . . . . . .  48

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  48

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  50

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  51

POINT III—The District Court Did Not Abuse Its
Discretion In Quashing Scott's Trial
Subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  52

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  53

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  54

POINT IV—Sufficient Evidence Supported Scott's
Conviction for Conspiring to Commit Money
Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

iv

PAGE

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  55

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  56

POINT V—The District Court Did Not Plainly Err in
Declining to Give a Jury Instruction that
Inaccurately Stated the Law . . . . . . . . . . . . . .  58

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  58

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  59

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  60

POINT VI—Sufficient Evidence Supported Scott's
Conviction for Conspiring to Commit Bank
Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

    A.  The CryptoReal Transaction . . . . . . . . . . .  62

    B.  The Armenta Transactions . . . . . . . . . . . .  64

POINT VII—The District Court Properly Concluded
that the Guidelines Calculation Should Include
Both Domestic and International Loss from the
OneCoin Scheme . . . . . . . . . . . . . . . . . . . . . . . .  67

    A.  Standard of Review. . . . . . . . . . . . . . . . . . .  67

    B.  The District Court Properly Held Greenwood
Responsible for the Full Loss Amount of His
Fraud Scheme . . . . . . . . . . . . . . . . . . . . . . .  69

    C.  *Azeem* Does Not Apply to Greenwood's
Convictions . . . . . . . . . . . . . . . . . . . . . . . . . .  71

v

PAGE

1. Applicable Law. . . . . . . . . . . . . . . . . . . 73

2. Discussion. . . . . . . . . . . . . . . . . . . . . 80

    a. The Foreign Losses on the Wire Fraud Counts Were Part of the Offenses of Conviction . . . . . . . . 80

    b. In the Alternative, the Foreign Losses on the Wire Fraud Counts Were Part of a Common Scheme or Plan . . . . . . . . . . . . . . . . . . . . . . 84

    c. The Foreign Losses on the Wire Fraud Counts Were Also Closely Intertwined with the Domestic Losses. . . . . . . . . . . . . . . . . . . . . 85

    d. Courts Regularly Include Foreign Victims in Loss Amount Calculations. . . . . . . . . . . . . . . 86

    e. Policy Reasons Counsel in Favor of Including Foreign Victims in Loss Amount Calculations . . . . . . . . . 88

  D. *Azeem* Does Not Apply to Section 2B1.1 of the Guidelines . . . . . . . . . . . . . . . . . . . . . . . . 91

POINT VIII—Greenwood's Sentence Was Substantively Reasonable. . . . . . . . . . . . . . . . . 94

  A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 94

vi

PAGE

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  96

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  99

## TABLE OF AUTHORITIES

*Cases*:

*Bascuñán v. Elsaca*,
  927 F.3d 108 (2d Cir. 2019) . . . . . . . . . .  56, 57, 69

*Beckles v. United States*,
  580 U.S. 256 (2017). . . . . . . . . . . . . . . . . . . . . . . 88

*Carrasco v. United States*,
  820 F. Supp. 2d 562 (S.D.N.Y. 2011) . . . . . . . . . . 92

*Edwards v. United States*,
  523 U.S. 511 (1998). . . . . . . . . . . . . . . . . . . . . . . 73

*Henderson v. Kibbe*,
  431 U.S. 145 (1977). . . . . . . . . . . . . . . . . . . . . . . 66

*Hughey v. United States*,
  495 U.S. 411 (1990). . . . . . . . . . . . . . . . . . . . . . . 75

*In re Subpoena Issued to Dennis Friedman*,
  350 F.3d 65 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 53

*Life Techs. Corp. v. Promega Corp.*,
  580 U.S. 140 (2017). . . . . . . . . . . . . . . . . . . . . . . 89

*Loughrin v. United States*,
  573 U.S. 351 (2014). . . . . . . . . . . . . . . . . . . . . . . 64

vii

PAGE

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
578 U.S. 374 (2016). . . . . . . . . . . . . . . . . . . . . . . . 89

*Muscarello v. United States*,
524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . 88

*Pasquantino v. United States*,
544 U.S. 349 (2005). . . . . . . . . . . . . . . . . . . . . . . 86

*Rita v. United States*,
551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Alcius*,
952 F.3d 83 (2d Cir. 2020) . . . . . . . . . . . . . . . 95, 97

*United States v. Alston*,
899 F.3d 135 (2d Cir. 2018) . . . . . . . . . . . . . . . . 25

*United States v. Alvarado*,
720 F.3d 153 (2d Cir. 2013) . . . . . . . . . . . . . . . . 60

*United States v. Ambrosio*,
129 F.3d 114, 1997 WL 701368
(2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Anderson*,
689 F. App'x 53 (2d Cir. 2017) . . . . . . . . . . . . . . 31

*United States v. Approximately $25,829,681.80 in Funds*,
No. 98 Civ. 2682 (LLM), 1999 WL 1080370
(S.D.N.Y. Nov. 30, 1999). . . . . . . . . . . . . . . . . . . 69

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) . . . . . . . . .  26, 28, 35, 47

viii

PAGE

*United States v. Avellino,*
    136 F.3d 249 (2d Cir. 1998) . . . . . . . . . . . . . . . . 30

*United States v. Ayala,*
    75 F. Supp. 2d 126 (S.D.N.Y. 1999) . . . . . . . . . . 75

*United States v. Azeem,*
    946 F.2d 13 (2d Cir. 1991) . . . . . . . . . . . . . *passim*

*United States v. Best,*
    219 F.3d 192 (2d Cir. 2000) . . . . . . . . . . . . . . . . 45

*United States v. Bok,*
    156 F.3d 157 (2d Cir. 1998) . . . . . . . . . . . . . 60, 61

*United States v. Booker,*
    543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Brock,*
    789 F.3d 60 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 55

*United States v. Broxmeyer,*
    699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . *passim*

*United States v. Burnett,*
    968 F.2d 278 (2d Cir. 1992) . . . . . . . . . . . . . . . . 75

*United States v. Carboni,*
    204 F.3d 39 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 75

*United States v. Castillo,*
    896 F.3d 141 (2d Cir. 2018) . . . . . . . . . . . . . . . . 94

*United States v. Castro-Valenzuela,*
    304 F. App'x 986 (3d Cir. 2008) . . . . . . . . . . . . . 80

ix

PAGE

*United States v. Catapano,*
No. 05 Cr. 229 (SJ), 2008 WL 2222013 (E.D.N.Y.
May 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) (en banc) . . . . . *passim*

*United States v. Chao Fan Xu,*
706 F.3d 965 (9th Cir. 2013) . . . . . . . . . . . . . . . 80

*United States v. Chmielewski,*
218 F.3d 840 (8th Cir. 2000) . . . . . . . . . . . . . . . 87

*United States v. Cho,*
713 F.3d 716 (2d Cir. 2013) . . . . . . . . . . . . . . . 68

*United States v. Chunza-Plazas,*
45 F.3d 51 (2d Cir. 1995) . . . . . . . . . . . . . . . 76, 77

*United States v. Cote,*
544 F.3d 88 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 25

*United States v. Cramer,*
777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . 68

*United States v. Cuthbert,*
466 F. App'x 46 (2d Cir. 2012) . . . . . . . . . . . . . . 97

*United States v. Cuti,*
720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . 50, 55, 62

*United States v. Dawn,*
129 F.3d 878 (7th Cir. 1997) . . . . . . . . . 79, 80, 85

*United States v. Desinor,*
525 F.3d 193 (2d Cir. 2008) . . . . . . . . . . . . . 60, 61

x

PAGE

*United States v. Dominguez Benitez,*
542 U.S. 74 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Eisenhart,*
710 F. App'x 50 (2d Cir. 2018) . . . . . . . . . . . . . . . 75

*United States v. Elbaz,*
52 F.4th 593 (4th Cir. 2022). . . . . . . . . . . . . . . . . 80

*United States v. Enwerem,*
482 F. App'x 869 (4th Cir. 2012) . . . . . . . . . . . . 87

*United States v. Feldman,*
647 F.3d 450 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 75

*United States v. Ferguson,*
676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 27

*United States v. Forbes,*
790 F.3d 403 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 29

*United States v. Gahagen,*
44 F.4th 99 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . 55

*United States v. Gambino,*
59 F.3d 353 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 30

*United States v. Gaskin,*
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . 55, 68

*United States v. Gasperini,*
894 F.3d 482 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 68

*United States v. Gatto,*
986 F.3d 104 (2d Cir. 2021) . . . . . . . . . .  45, 51, 54

xi

PAGE

*United States v. Gonzalez,*
    407 F.3d 118 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 59

*United States v. Greer,*
    285 F.3d 158 (2d Cir. 2002) . . . . . . . . . . . . . . 77, 78

*United States v. Hayes,*
    99 F. Supp. 3d 409 (2d Cir. 2019) . . . . . . . . . . . 56

*United States v. Helmsley,*
    985 F.2d 1202 (2d Cir. 1993) . . . . . . . . . . . . . . . . 28

*United States v. Huggins,*
    844 F.3d 118 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 92

*United States v. Hunter,*
    No. 05 Cr. 188 (JG), 2008 WL 268065 (E.D.N.Y.
    Jan. 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 94

*United States v. Josephberg,*
    562 F.3d 478 (2d Cir. 2009) . . . . . . . . . . 55, 62, 63

*United States v. Kenner,*
    No. 21-2289, 2023 WL 4692508
    (2d Cir. July 24, 2023) . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Khodadad,*
    122 F.3d 1058, 1995 WL 595073 (2d. Cir. Sept. 12,
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Kinder,*
    64 F.3d 757 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 88

xii

PAGE

*United States v. Lespier,*
266 F. App'x 5 (2d Cir. 2008) . . . . . . . . . . . . . . . 31

*United States v. Locascio,*
6 F.3d 924 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 30

*United States v. Lussier,*
104 F.3d 32 (2d Cir.1997). . . . . . . . . . . . . . . . . 75

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . 66

*United States v. Martinez,*
54 F.3d 1040 (2d Cir. 1995) . . . . . . . . . . . . . . . 55

*United States v. McDonald,*
759 F.3d 220 (2d Cir. 2014) . . . . . . . . . . . . . . . 60

*United States v. Mendoza,*
464 U.S. 154 (1984). . . . . . . . . . . . . . . . . . . . . 78

*United States v. Messina,*
806 F.3d 55 (2d Cir. 2015) . . . . . . . . . . . . . . . . 95

*United States v. Monteleone,*
257 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . 26, 33

*United States v. Nektalov,*
461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . 50

*United States v. Norman,*
776 F.3d 67 (2d Cir. 2015) . . . . . . . . . . . . . . . . 68

*United States v. Okike,*
60 F. App'x 100 (9th Cir. 2003) . . . . . . . . . . . . . 87

xiii

PAGE

*United States v. Oluwanisola,*
   605 F.3d 124 (2d Cir. 2010) . . . . . . . . . . . . . . 45, 51

*United States v. Orena,*
   32 F.3d 704 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 30

*United States v. Parkes,*
   497 F.3d 220 (2d Cir. 2007) . . . . . . . . . .  27, 30, 41

*United States v. Paulino,*
   445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . . 51

*United States v. Persico,*
   645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . 45, 55

*United States v. Peterson,*
   101 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . 75

*United States v. Pope,*
   554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 97

*United States v. Rigas,*
   583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . . . 95

*United States v. Robie,*
   166 F.3d 444 (2d Cir. 1999) . . . . . . . . . . . . . . . . 75

*United States v. Ryan,*
   806 F.3d 691 (2d Cir. 2015) . . . . . . . . . . . . . . . . 68

*United States v. Sasso,*
   59 F.3d 341 (2d Cir. 1995) . . . . . . . . . . . . . . 27, 28

*United States v. Seabrook,*
   No. 10 CR 87 (DAB), 2013 WL 4754331 (S.D.N.Y.
   Aug. 26, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

xiv

PAGE

*United States v. Simpson,*
    319 F.3d 81 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 88

*United States v. Spence,*
    923 F.3d 929 (11th Cir. 2019) . . . . . . . . . . . . . . 80

*United States v. Stanley,*
    12 F.3d 17 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 75

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . *passim*

*United States v. Taylor,*
    961 F.3d 68 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 68

*United States v. Teyer,*
    322 F. Supp. 2d 359 (S.D.N.Y. 2004) . . . . . . . 79, 85

*United States v. Tokhtakhounov,*
    607 F. App'x 8 (2d Cir. 2015) . . . . . . . . . . . . 78, 79

*United States v. Tracy,*
    12 F.3d 1186 (2d Cir. 1993) . . . . . . . . . . . . . . . . 69

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . *passim*

*United States v. Watson,*
    894 F.2d 1345 (D.C. Cir. 1990) . . . . . . . . . . . . . . 60

*United States v. White,*
    972 F.2d 16 (2d Cir. 1992) . . . . . . . . . . . 28, 29, 47

*United States v. Wilkinson,*
    169 F.3d 1236 (10th Cir. 1999) . . . . . . . . . . . . . . 80

xv

PAGE

*United States v. Wong,*
    78 F.3d 73 (2d Cir. 1996) . . . . . . . . .   27, 30, 38, 41

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 36

*United States v. Zayas,*
    758 F.3d 986 (8th Cir. 2014) . . . . . . . . . . . . . . . . 80

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

18 U.S.C. § 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

18 U.S.C. § 38(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

18 U.S.C. § 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

18 U.S.C. § 1029(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

18 U.S.C. § 1091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 84

18 U.S.C. § 1956(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

18 U.S.C. § 2280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

18 U.S.C. § 2332b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 93

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . .   88, 89, 94

28 U.S.C. § 991(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . 88

49 U.S.C. § 14915(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 93

49 U.S.C. § 14915(c) . . . . . . . . . . . . . . . . . . . . . . . . . . 93

xvi

PAGE

49 U.S.C. § 40102(a)(5) . . . . . . . . . . . . . . . . . . . . . . . 93

49 U.S.C. § 46317(a). . . . . . . . . . . . . . . . . . . . . . . . . . 93

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Crim. P. 30(a). . . . . . . . . . . . . . . . . . . . 59, 60

Fed. R. Crim. P. 30(b). . . . . . . . . . . . . . . . . . . . 59, 60

Fed. R. Crim. P. 30(d). . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . . . . . . 16, 25

Fed. R. Evid. 801(c)(2) . . . . . . . . . . . . . . . . . . . 48, 51

Fed. R. Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . . . 45

U.S.S.G. § 1B1.1 . . . . . . . . . . . . . . . . . . . . . . . . 71, 73

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 2B1.5(b)(2) . . . . . . . . . . . . . . . . . . . . . 91

U.S.S.G. § 2F1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 87

U.S.S.G. § 2M5.3 . . . . . . . . . . . . . . . . . . . . . . . . . . 91

U.S.S.G. § 2S1.1 . . . . . . . . . . . . . . . . . . . . . . . . 71, 73

U.S.S.G. § 2T1.1(b)(1). . . . . . . . . . . . . . . . . . . . . . 91

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 73

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 23-7199(L), 24-368(CON)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

KARL SEBASTIAN GREENWOOD, MARK S. SCOTT,

*Defendants-Appellants,*

RUJA IGNATOVA, also known as Cryptoqueen,
KONSTANTIN IGNATOVA, also known as Sealed
Defendant 1, DAVID R. PIKE, FRANK SCHNEIDER, IRINA
DILKINSKA,

*Defendants.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Mark Scott appeals from a judgment of conviction entered on February 2, 2024, and amended on February 12, 2024, in the United States District Court for the Southern District of New York, following a three-week trial before the Honorable Edgardo Ramos,

2

United States District Judge, and a jury. Karl Sebastian Greenwood appeals from a judgment of conviction entered on September 25, 2023, and amended on January 18, 2024, in the United States District Court for the Southern District of New York, by Judge Ramos, following his guilty plea.

Superseding Indictment S10 17 Cr. 630 (ER) was filed on October 8, 2019, charging Scott in two counts. Count One charged Scott with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). Count Two charged Scott with conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349.

Scott's trial commenced on November 4, 2019, and ended on November 25, 2019, when Scott was convicted on both counts.

On January 25, 2024, Judge Ramos sentenced Scott principally to 120 months' imprisonment and imposed forfeiture in the amount of $392,940,000.

Scott is on bail pending appeal.

Superseding Information S16 17 Cr. 630 (ER) was filed on December 16, 2022, charging Greenwood in three counts. Count One charged Greenwood with conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Two charged Greenwood with wire fraud, in violation of 18 U.S.C. § 1343. Count Three charged Greenwood with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h).

On December 16, 2022, Greenwood pled guilty to all three counts in the S16 Superseding Information without a plea agreement.

3

On September 12, 2023, Judge Ramos sentenced Greenwood principally to 240 months' imprisonment and imposed forfeiture in the amount of $300,000,000.

Greenwood is serving his sentence.

## Statement of Facts

### A. The OneCoin Fraud and Money Laundering Scheme

OneCoin was a fake cryptocurrency founded by Ruja Ignatov ("Ruja")[1] and defendant-appellant Karl Sebastian Greenwood in 2014. From its inception, OneCoin was designed by Ruja and Greenwood to be a fraudulent scheme. (Greenwood PSR ¶ 27).[2] Ruja and

---

    [1]   To avoid confusion, this brief refers to Ruja and her brother, Konstantin Ignatov, by their first names.

    [2]   "Greenwood PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Greenwood's sentencing; "Scott PSR" refers to the Presentence Investigation Report prepared by the Probation Office in connection with Scott's sentencing; "Greenwood Br." refers to Greenwood's brief on appeal; "GA." refers to the appendix filed with Greenwood's brief; "Scott Br." refers to Scott's brief on appeal; "SA." refers to the appendix filed with Scott's brief; "SPA" refers to the special appendix filed with Scott's brief; "GX" refers to a Government Exhibit at Scott's trial; "DX" refers to a defense exhibit at Scott's trial; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text

4

Greenwood developed an unsustainable compensation structure for the purpose of enticing people to invest in OneCoin "trader packages," and they falsely promised investors that they would make a five-fold or ten-fold investment return. (Scott PSR ¶ 22). OneCoin's head office was located in Bulgaria, and it began operating in the United States in or about 2015. (SA. 75, 81, 246). Approximately 3.5 million people invested in OneCoin cryptocurrency packages. (SA. 81; GA. 169). OneCoin defrauded these investors out of more than $4 billion. (GA. 169).

OneCoin sold its phony cryptocurrency through a global multi-level marketing scheme in which One-Coin members were encouraged to sell trader packages to friends and family. (SA. 91-92; GX 100). Purchase of a trader package provided access to "educational materials" and "tokens." (SA. 92). OneCoin falsely represented that "tokens" could be used to "mine" OneCoins. (SA. 92). In fact, unlike a legitimate cryptocurrency, OneCoin was not actually engaged in mining, but was only tricking investors into believing that it was. (SA. 92).

OneCoin also falsely claimed that the value of a OneCoin was based on market supply and demand when, in fact, the company simply set and manipulated the stated value. (SA. 97; GX 1001 at 19). The purported value of a OneCoin grew steadily from €0.50

—————

quotations omit internal quotation marks, citations, footnotes, and previous alterations.

5

to €29.95 per coin and never decreased. (GX 3007; SA. 87).

In addition, OneCoin fraudulently claimed to have a private "blockchain"—a digital ledger identifying OneCoins and recording historical transactions. (GX 204; SA. 89). In 2015, Ruja falsely represented to the public that the OneCoin blockchain had been audited by an external auditor. (SA. 89). In reality, the audit report was fake and had been drafted by OneCoin employees. (SA. 89-90).

As banks around the world began to catch on to the OneCoin fraud scheme, they became unwilling to handle OneCoin's money. (SA. 105). OneCoin could not open bank accounts in its own name or transfer its fraud proceeds. (SA. 105).

In late 2015, Gilbert Armenta—who was Ruja's boyfriend—began laundering OneCoin fraud proceeds for Ruja. (GX 2114, 2115). Around that same time, Armenta introduced Ruja to defendant-appellant Mark Scott, a Miami-based corporate lawyer with experience representing private equity funds. (GX 2201). Scott then leveraged that experience to construct a sophisticated money laundering scheme for Ruja. (*See* GX 2602, 2602-A). He arranged for hundreds of millions of dollars in OneCoin fraud proceeds to be transferred—via shell companies operated by members of the OneCoin fraud conspiracy—into a series of fake investment funds (called the "Fenero Funds") that he set up in the Cayman Islands and the British Virgin Islands. (GX 2602, 2602-A, 2701). On paper, the shell companies were "investors" in the Fenero Funds. (Scott PSR ¶ 34). But instead of making legitimate

6

investments, the Fenero Funds transferred the fraud proceeds back to accounts controlled by Ruja and other members of the OneCoin fraud conspiracy—allowing them to access fraud proceeds while concealing the link between those proceeds and OneCoin. (Scott PSR ¶ 34).

Throughout Scott's participation in the scheme, Scott and his co-conspirators made numerous misrepresentations to banks and financial institutions—including federally insured U.S. banks—to cause them to unwittingly transfer proceeds from the OneCoin fraud scheme. (Scott PSR ¶¶ 34, 42-43). In particular, Scott and his co-conspirators misrepresented the source of the funds they were transferring and the true purpose of the transfers. (Scott PSR ¶¶ 35-43).

In 2016, the fund administrator for the Fenero Funds—Apex Group Ltd. ("Apex")—began conducting enhanced due diligence on the funds. (Scott PSR ¶ 38). Scott repeatedly lied to Apex and provided them with a series of fraudulent documents. (Scott PSR ¶¶ 38-41). After Apex notified government agencies, Scott resigned from his law firm position in September 2016. (Scott PSR ¶¶ 28, 38).

## B.  The Government's Case Against Scott

At Scott's trial, the Government overwhelmingly proved that OneCoin was an international wire fraud scheme, that Scott knowingly laundered the proceeds from that scheme, and that Scott and others conspired to mislead banks to convince them to transfer fraud proceeds. The Government called seventeen witnesses, including a former managing director at Apex; a

7

money laundering expert; employees from U.S. banks that were defrauded by Scott; a partner from Scott's former law firm; a financial intelligence analyst who traced the criminal proceeds; a federal agent who was present for Scott's post-arrest interview, in which Scott repeatedly lied about his involvement with One-Coin and Ruja; and Konstantin Ignatov, Ruja's brother, who initially served as Ruja's personal assistant and later assumed a top leadership position at OneCoin.

Two of the Government's witnesses were victims in the United States who were defrauded by the OneCoin scheme. One victim testified that he and his family were induced to invest tens of thousands of dollars based on false representations, and that they never received any of their money back. (SA. 65, 71-72). Another victim testified that she was swindled into investing $30,000 in OneCoin, that she was never able to exchange her OneCoins for anything of value, and that she had to delay her retirement as a result. (SA. 246, 251).

The Government's evidence also included numerous emails, including emails between Scott and key members of the OneCoin scheme—such as Ruja, Armenta, and Irina Dilkinska. (*See, e.g.*, GX 1005, 1012, 1025, 1047, 1060, 1061). In addition, the Government introduced bank records and charts detailing Scott's network of offshore bank accounts, his laundering of OneCoin scheme proceeds, and his own criminal proceeds. (*See, e.g.*, GX 2627, 2628). This evidence made clear that Scott had custom-built an elaborate money laundering vehicle, using fake investment funds to

8

launder nearly $400 million of OneCoin fraud proceeds on Ruja's behalf. In exchange, Scott was paid over $50 million. (GX 2628).

### 1. Scott's Knowing Participation in the Scheme

At trial, Scott did not dispute that OneCoin was a "massive fraud scheme." (SA. 62; *see* SA. 528). Nor did he dispute that the $400 million he received into the Fenero Funds was derived from criminal activity. Instead, the key dispute at trial was whether Scott *knew* that the money he received was criminally derived. As discussed below, the Government presented devastating evidence that Scott knew the money was derived from criminal activity, and this evidence was almost entirely independent of Konstantin's testimony.

*First*, the Government introduced evidence that the Fenero Funds were not legitimate investment funds, but instead were used as an elaborate front company to "clean" Ruja's criminal proceeds by disguising them as investments and thereby concealing their connection to Ruja and OneCoin. For example, when opening bank accounts for the Fenero Funds, Scott sent banks a mission statement full of blatant lies. He falsely stated that he had lined up a "small investor base of wealthy families and middle market companies," and that the initial investors in the Fenero Funds had been Scott's clients for 3-12 years and had closed more than $2.1 billion in transactions under Scott's legal advice. (GX 2201). In fact, all the money invested in the Fenero Funds was derived from OneCoin and belonged to one "investor," Ruja. Other portions of Scott's

9

mission statement, including his so-called "track record," were copied and pasted from other websites. (GX 1411, 3301, 3302, 3305).

Moreover, the discussions between Scott and Ruja regarding the Fenero Funds had nothing to do with investments. (*See, e.g.*, GX 1056-T, 4104). Instead, they discussed financial transactions designed solely to hide the connection between Ruja and the OneCoin proceeds. (*See, e.g.*, GX 1032, 1041). In one email, for instance, Scott told Ruja, "you don't need all of the entities anymore for your purposes. Much smoke and mirror for the set-up. Can be combined now." (GX 4104). When choosing the name for the investment funds, Scott explained that it could be anything not associated with OneCoin and should therefore be as "neutral" and "sterile" as possible. (GX 1042). In another email, Scott wrote, "The possible link to [OneCoin] will kill this for us. I will terminate the opportunity slowly and for several other reasons." (GX 1289).

The evidence further demonstrated Scott's knowledge that the shell companies that, on paper, were "investors" in the Fenero Funds were not legitimate investors and were instead being used to disguise the source of the money being transferred (*i.e.*, Ruja and OneCoin). (GX 1391, 2281). On one occasion, for instance, Scott was informed that the purported director and beneficial owner of one of the shell company investors—which had "invested" €95 million in the Fenero Funds—did not have his own house or bank account. (GX 1178). Another shell company was purportedly owned by co-conspirator Irina Dilkinska, who

10

Scott knew was OneCoin employee. (GX 1388, 1391, 2262). Scott knew that the real owner of all these funds was Ruja. (GX 1434).

Scott also used fake loans to create a paper trial for the transfer of OneCoin fraud proceeds out of the Fenero Funds on Ruja's behalf. In one email, for example, Scott wrote to Dilkinska, "There was a 5 million Euro distribution made as per the boss a few weeks ago. We need to paper this deal for our administrator." (GX 1388). Scott attached to his email an amended loan agreement for Dilkinska to sign. (GX 1388). As the Government's money laundering expert at trial explained, "Papering is a term given to the creation of business documents to justify the transfer of money." (SA. 168). The expert then provided the specific example of creating loan documentation, which is precisely what Scott did—he created a loan agreement after the fact to justify the transfer of criminal proceeds. (SA. 168).

*Second*, Scott was told—in elaborate detail—that OneCoin was a fraud scheme and that it was under criminal investigation. In April 2016, before Scott had received any of OneCoin's money into the Fenero Funds, Scott received an email from Dilkinska containing a link to an article in which a certified public accountant in the United States explained in detail all the ways that OneCoin appeared to be a fraud scheme. (GX 4109, 4109-A). Among other things, the article explained that "OneCoin is a sophisticated example of a classic pyramid and/or Ponzi scheme with just enough sheen of respectability and legitimacy to make it a long-ish con." (GX 4109-A). The author also

11

highlighted obvious signs that OneCoin was a fraud scheme, including that OneCoins were entirely unusable and that OneCoin's multi-level marketing program was mathematically unsustainable. (GX 4109-A). Separately, Scott was also informed that there was a history of OneCoin's bank accounts being blocked around the world and that there was a City of London Police investigation into OneCoin. (GX 4102).

*Third*, Scott took extraordinary steps to cover up the link between the Fenero Funds and OneCoin, including lying to Apex, forging documents, and lying to law enforcement. In July and August 2016, Apex began conducting enhanced due diligence on the Fenero Funds—partly due to a series of loans that Scott made to himself from the funds. (SA. 200). When Apex attempted to obtain additional information regarding the source of wealth for the investors in the Fenero Funds, Scott repeatedly lied to Apex and fabricated documents to conceal any connection to OneCoin and to try to convince Apex to continue transferring money out of the Fenero Funds. Scott and his co-conspirators (at Scott's direction) doctored letters of comfort on behalf of two lawyers, created and sent backdated wire instruction letters to Apex, and forged a set of agreements between two of the shell company "investors" in the Fenero Funds. (GX 1175, 1177, 1209, 1312, 2276; SA. 109). In order to make fraudulent documents appear legitimate, Scott directed co-conspirators to "sign some of the letters with a different pen so they do not look so mechanically produced," suggesting that Dilkinska "print them wherever she is and sign and scan them back . . . one at a time" and "sign others in the office with her automatic signature." (GX 1190). Scott

12

then sent the fake wire instruction letters and forged contracts to Apex. (GX 2270, 2276).

After receiving these materials from Scott, Apex continued to refuse Scott's request to transfer money out of the Fenero Funds. At that point, Apex had concluded that it had "been provided [by Scott] with fraudulent documents that hid the relationship with One-Coin." (SA. 231). In a final attempt to convince Apex to transfer money out of the Fenero Funds, Scott demanded a phone call with Apex. During the call, Scott continued to lie to Apex about the underlying source of the money transferred into the Fenero Funds. (GX 2302-TR).

In his post-arrest statement, Scott again lied to federal agents about his fake investment funds. (GX 601). Scott falsely stated that his real "investors" were Dilkinska and Armenta, not Ruja. (GX 601). When asked directly if OneCoin and Ruja had anything to do with the Fenero Funds, Scott flat out denied it. (GX 601).

*Fourth*, Scott received more than $50 million from Ruja, an enormous sum of money that could only be explained by Scott's involvement in a criminal conspiracy. Scott had no investment experience and earned Ruja next to no money, yet he was paid over $50 million. (GX 2628). The only explanation for that type of fee was that Scott was willing to take the risk of engaging in criminal conduct and potentially being caught. The evidence at trial also showed that Scott was obsessed with making money. In one text message, he wrote that he was trying to make $50 million by age 50. (GX 3025-S). And Scott used the millions of dollars he made from the scheme to fund his lavish

13

lifestyle. He used OneCoin fraud proceeds to purchase numerous multi-million-dollar homes, a Ferrari, three Porsches, a Sunseeker yacht, luxury bags, and luxury watches. (GX 2620).

*Fifth*, communications sent by Scott's co-conspirators indicated that Scott was on the inside of the criminal conspiracy. For instance, in an email sent by a co-conspirator to Konstantin, the co-conspirator warned Konstantin that Scott might be a highly placed U.S. informant. (GX 3005-S). The email made clear that Scott was on the inside of the conspiracy and was privy to incriminating information that other co-conspirators did not want him to share with law enforcement. (GX 3005-S).

*Sixth*, Scott took steps throughout the conspiracy to conceal his criminal communications. Scott was unwilling to communicate through Skype because it was "very unsafe" (GX 4041), and instead communicated with Ruja through a special "crypto cell" from Dubai (GX 1035). Scott also told co-conspirators to be careful about putting certain communications in writing. (GX 1110).

## 2. Konstantin Ignatov's Testimony

Konstantin testified at trial pursuant to a cooperation agreement with the Government. His testimony was primarily focused on OneCoin's background, products, multi-level marketing structure, its fraudulent nature, its banking issues, and how it solved those issues through a network of money launderers. (SA. 81, 89-94, 105-08; SPA 6). Konstantin's testimony had little bearing on the key issue of whether Scott knew the

14

$400 million he received into the Fenero Funds was criminally derived.

Konstantin's interactions with Scott were very limited: he only met Scott once, had no substantive conversations with him, and primarily communicated with him about meeting and travel logistics. (SA. 80-81). Konstantin testified that the one time he met Scott was in Sofia, Bulgaria. (SA. 109). He explained that Scott traveled to Bulgaria to meet with Ruja (a fact corroborated by emails and travel records), and that Scott in fact met with Ruja and Dilkinska in the OneCoin office on July 20, 2016. (SA. 109). Konstantin did not attend the meeting and was never told what was discussed at the meeting. (SA. 124). Konstantin also testified more generally that Scott was one of the main money launderers for OneCoin. (SA. 80).

During cross-examination, defense counsel "extensively impeached Konstantin about [his] purported dishonesty and especially about his limited interactions with Scott." (SPA 7). For instance, defense counsel elicited that Konstantin and Scott had only met once; that they never spoke on the phone or exchanged text messages; that they never communicated about the Fenero Funds, OneCoin's blockchain, or anything beyond the logistics of meetings between Scott and Ruja; that no one had told Konstantin what was discussed at the July 2016 meeting; that Konstantin had never seen communications between Scott and Ruja discussing the OneCoin fraud scheme; that Konstantin did not know whether Dilkinska ever told Scott that OneCoin was a fraud; and that Ruja never told Konstantin that OneCoin was a fraud. (SA. 124, 129-31,

15

134, 153). As to Konstantin's testimony that Scott was a money launderer, Konstantin admitted that his understanding of this fact was based on information from Dilkinska, that he had no personal knowledge about that information, and that he had serious questions about Dilkinska's honesty. (SA. 123, 149-51, 153-54).

Konstantin was also heavily impeached regarding his lies to law enforcement, family, and friends; his destruction of evidence; and his commission of several felonies involving fraud and deception. (SA. 99-101, 138). For instance, Konstantin testified that when he entered the United States and was questioned by border patrol agents at the airport in February 2019, he lied about who he worked for and the purpose of his visit. (SA. 99). He also admitted to lying "[a]bout almost everything" in his post-arrest interview. (SA. 100). In addition, Konstantin admitted to participating in wire fraud, bank fraud, and money laundering conspiracies during which false representations were made to investors. (SA. 100).

During cross-examination, defense counsel repeatedly suggested that Konstantin was lying when he testified that Dilkinska had been present for the July 20, 2016 meeting. (*See, e.g.*, SA. 124, 147-49). "[W]hen Scott's counsel thrice pressed Konstantin whether he was 'a hundred percent sure that Ms. Dilkinska was at' the Meeting, Konstantin said he was 'pretty sure' but not a hundred percent." (SPA 8). In an effort to impeach this testimony, the defense showed Konstantin a July 17, 2016 email in which Dilkinska stated that she was "travelling for the whole week." (DX 550; SA. 147-48). Defense counsel sought to admit this email

into evidence, along with a July 20, 2016 email in which Dilkinska stated that she was currently traveling. (DX 552; SA. 372-74). The District Court refused to admit the emails on hearsay grounds. (SA. 373-74).

## C. The Defense Case and Verdict

Scott presented the defense case principally through cross-examination of the Government's witnesses. Scott also called three character witnesses and admitted a number of exhibits. (SA. 447-53, 500-07).

On November 21, 2019, after deliberating for less than four hours, the jury found Scott guilty on both counts charged in the S10 Superseding Indictment. (SA. 562, 567).

## D. Scott's Post-Trial Motions

On February 3, 2020, Scott filed a motion for a judgment of acquittal or for a new trial under Federal Rules of Criminal Procedure 29 and 33. (Dkt. 218). Scott argued that his conviction on the money laundering conspiracy count was improperly extraterritorial, that the Government had failed to prove that he agreed to defraud a bank or that venue was proper, and that the bank fraud jury charge was erroneous. (Dkt. 218). The Government opposed Scott's motion on March 23, 2020. (Dkt. 244).

On August 23, 2021, Scott filed a supplemental Rule 33 motion, arguing that Konstantin testified falsely about (1) throwing his laptop into a trash bin in Las Vegas in February 2019, and (2) Dilkinska being present for the July 20, 2016 meeting in Sofia. (Dkt. 410). Scott requested a new trial or, in the alternative,

17

an evidentiary hearing to question Konstantin. (Dkt. 410).

Prior to Scott's filing of his supplemental motion on August 23, 2021, none of the prosecutors had any knowledge that Konstantin's testimony regarding the disposal of the laptop was false. (Dkt. 412, 445; SPA 9). Upon receiving the supplemental motion, the prosecutors raised the issue with Konstantin, who immediately admitted that he had testified falsely regarding the laptop. (Dkt. 412, 445). The Government opposed Scott's supplemental motion, arguing that Konstantin did not commit perjury regarding the July 2016 meeting and that, regardless, neither that testimony nor the false testimony regarding the laptop affected the outcome of the trial, given the overwhelming independent evidence of Scott's guilt. (Dkt. 412, 445).

In a reply brief, Scott alleged that "a source" had recently provided the defense with a copy of Dilkinska's passport and that the stamps therein showed that she was in India during the same time that Konstantin stated she was at the meeting. (Dkt. 433 at 9). The Government subsequently confirmed with Indian authorities that Dilkinska was in India from July 19, 2016 to July 22, 2016. (SPA 9).

The District Court denied Scott's motions in a written order on September 14, 2023. (SPA 1-38). First, the Court held that the Government provided sufficient evidence to prove Scott guilty of conspiracy to commit bank fraud. (SPA 13-20). Specifically, the Court concluded that the Government proved that three different transactions constituted bank fraud. (SPA 13-20). First, the Court explained, in July 2016, Scott

18

disguised the transfer of OneCoin funds by "loaning" $30 million from the Fenero Funds to CryptoReal Investment Trusts Ltd. ("CryptoReal"). (SPA 4). Scott misrepresented to Apex that someone other than Ruja (a lawyer named Martin Breidenbach) was the beneficial owner of CryptoReal and that the purpose of the loan was to purchase an oil field. (SPA 4). In fact, the funds belonged to Ruja and the true purpose of the loan was to launder OneCoin proceeds back to her. (SPA 4). Because Apex transferred the funds in U.S. dollars, the transfer used a federally insured correspondent bank in Manhattan. (SPA 4). Judge Ramos concluded that the Government had sufficiently proved that Scott knowingly lied about the CryptoReal transaction, that he knew the New York bank would be used to complete the transaction (though his awareness of that fact was not legally required), and that the misrepresentations to banks were material. (SPA 15-17).

Second, the Court explained, in two separate transactions on June 2016 and December 2016, Scott received transfers totaling approximately $10 million into the Fenero Funds from U.S. bank accounts controlled by Armenta. (SPA 4-5). Armenta falsely represented to U.S. banks that these were investments in the Fenero Funds and that the Fenero Funds were private equity firms investing in renewable energy. (SPA 5). Despite knowing that the Fenero Funds were not legitimate investment funds, Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes. (SPA 5). Judge Ramos concluded that the Government had sufficiently proved that Scott was

19

aware of and complicit in Armenta's lies, and that the lies were material. (SPA 17-19).

The District Court likewise held that venue was proper on the bank fraud conspiracy count because the CryptoReal and Armenta transactions went through Manhattan bank accounts, and because the Government adduced sufficient evidence that Scott was aware that international U.S. dollar transactions would require use of U.S. accounts. (SPA 21). The Court also rejected Scott's argument that the bank fraud jury instructions were erroneous. (SPA 21-24).

Judge Ramos further denied Scott's motion as to the money laundering conspiracy count, finding that the Government had presented sufficient evidence that Scott knowingly concealed or disguised proceeds of wire fraud through the Fenero Fund transactions. (SPA 24-30). Moreover, the Court held, "[t]he Government's evidence demonstrated that OneCoin was not a purely extraterritorial wire fraud scheme; rather, it included testimony from two U.S. victims of OneCoin about their investments in the scheme and the promoters who introduced them to OneCoin, testimony regarding OneCoin meetings and conferences in the United States promoting OneCoin . . . , and individuals transmitting wires internationally in connection with OneCoin's U.S. activities." (SPA 26). Because "One-Coin specifically targeted victims in the United States and carried out elements of its fraudulent scheme in the United States," the Court concluded, "OneCoin's use of United States wires constitutes an execution of the wire fraud scheme in the United States." (SPA 26-27).

20

Next, Judge Ramos denied Scott's Rule 33 motion for a new trial, finding Scott's arguments meritless and stating that he had no "real concern that an innocent person may have been convicted." (SPA 30). The Court found that Konstantin's perjury regarding the laptop "was such a small part of his testimony as to be negligible," and that it "was a purely collateral matter" and thus "unlikely to have impacted the jury's determination of Scott's guilt." (SPA 32). Given that the focus of Konstantin's testimony was on OneCoin operations (and not Scott), and given the "overwhelming additional evidence" presented at trial, the Court found that Konstantin's testimony—even in its entirety—was not determinative of Scott's guilt. (SPA 32). Judge Ramos found this conclusion to be "reinforced by Scott's extensive impeachment of Konstantin, including on much more significant topics more relevant to the jury's determination of Scott's guilt." (SPA 32). He further held that an evidentiary hearing was unnecessary as there was "no dispute as to the relevant facts." (SPA 32 n.7).

Finally, the District Court rejected Scott's argument that a new trial was warranted based on Konstantin's testimony that Dilkinska attended the July 20, 2016 meeting in Sofia. (SA. 34-37). While other evidence showed that Dilkinska was in India at the time, Judge Ramos noted that Konstantin's testimony about her presence at the meeting was equivocal and that Konstantin "may have merely been mistaken of the date of the meeting—that Scott met with Ruja and Dilkinska in September 2016, not July 2016, or Dilkinska attended by phone rather than in person." (SPA 35). Accordingly, the Court concluded, Scott had not

21

satisfied his burden of showing that Konstantin made a willful, as opposed to accidental, misstatement. (SPA 35). Moreover, the Court continued, even assuming that Konstantin perjured himself about the meeting, such perjury would be—at most—"cumulative impeachment material" and would not have affected the jury's judgment, given the tremendous evidence of Scott's guilt. (SPA 36-37).

### E.  Scott's Sentencing

On January 25, 2024, the District Court sentenced Scott to 120 months' imprisonment on each count, to be served concurrently, followed by three years' supervised release. (SPA 40-41). The Court also imposed forfeiture in the amount of $392,940,000 and a $200 special assessment. (SPA 44-45).

### F.  Greenwood's Plea

On December 16, 2022, Greenwood waived indictment and pled guilty—without a plea agreement—to all three counts of the S16 Superseding Information: (1) conspiring to commit wire fraud; (2) wire fraud; and (3) conspiring to commit money laundering. Each of the three counts related to Greenwood's role in the OneCoin fraud scheme. (GA. 19-26). In describing the wire fraud scheme, the Information stated that Greenwood and others "made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in 'OneCoin,' a purported cryptocurrency," "resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts." (GA. 20-21).

22

During his plea allocution, Greenwood admitted, among other things, that he and Ruja had created and operated the OneCoin fraud scheme, that he "knew the company would set and manipulate the stated value of OneCoin," and that he "participated in this deception by making misrepresentations to convince people that OneCoin would be the next big thing, bigger than Bitcoin, when I knew that it had no intrinsic value." (GA. 55-56). He also admitted that, with his participation, "the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States." (GA. 56). In addition, he explained, he "knew that the banks were reluctant to accept the proceeds of sales of OneCoin," that he "therefore agreed with others to conceal the source of those proceeds when engaging in financial transactions," and that he "understood that the same agreement would apply to any of those proceeds coming from the United States market." (GA. 56).

## G.  Greenwood's Sentencing

In advance of sentencing, the parties briefed the issue of whether, in calculating the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the loss amount should be based on the total loss caused by the One-Coin scheme, or only the losses suffered by U.S. investors. Greenwood argued that, even though his scheme defrauded investors of billions of dollars in total, his Guidelines should be based on the much lower loss amount suffered by domestic victims. (Dkt. 516, 522, 523). The Government disagreed, arguing that the

23

international loss amount should drive the Guidelines. (Dkt. 519, 530).

The District Court held oral argument on this issue on April 11, 2023. (GA. 79-119). After hearing from the parties, Judge Ramos concluded that the Guidelines should take into account the international loss resulting from the OneCoin scheme. (GA. 115-16). "As the government argues," the Court explained, "the crime that was charged in this case was a unitary international scheme that was run in substantial part, at least the money laundering part, out of the United States." (GA. 115). The Court noted that "the primary money launderers for OneCoin were Mr. Armenta and Mr. Scott," both of whom "were based in the United States I think at all times during their involvement in the scheme." (GA. 115).

"And not only that," the Court continued, "but other aspects of the crime are also run out of the United States at times." (GA. 115). "And where there is . . . a large international scheme, I do not believe that the United States loss, even those that are not extraterritorial do not require that those schemes be chopped up into individual countries." (GA. 115). Because the OneCoin scheme was "not only charged as an international unitary scheme, but was [also] carried out as an international unitary scheme," the Court concluded, "it would be perfectly appropriate to include the totality of the illicit activity in the calculation of the applicable guidelines range." (GA. 115).

Consistent with this ruling, both the Probation Office and the District Court calculated Greenwood's applicable Guidelines range as 720 months' (*i.e.*, 60

24

years') imprisonment, based on a total offense level of 43 and a Criminal History Category of I. (Greenwood PSR p. 39; GA. 138). The Probation Office recommended a Guidelines sentence of 720 months' imprisonment. (Greenwood PSR pp. 39-40).

Prior to sentencing, Greenwood submitted a sentencing memorandum devoting approximately 14 pages to the difficult circumstances of his pretrial incarceration. (Dkt. 566). A substantial portion of Greenwood's oral presentation at the sentencing hearing also focused on the circumstances of his incarceration. (GA. 151-54).

Judge Ramos ultimately imposed a sentence of 240 months' imprisonment on each count, to run concurrently. (GA. 167-74). That aggregate sentence of 240 months' imprisonment was one third of the Guidelines range, one third of the Probation Office's recommendation, and 10 years below the Government's sentencing recommendation (of 30 years' imprisonment). (GA. 161-62). The District Court also imposed forfeiture in the amount of $300,000,000 and a $300 special assessment. (GA. 174).

In explaining the reasons for the sentence, Judge Ramos explicitly recognized the "horrific conditions" of Greenwood's incarceration overseas and the "incredibly difficult" conditions of his incarceration in the United States, finding that this was a reason "to grant Mr. Greenwood some measure of lenity." (GA. 172).

25

# A R G U M E N T

## POINT I

### The District Court Did Not Abuse Its Discretion in Denying Scott's Motion for a New Trial Based on Konstantin's Purported Perjury

Judge Ramos did not abuse his substantial discretion in denying Scott's motion for the extraordinary remedy of a new trial based on Konstantin's testimony regarding his disposal of his laptop and the July 2016 meeting in Sofia. As the District Court correctly concluded, this testimony was—at most—cumulative impeachment material that would not have affected the jury's judgment, given the overwhelming evidence of Scott's guilt.

### A.  Applicable Law

#### 1.  New Trial Motions Alleging Perjury

On a defendant's motion, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). This Court has repeatedly cautioned that district courts should exercise this authority only "sparingly and in the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008). "[T]he ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).

This Court has "frequently acknowledged that, even where newly discovered evidence indicates perjury, motions for new trials should be granted only

26

with great caution and in the most extraordinary circumstances." *United States v. Stewart*, 433 F.3d 273, 296-97 (2d Cir. 2006). " '[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury.' " *Id.* at 297. "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Id.*

A showing of perjury "does not, by itself, warrant a new trial." *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018). "[T]he court must assess the materiality of the false statements, applying one of two standards depending on the prosecution's awareness of the falsehoods at the time of trial." *Id.* "If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Stewart*, 433 F.3d at 297 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Id.* "On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to 'a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.' "

27

*Id.* (quoting *Wallach*, 935 F.2d at 456); *see also United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011) (describing alternative formulation of applicable standard in this Court's cases).

This Court has repeatedly held that "[n]ew impeachment evidence is *not* material, and thus a new trial is *not* required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007). Thus, "newly discovered evidence of perjury that serves only to impeach credibility is generally insufficient to justify a new trial." *Stewart*, 433 F.3d at 301; *see also United States v. Wong*, 78 F.3d 73, 82 (2d Cir. 1996) (holding that "the new evidence of [the witness's] perjury is the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial"). Furthermore, where "independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Stewart*, 433 F.3d at 300 (quoting *Wong*, 78 F.3d at 82).

## 2. Evidentiary Hearings on New Trial Motions

Whether to conduct an evidentiary hearing on a new trial motion rests in the district court's sound discretion. *United States v. Sasso*, 59 F.3d 341, 350-51 (2d Cir. 1995). "No hearing is required on a new trial motion if the moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have

28

been unavailing." *United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993).

In the context of a new trial motion based on a witness's alleged perjury, no hearing is required if the defendant fails to establish that the witness's testimony was false. *See Aquart*, 912 F.3d at 22; *Sasso*, 59 F.3d at 350-51. Likewise, no hearing is required if "the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict." *Stewart*, 433 F.3d at 301; *see also United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992) (holding that where it was "not necessary to resolve the issues that might be the focus of an evidentiary hearing, the district court did not abuse its discretion in refusing to conduct an evidentiary hearing"). A defendant's "speculat[ion]" about a witness' alleged perjury "is insufficient to warrant a hearing" on a new trial motion. *Aquart*, 912 F.3d at 23.

### 3. Standard of Review

This Court reviews the denial of a new trial motion based on newly discovered evidence of a witness's alleged perjury "for abuse of discretion, upholding findings of fact that were made in the course of deciding the motion [ ] unless they are clearly erroneous." *Stewart*, 433 F.3d at 295. "[T]he trial court's discretion to decide whether newly discovered evidence warrants a new trial is broad because its vantage point as to the determinative factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *Id*. at 296. Likewise, this Court reviews the denial of an evidentiary hearing on a new trial motion for abuse of

29

discretion. *United States v. Forbes*, 790 F.3d 403, 411 (2d Cir. 2015); *Stewart*, 433 F.3d at 302.

## B. Discussion

### 1. Konstantin's Perjury Regarding the Disposal of His Laptop Was Not Material

The District Court did not abuse its discretion in concluding that Konstantin's testimony that he threw his laptop into a Las Vegas trash bin had no impact on the jury's verdict. It is undisputed that this testimony constituted perjury. And Scott does not claim (nor could he) that the Government knew or should have known that this testimony was false during trial. Accordingly, in order to obtain a new trial, Scott was required to establish that "but for the perjured testimony, [he] would most likely not have been convicted." *Wallach*, 935 F.2d at 456. Judge Ramos did not abuse his discretion in holding that Scott failed to make that showing.

As the District Court correctly concluded, "the disposition of the laptop was a purely collateral matter and was thus unlikely to have impacted the jury's determination of Scott's guilt." (SPA 32). Konstantin's testimony concerned an event that took place in February 2019, after the timeframe of the charged conspiracies. (SA 50-55). And the manner in which Konstantin disposed of the laptop was irrelevant to "the merits of the case," *White*, 972 F.2d at 20-21—*i.e.*, whether Scott knowingly conspired to commit money laundering and bank fraud.

30

Because the evidence of Konstantin's perjury was immaterial and would serve "only to impeach credibility," it does not justify a new trial. *Stewart*, 433 F.3d at 301; *Parkes*, 497 F.3d at 233; *Wong*, 78 F.3d at 82. As the District Court found, there was "extensive impeachment of Konstantin" by Scott at trial, "including on much more significant topics more relevant to the jury's determination of Scott's guilt." (SPA 32). Moreover, given that Konstantin admitted to disposing of the laptop to hide evidence from law enforcement, Scott was afforded a similar opportunity to cross-examine Konstantin's bad conduct. The newly discovered evidence that Konstantin committed perjury was therefore merely cumulative impeachment material that would not have affected the jury's verdict. *See, e.g.*, *United States v. Avellino*, 136 F.3d 249, 258 (2d Cir. 1998); *United States v. Gambino*, 59 F.3d 353, 364-65 (2d Cir. 1995); *United States v. Orena*, 32 F.3d 704, 717 (2d Cir. 1994); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).

This conclusion is reinforced by the overwhelming independent evidence of Scott's guilt. Setting aside Konstantin's testimony, the Government presented substantial, detailed testimony and evidence establishing that Scott knowingly participated in the charged conspiracies. As discussed above, this included—among other things—evidence that the Fenero Funds were not legitimate investment funds, but were used as elaborate front companies to clean Ruja's OneCoin fraud proceeds; that Scott was explicitly informed that OneCoin had all the hallmarks of a fraud scheme and was under criminal investigation; that Scott took extraordinary steps to hide the link

31

between OneCoin and the Fenero Funds, including forging documents, lying to Apex, and lying to law enforcement; that Scott received more than $50 million for his services—in a short amount of time—despite his lack of investment experience and the very limited profit he made for Ruja; and that Scott took steps throughout the conspiracy—such as communicating through a special "crypto phone"—to conceal his communications.

In contrast to this evidence, Konstantin's testimony had limited bearing on the key issue at trial: whether Scott knew the money he received in the Fenero Funds on behalf of Ruja was criminally derived. Konstantin admitted that he had very limited interactions with Scott; that he did not know what was discussed at the July 2016 meeting; that his understanding that Scott was a money launderer was based on information received from Dilkinska; that he had no personal knowledge about that information; and that he did not trust Dilkinska's honesty. (SA. 123-24, 129-31, 134, 149-51, 153-54). The Government thus placed little reliance on Konstantin's testimony in its closing argument to the jury. (*See* SA. 519-27, 542-46).

Given the devasting evidence of Scott's guilt—entirely independent of Konstantin's testimony—the District Court did not abuse its discretion in concluding that Scott had failed to show that "but for the perjured testimony" regarding the laptop, Scott "would most likely not have been convicted." *Wallach*, 935 F.2d at 456; *see United States v. Anderson*, 689 F. App'x 53, 57 (2d Cir. 2017); *United States v. Lespier*, 266 F. App'x 5, 6-9 (2d Cir. 2008).

32

### 2. Konstantin's Testimony Regarding the July 2016 Meeting Does Not Necessitate a New Trial

Similarly, the District Court did not abuse its discretion in concluding that Konstantin's testimony regarding the July 2016 meeting in Sofia did not justify a new trial. As Judge Ramos correctly held, Scott failed to demonstrate that Konstantin "gave false testimony *with willful intent*," "as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." (SPA 35). And even if Konstantin had perjured himself with respect to the meeting, the District Court correctly concluded that such perjury "would, at most, have been cumulative impeachment material" that would not "have affected the judgment of the jury." (SPA 36).

### a. The District Court Did Not Clearly Err in Concluding that Konstantin's Testimony Regarding the Meeting Was Not Perjury

First, Judge Ramos—who observed Konstantin's testimony and demeanor first-hand—did not clearly err in concluding that Konstantin's testimony regarding the July 20, 2016 meeting was not perjury, as opposed to an unintentionally false statement. (SPA 35). As the District Court recognized, Konstantin's testimony that Dilkinska was physically present for the meeting was equivocal. (SPA 8, 35). During the unrelenting cross-examination on this issue, Konstantin repeatedly stated that he was "pretty sure" that Dilkinska was at the meeting, but not one hundred

33

percent sure. (SPA 8, 35; SA. 124, 147-48). Konstantin's forthright lack of certainty casts doubt on the claim that he was willfully providing false testimony, "as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *Monteleon*, 257 F.3d at 219.

Additional evidence supports the conclusion that Konstantin was merely mistaken regarding the exact circumstances of the meeting. (SPA 35). For example, Scott's personal calendar entry indicates that he was scheduled to meet with both Ruja and Dilkinska on July 20, 2016, suggesting that Dilkinska may have joined the meeting remotely rather than in person. (GX A). Other evidence makes clear that Scott, in fact, traveled to Sofia to meet with Ruja on that date (Dkt. 445 at 4-5), and Scott does not claim otherwise. Furthermore, the evidence showed that Scott traveled to Sofia again just two months later, in September 2016, to meet with both Ruja and Dilkinska. (*See* Dkt. 445 at 5; GX B (email in which Dilkinska wrote: "I will talk to Mark when we meet (15th of September)—need to discuss with him some aspects regarding this matter")). Konstantin therefore may have been mistakenly describing a meeting that occurred in September 2016 rather than July 2016.

Furthermore, if—as Scott argues—Konstantin was conjuring "a vivid, incriminating tale" to falsely inculpate Scott (Scott Br. 23), it is unclear why he would have lied about Dilkinska's mere presence at the meeting, rather than presenting a much more incriminating lie. A meeting between Scott, Ruja, and Dilkinska is not meaningfully (if any) more incriminating than a

34

meeting between Scott and Ruja alone. And if Konstantin was simply lying to implicate Scott, he could have claimed, for example, that his sister Ruja told him after the meeting that she and Scott had explicitly discussed money laundering. In fact, Konstantin testified that he did not attend the meeting and was never told what was discussed at the meeting. (SA. 124). In short, Konstantin had little incentive to falsely place Dilkinska at the meeting.

Given the equivocal nature of Konstantin's testimony regarding Dilkinska's presence at the meeting, the other evidence that Konstantin was simply misremembering details of a meeting that occurred more than three years earlier, and Judge Ramos's firsthand observations of Konstantin's testimony and demeanor, this Court should reject Scott's argument that the District Court clearly erred in concluding that Konstantin did not commit perjury. And because Konstantin did not commit perjury, Scott is not entitled to a new trial. *See Stewart*, 433 F.3d at 296-97 ("[A] threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury.").

### b. The District Court Did Not Abuse Its Discretion in Concluding that Konstantin's Testimony Regarding the Meeting Was Not Material

The District Court further held that, "even if Konstantin *had* perjured himself with respect to the testimony about the Meeting," Scott was not entitled to a new trial because that testimony was not material and was, "at most, . . . cumulative impeachment material."

35

(SPA 35-36). The question of whether Dilkinska was physically present for the July 2016 meeting—*i.e.*, whether Scott met in person with both Dilkinska and Ruja, or only met with Ruja—had little to no bearing on whether Scott knew the money received in the Fenero Funds was derived from illegal activity. And given the devastating independent evidence of Scott's guilt, Judge Ramos did not abuse his discretion in concluding that the false testimony did not affect the jury's judgment. (SPA 36).

### i. The Government Did Not Know or Have Reason to Know that Konstantin's Testimony Was Perjury

As noted above, in assessing the materiality of perjured testimony, the appropriate standard depends on the prosecution's awareness of the perjury at the time of trial. *Wallach*, 935 F.2d at 456; *Stewart*, 433 F.3d at 297; *Aquart*, 912 F.3d at 20. Where "the prosecution knew or should have known of the perjury prior to the conclusion of the trial," the test is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Stewart*, 443 F.3d at 297. In contrast, where "the prosecution was not aware of the perjury," the test is whether the court has "a firm belief that but for the perjured testimony, the defendant would most likely have not been convicted." *Id.* Without deciding whether "the Government knew or should have known" that Konstantin's testimony regarding the meeting was perjury, Judge Ramos applied the more defense-friendly standard, concluding that—even under that standard—Scott

36

could not establish "any reasonable likelihood" that Konstantin's purported perjury affected the judgment of the jury. (SPA 36). As discussed below, the Government prevails under either standard. This Court, however, "is free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003). And here, because the Government did not know or have reason to know that Konstantin's testimony was perjury, this Court should apply the more rigorous standard.

First, because Konstantin did not commit perjury regarding the meeting, the prosecution could not have known he committed perjury. *See United States v. Seabrook*, No. 10 CR 87 (DAB), 2013 WL 4754331, at *5 (S.D.N.Y. Aug. 26, 2013) (rejecting claim that the Government knew of alleged perjury as "fatally deficient," and reasoning that, because the witnesses "did not commit perjury," "the Government could not have known about it").

But even assuming that Konstantin committed perjury, the record does not show that the Government knew or should have known that at the time of trial. Starting with his first meeting with the Government, Konstantin consistently stated that Dilkinska was present for the July 2016 meeting. (Dkt. 445 at 38). That representation was corroborated by Scott's undisputed presence in Sofia on that same date and his personal calendar entry indicating that he was meeting with both Ruja and Dilkinska on that date. (GX A; Dkt. 445 at 4-5). Konstantin's other testimony was also

37

heavily corroborated by substantial independent evidence, giving the Government comfort that he was telling the truth about the meeting. (*See* Dkt. 412 at 3-13; Dkt. 445 at 36-37). Furthermore, Konstantin had no apparent motive to lie about Dilkinska's presence at the meeting, which Konstantin did not attend and thus could not describe. And unlike defense counsel, who had access to a witness who was present for the July 2016 meeting (*i.e.*, Scott), the Government did not have access to any other witness present for the meeting.

Scott ignores this evidence, instead pointing to Dilkinska's emails suggesting that she was traveling at the time of the meeting (DX 550, 552) and messages on devices seized from Greenwood (Scott Br. 26). But given all the indications that Dilkinska had, in fact, attended the meeting in person, these emails and messages are insufficient to conclude that the Government knew or should have known that Konstantin was committing perjury. For example, DX 550 is an email Dilkinska sent on July 17, 2016—three days before the meeting—indicating an intent to travel "for the whole week." (SA. 630). Dilkinska did not indicate where she was traveling or whether she was traveling within Bulgaria, and travel plans can obviously change. (SA. 630). Similarly, in DX 552, Dilkinska simply stated "I am travelling too," without explaining where or for how long. (SA. 632). Moreover, at the time of trial, none of the prosecutors had reviewed the relevant messages on the Greenwood devices. (Dkt. 445 at 6-9, 38). While the voluminous extractions from Greenwood's devices were in the Government's possession, they were produced to Scott well in advance of trial,

38

giving him an equal opportunity to find the messages. (Dkt. 445 at 6-9). Like the defense, the Government was unaware of the messages pertaining to the July 2016 meeting at the time of trial. (Dkt. 445 at 6-9, 38).

Furthermore, this evidence indicated, at most, that Konstantin was mistaken about the details of the July 2016 meeting—not that he intentionally testified falsely. As this Court's case law makes clear, the "any reasonable likelihood" standard is only triggered where "the prosecution knew or should have known of the *perjury*," *Wallach*, 935 F.2d at 456 (emphasis added), not—as Scott claims (Scott Br. 26-27)—where the Government merely "should have known" that a witness accidentally made a false statement due to confusion, mistake, or faulty memory. *See also, e.g.*, *Stewart*, 443 F.3d at 297; *Wong*, 78 F.3d at 81; *United States v. Kenner*, No. 21-2289, 2023 WL 4692508, at *4 (2d Cir. July 24, 2023).[3]

---

[3]    Scott falsely claims that "the Government has admitted that it should have known that Konstantin's testimony was false." (Scott Br. 26 (citing Dkt. 445 at 38)). The Government made no such concession. In its brief below, the Government plainly set out its position that "the evidence does not support Scott's assertion that the Government 'knew or should have known' of the allegedly perjured testimony," since Konstantin did not commit perjury. (Dkt. 445 at 37). "But even assuming that the Court" disagreed, the Government noted in the alternative, Scott's argument failed because the Government had no reason to know that Konstantin "intentionally testified falsely," as opposed

39

Because the record fails to show that "the prosecution knew or should have known of the perjury prior to the conclusion of the trial," the relevant test is whether the court has "a firm belief that but for the perjured testimony, the defendant would most likely have not been convicted." *Stewart*, 443 F.3d at 297.

### ii.   Konstantin's Testimony Regarding the Meeting Was Not Material, Regardless of the Applicable Standard

In any event, regardless of which standard the Court applies, Konstantin's testimony that Dilkinska attended the July 2016 meeting in person was not material. And the District Court—which applied the more defendant-friendly standard—did not abuse its

––––––––––

to by mistake. (Dkt. 445 at 38). "At most," the Government stated, "there is evidence that the Government should have known—based on the Greenwood Communications, which the Government possessed but had not reviewed at the time of trial—that [Konstantin] had misremembered certain details about the July 2016 Meeting and that his testimony about Dilkinska being present at the meeting was inaccurate." (Dkt. 445 at 38). While Scott attempts to characterize this sentence as a concession—ignoring the surrounding context and conspicuously omitting the phrase "at most"—the full context shows otherwise. (Dkt. 445 at 37-38; *see also* SA. 846 ("[T]he government did not know, nor should it have known, that [Konstantin] intentionally testified falsely.")).

40

discretion in concluding that there was no "reasonable likelihood that the false testimony could have affected the judgment of the jury." (SPA 36).

As discussed at length above, even setting aside Konstantin's testimony, there was extensive evidence that Scott knew that the Fenero Funds were receiving crime proceeds. Compared to this evidence, the testimony that Scott attended a meeting with both Ruja and Dilkinska—rather than with Ruja alone—was insignificant and could not have swayed the jury's verdict. As Judge Ramos explained, "[o]n cross, Scott elicited from Konstantin his lack of definitive certainty of Dilkinska's presence at the Meeting, and, even on direct, Konstantin only ever testified that the Meeting occurred but provided no information as to what was discussed at the Meeting." (SPA 36). Konstantin also admitted that he only met Scott once, only communicated with him about travel logistics, and had no firsthand knowledge of whether Scott knew OneCoin was a fraud. (SA. 124, 129-31, 134, 153). "Moreover, ample other evidence existed both of Scott's involvement with Ruja and Dilkinska and, more generally, of his guilt." (SPA 36). Under these circumstances, evidence that Konstantin committed perjury regarding Dilkinska's presence at the meeting was, "at most, . . . cumulative impeachment material" that does not justify a new trial. (SPA 36; *see* SPA 32 (noting that Konstantin was extensively impeached about "much more significant topics more relevant to the jury's determination of Scott's guilt")); *see Stewart*, 433

41

F.3d at 301; *Parkes*, 497 F.3d at 233; *Wong*, 78 F.3d at 82.[4]

Scott's arguments to the contrary are meritless. First, Scott mischaracterizes the relevant standard, arguing that Konstantin's testimony, as a whole, was material because it "played a crucial role in presenting and explaining the OneCoin scheme, the personalities involved, and why OneCoin was fraudulent." (Scott Br. 29). But the relevant inquiry is not whether the entirety of Konstantin's testimony was material, but rather whether *the perjured testimony* was material. *See Wallach*, 935 F.2d at 456 (court must consider whether "*the false testimony* could have affected the judgment of the jury" (emphasis added)). Scott has failed to demonstrate that any of Konstantin's other testimony —aside from, at most, his testimony that Dilkinska was present for the meeting and that he dumped his laptop in a trash bin—was perjury (or even false).

---

4   Given the District Court's conclusion that Konstantin's purported perjury regarding the meeting was, "at most, . . . cumulative impeachment material" (SPA 36), and its conclusion that his perjury regarding the laptop was "purely collateral" (SPA 32), it plainly considered the cumulative effect of that testimony to be immaterial as well. In any event, because Judge Ramos concluded that Konstantin's testimony regarding the meeting was *not* perjury (SPA 35), he did not abuse his discretion by not expressly addressing the cumulative effect of the purported perjury in his opinion.

42

In support of his materiality argument, Scott repeatedly cites three brief portions of Konstantin's testimony: (1) his statement that Scott "was one of the main money launderers for OneCoin" (SA. 80); (2) his statement that, a week after her meeting with Scott, Dilkinska told Konstantin that "she had to stay . . . a long time . . . until Mark Scott understood everything that has to be done or he has to do" (SA. 109-10); and (3) his description of a conversation in which Dilkinska was panicking because she heard a rumor that Scott was cooperating with authorities (SA. 121-22). As an initial matter, because Scott has not demonstrated that any of these statements were perjury, they do not factor into the materiality inquiry. *See Wallach*, 935 F.2d at 456.

In any event, Scott greatly exaggerates the importance of this testimony. Critically, as the jury was well aware, all of this testimony was based on statements from Dilkinska, whose credibility was heavily impeached at trial. Konstantin admitted that his testimony that Scott was a "money launderer" was based on information from Dilkinska and that he had no personal knowledge. (SA. 149-51, 153-54). Likewise, the other testimony cited by Scott was Konstantin recounting things that Dilkinska told him. (SA. 80, 121-22). The jury heard extensive evidence that Dilkinska was dishonest and that her statements should be viewed with great caution. For instance, Konstantin testified that Dilkinska was an extremely dishonest person, that he believed she was stealing money from OneCoin, that she was hiding information about OneCoin's finances, that she had forged two powers of attorney, and that he could not trust her about anything

43

important in his life. (SA. 153-54). Given this testimony, it is unlikely that the jury placed much, if any, weight on evidence originating solely from Dilkinska's statements.

Moreover, much of Konstantin's testimony on these points was duplicative of other evidence. For instance, in one text message exchange between Konstantin and Dilkinska, Dilkinska stated that it was unlikely Scott was an informant because if he were, Dilkinska "would be in much deeper shit" because she was "in all papers with which [Scott] was working." (SA. 114). Because there was "ample other evidence" showing the criminal relationship between Scott and Dilkinska (SPA 36), Konstantin's limited testimony on this point was immaterial.

Notably, in its summation and rebuttal, the Government did not rely on Konstantin's characterization of Scott as a "money launderer" or Dilkinska's statement that "she had to stay . . . a long time . . . until Mark Scott understood everything." (*See* SA. 519-27, 542-46). In fact, the Government placed little reliance on Konstantin's testimony at all, instead emphasizing the other compelling evidence of Scott's guilt. (*See* SA. 519-27, 542-46). The fact that the Government highlighted this other evidence, and largely ignored Konstantin's testimony, belies Scott's claims that Konstantin was the "leading witness" whose testimony was the linchpin of the Government's case, and that the July 2016 meeting "represented some of the Government's strongest evidence of the key factual dispute at trial." (Scott Br. 15).

44

Given the overwhelming evidence of Scott's guilt, entirely independent of Konstantin's testimony, Scott cannot show that "but for the perjured testimony," he "would most likely have not been convicted." *Stewart*, 443 F.3d at 297. For the same reasons—as the District Court correctly held—Scott cannot meet the less onerous "any reasonable likelihood" standard either. (SPA 36). Judge Ramos—who oversaw the three-week trial, was deeply familiar with the evidence, and observed Konstantin's testimony firsthand—reasonably concluded that there was no reasonable likelihood that Konstantin's false testimony could have affected the jury's judgment. (SPA 36). That conclusion was well within his discretion.[5]

---

[5]  Scott's claim that the District Court applied the wrong legal standard (Scott Br. 33) is contradicted by the record. The Court's written opinion states: "the Court instead considers whether Scott has established that there exists 'any reasonable likelihood that the false testimony could have affected the judgment of the jury. But the Court does not find such likelihood exists." (SPA 36 (citing *Wallach*, 935 F.2d at 456)). The Court could not have been clearer about which standard it was applying. And the Court's subsequent statement that Scott had also failed to satisfy the standard for Rule 33 motions generally does not suggest otherwise. (*See* SPA 37).

45

### 3. The District Court's Exclusion of the Dilkinska Emails Was Harmless

For similar reasons, the District Court's exclusion of Dilkinska's emails suggesting that she was traveling (DX 550, 552) was harmless. The Government acknowledges that DX 550 was admissible under Federal Rule of Evidence 803(3) because Dilkinska was describing her future intent to travel. *See United States v. Persico*, 645 F.3d 85 (2d Cir. 2011).[6] In contrast, DX 552—in which Dilkinska stated, "I *am* travelling" —is not a statement of future intent and thus does not fall within the ambit of Rule 803(3). (SA. 373). But even assuming the District Court abused its discretion in excluding both exhibits, any error was harmless.

Even where an evidentiary decision "was manifestly erroneous, [this Court] will affirm if the error was harmless." *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021). "Under harmless error review, [this Court] ask[s] whether [it] can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133-34 (2d Cir. 2010).

Here, the Court can conclude with fair assurance that any error in excluding Dilkinska's emails did not

---

6 During trial, neither party cited or otherwise discussed *Persico*, and the defense did not contest the Government's mistaken position—based on its reading of *United States v. Best*, 219 F.3d 192 (2d Cir. 2000)— that Rule 803(3) had an independent corroboration requirement. (Dkt. 445 at 10).

46

substantially influence the jury's verdict. Given the powerful evidence of Scott's guilt—as described above—Dilkinska's emails were inconsequential. The emails did not state where Dilkinska was traveling (or whether she was traveling within Bulgaria) and thus did not refute Konstantin's testimony. Nor did the emails prove that Konstantin was lying, as opposed to just mistaken. As the District Court correctly concluded, the exclusion of the emails, "even if in error, had no impact on the jury's verdict since . . . Konstantin disclaimed any knowledge of the substance of the Meeting." (SPA 37). In addition, as discussed above, Konstantin's testimony that Dilkinska was present for the July 2016 meeting was insignificant compared to the crushing, independent evidence that Scott knew the OneCoin money was criminally derived. (SPA 36). Any error in excluding DX 550 and 552 was therefore harmless.

### 4. The District Court Did Not Abuse Its Discretion by Declining to Hold an Evidentiary Hearing

Judge Ramos did not abuse his discretion in denying Scott's request for an evidentiary hearing. (*See* Scott Br. 24-25). Because all parties agreed that Konstantin's testimony regarding the laptop was perjury, "there [was] no dispute as to the relevant facts" and thus no need for a hearing. (SPA 32 n.7). Likewise, given that Konstantin had already been cross-examined *ad nauseam* about Dilkinska's presence at the meeting, that he had equivocated about whether he was certain she was present, and that he had already been confronted with Dilkinska's emails about

47

traveling, a hearing regarding his meeting testimony would have been pointless. In any event, the District Court correctly concluded that—even assuming Konstantin's testimony regarding the meeting was perjury—the testimony was immaterial and thus did not justify a new trial. (SPA 34-37). There was thus no reason to hold a hearing on this issue. *See Stewart*, 433 F.3d at 301; *White*, 972 F.2d at 22.

Nor did the District Court abuse its discretion in declining to hold an evidentiary hearing to determine whether the prosecution knowingly suborned perjury. (*See* Scott Br. 33). Scott's baseless speculation that the Government was lying to the Court—in representing that it had lacked actual knowledge that Konstantin had committed perjury at the time of trial—"is insufficient to warrant a hearing." *Aquart*, 912 F.3d at 23. Moreover, while Scott faults the District Court for failing to hold a hearing on whether the Government "knowingly use[d] perjured testimony" in order to determine whether reversal should have been "virtually automatic" (Scott Br. 33), that was not the request he made below. Rather, Scott requested a hearing "to investigate factual issues relating to the Government's failure to comply with its disclosure obligations to determine what other relief—including dismissal of the indictment—may be appropriate." (Dkt. 433 at 29; *see also* Dkt. 461 at 40 (requesting a hearing so that the Court could assess whether to dismiss the case and impose sanctions)). Scott cannot fault the District Court for failing to grant a request he did not make. In any event, given the District Court's conclusion that "the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict, there [was]

48

no need to probe the extent of the Government's awareness of the perjury because the argument fails under either standard." *Stewart*, 433 F.3d at 302. Judge Ramos thus acted well within his discretion in denying Scott's request for a hearing.

## POINT II

### The District Court Acted Well Within Its Discretion In Excluding Prior Out-of-Court Statements as Hearsay

At trial, Scott attempted to introduce emails exchanged among himself, Ruja, and another lawyer at his law firm, Robert Courtneidge. Judge Ramos agreed to admit one of these emails—along with other evidence regarding Courtneidge and his role advising OneCoin—but excluded other emails on hearsay grounds, concluding that Scott was attempting to use them "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). That ruling was well within the District Court's discretion. And even assuming Judge Ramos abused his discretion, any error was harmless given the other evidence of Scott's guilt and the fact that the jury heard extensive evidence regarding Courtneidge.

### A.   Relevant Facts

During the trial, Scott attempted to introduce a large volume of emails containing out-of-court statements showing that Courtneidge "was doing legal work with OneCoin" and had never expressed "any concern about Ruja Ignatov or about OneCoin." (SA. 327). Some of the emails the defense sought to admit

49

had been sent to Scott, while others were emails Court-neidge sent to other people without copying Scott. (SA. 327). Instead of calling Courtneidge as a witness, Scott attempted to admit his out-of-court statements by claiming that they were relevant to Scott's state of mind. (SA. 327-28). The Government opposed admission of the exhibits, pointing out that—despite claiming otherwise—Scott was plainly attempting to admit these documents for their truth (*e.g.*, to show that Courtneidge (like Scott) was, in fact, advising Ruja on OneCoin without knowing that it was fraudulent). (SA. 328). The District Court initially agreed with the Government, concluding that the emails were being offered for their truth and were thus inadmissible hearsay. (SA. 327-28).

After Scott raised the issue again, Judge Ramos agreed to admit DX 519, an "e-mail from Robert Court-neidge to Mark Scott" offered to show that Scott was aware that "Courtneidge was working on OneCoin-related matters." (SA. 512). Scott ultimately declined to offer this email, fearing that it would open the door to evidence that Courtneidge—just like Scott—was well aware that OneCoin was fraudulent. (*See* SA. 512-14). Nevertheless, the jury heard extensive evidence about Courtneidge, his expertise in cryptocurrency, and his role in advising OneCoin. (*See, e.g.*, SA. 301 ("Ruja . . . has been a client for months. Robert Court-neidge has been advising her since the outset on currency and cart issues."); SA. 324 ("I would like to ask you some questions about another lawyer who worked at Lock Lorde[,] Robert Courtneidge."); SA. 325 ("And this email from Mark Scott says, 'One of my partners at Locke Lord is a specialist in the industry of this

50

client and we established ... that this industry was completely legitimate."); SA. 325 (stating that Courtneidge was "global head of cards and payments" at Locke Lorde and "an expert in cryptocurrencies"); *see also* SA. 326, 378, 494).

In closing, defense counsel repeatedly emphasized that Courtneidge had also advised OneCoin, which he claimed gave Scott "comfort" that OneCoin was legitimate. (SA. 533, 535-36). He argued, for example:

> So, there is a division of roles at this law firm, and Robert Courtneidge is the guy who knows crypto. And that's comforting to Mr. Scott. These has been no evidence at all that Robert Courtneidge ever told Mr. Scott or e-mailed him or anything to say, you know, some red flags on this one. So why would Mr. Scott not have comfort that his law partner is doing this.

(SA. 536).

## B. Applicable Law

A district court's evidentiary rulings are reviewed for abuse of discretion and will be reversed "only when the court has acted arbitrarily or irrationally." *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006). A district court abuses its discretion when "its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013). Even when a district court's evidentiary ruling is manifestly erroneous, the defendant is not entitled

51

to a new trial if the error was harmless. *Gatto*, 986 F.3d at 117.

## C. Discussion

The District Court did not act "arbitrarily or irrationally" in excluding some of the emails offered by Scott. Judge Ramos correctly applied the law, concluding that the emails were hearsay because they were out-of-court statements that Scott was "offer[ing] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). And Judge Ramos's conclusion that Scott was, in fact, offering these statements for their truth was not clearly erroneous. For example, if Scott's only goal were to demonstrate his state of mind, there was no reason for him to attempt to introduce an entire "batch of e-mails" "that Scott is not on"—which Scott admitted were "not directly relevant to [his] state of mind" and were for the purpose of showing that "Mr. Courtneidge was doing that sort of work." (SA. 327). Finally, Scott cannot argue that the District Court abused its discretion in excluding DX 519; the Court agreed to admit the exhibit, and Scott himself chose not to offer it.

Moreover, even assuming the District Court abused its discretion in excluding the emails, any error was harmless. *Gatto*, 986 F.3d at 117; *Oluwanisola*, 605 F.3d at 133-34. In light of the overwhelming evidence that Scott knowingly participated in the charged conspiracies, Scott's knowledge that another lawyer was also advising Ruja and OneCoin would not have "substantially swayed" the jury. *United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006). And—as Scott

52

conspicuously fails to mention in his brief (*see* Scott Br. 37-39)—the jury in fact heard a slew of evidence about Courtneidge, his expertise, and his role advising Ruja and OneCoin, which Scott used at closing to make the precise argument he now claims he was prevented from making. (*See, e.g.*, SA. 301, 324, 325, 326, 378, 494, 533, 535-36). The exclusion of additional, cumulative exhibits was thus harmless.

## POINT III

## The District Court Did Not Abuse Its Discretion In Quashing Scott's Trial Subpoena

Judge Ramos did not abuse his discretion in quashing Scott's subpoena of Neil Bush, and even if he had, any error was harmless.

### A. Relevant Facts

As discussed above, in July 2016, Scott caused the Fenero Funds to "loan" $30 million to CryptoReal, an entity ostensibly controlled by "Martin Breidenbach," but actually controlled by Ruja. (SPA 4). Scott represented that the funds would be used to purchase an oil field. (SPA 4). Regardless of whether an oil field was purchased or not, the true purpose of transferring the funds to CryptoReal was to launder money for Ruja. (SPA 4). Neil Bush was tangentially related to the company looking to sell the oil field to CryptoReal. (SA. 365-70).

Scott subpoenaed Bush to testify at trial about his involvement with the seller of the oil field. Bush moved to quash the subpoena, arguing that he had no

53

relevant testimony and that he could not shed any light on what, if anything, Scott knew about his involvement in the oil field transaction. (SA. 368 ("Mr. Bush doesn't know Scott, has never met him, has never talked to him that he knows, has never corresponded with him, does not know about a loan, does not know [Breidenbach].")).

After hearing argument, Judge Ramos quashed the subpoena. (SA. 370). To the extent Scott was seeking "to put Mr. Bush on the stand . . . to relay to the jury the idea that he was given some level of comfort knowing that Mr. Bush was associated with the transaction in some fashion," the Court concluded, "that's already before the jury." (SA. 370). As Judge Ramos explained, the jury had already seen an email in which Scott "discusses Mr. Bush's involvement" in the transaction and his familial relationship to two former presidents. (SA. 370). Furthermore, he noted, Bush "has never met Mr. Scott" and "cannot provide . . . firsthand relevant evidence about the effect of this transaction on Mr. Scott." (SA. 370). Finally, the Court held, it was irrelevant whether there was actually an oil field for sale (a fact no one disputed)—"[w]hat is relevant is that there was going to be a transaction" designed to return OneCoin fraud proceeds to Ruja's control while obscuring their relationship to OneCoin. (SA. 370).

## B.  Applicable Law

This Court "review[s] a district court's ruling on a motion to quash a subpoena for abuse of discretion." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68 (2d Cir. 2003). Any error in excluding evidence

54

should be disregarded if the error was harmless. *Gatto*, 986 F.3d at 117.

## C. Discussion

Judge Ramos did not abuse his discretion in quashing Scott's subpoena. As the Court correctly noted, there was already evidence in the record that established Bush's involvement in the deal and his family connections. (SA. 370). The Government did not dispute the existence of the deal, and Bush had no personal knowledge of any other fact that was even arguably relevant. (SA. 365-70). He certainly could not testify that Scott—someone he had never met or talked to —took comfort from his involvement in the oil field sale. Because Scott's testimony offered no new information, the District Court did not abuse its discretion in quashing the subpoena. Likewise, because the jury already knew about Bush's involvement in the deal, and given the devastating evidence of Scott's guilty, any error in quashing the subpoena was harmless.

## POINT IV

## Sufficient Evidence Supported Scott's Conviction for Conspiring to Commit Money Laundering

Scott argues that the Government presented insufficient evidence that the wire fraud underlying his money laundering conspiracy conviction had a nexus to the United States. (Scott Br. 41-45). This argument is contrary to both the facts and the law.

55

### A.  Applicable Law

"A defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022). The reviewing court must "view all the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and . . . must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009). "Moreover, the jury's verdict may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *see United States v. Gaskin*, 364 F.3d 438, 460-61 (2d Cir. 2004) (knowledge and criminal intent often can only be established solely through circumstantial evidence). The Court must consider the evidence "in conjunction, not in isolation." *Persico*, 645 F.3d at 104. And this Court will not disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Cuti*, 720 F.3d at 461.

"Although sufficiency review is *de novo*," this Court "will uphold the judgments of conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015).

56

## B. Discussion

As the District Court correctly held, the Government presented sufficient evidence that the OneCoin wire fraud scheme—the specified unlawful activity underlying Scott's conviction for conspiracy to commit money laundering—had a nexus to the United States. (SPA 24-30). Scott's argument to the contrary "misrepresents the trial evidence." (SPA 26). As Judge Ramos explained:

> The Government's evidence demonstrated that OneCoin was not a purely extraterritorial wire fraud scheme; rather, it included testimony from two U.S. victims of OneCoin about their investments in the scheme and the promoters who introduced them to OneCoin, testimony regarding OneCoin meetings and conferences in the United States promoting OneCoin (including a trip by Konstantin to Las Vegas to conduct OneCoin-related meetings), and individuals transmitting wires internationally in connection with OneCoin's U.S. activities.

(SPA 26; *see also* GX 63 ¶ 1(d), 204-C (OneCoin began operating in the United States in or around 2015)). Given this evidence, "OneCoin's use of United States wires constitutes an execution of a wire fraud scheme in the United States." (SPA 26); *see Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (2d Cir. 2019) (collecting cases involving international wire fraud schemes prosecuted in the United States based on their use of

57

interstate wires in furtherance of the fraudulent scheme).

Scott argues that only a small fraction of the losses from the OneCoin fraud scheme were suffered by U.S. investors. (Scott Br. 41, 45).[7] But as the District Court recognized, "Scott's cited authority does not require that the Court parse the percentage of fraudulent proceeds obtained in the United States, as compared to abroad." (SPA 26-27). "Rather, it simply states that a fraud carried out entirely outside the United States, with absolutely no domestic nexus except a tangential and limited use of some U.S. wires, is insufficient for domestic application of wire fraud." (SPA 27). "And here, OneCoin specifically targeted victims in the United States and carried out elements of its fraudulent scheme in the United States, which is sufficient for domestic application of wire fraud." (SPA 27); *see also Bascuñán*, 927 F.3d at 122 ("[T]he mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States.").

---

[7] Contrary to Scott's claims (Scott Br. 41, 45), the Government's evidence at trial showed far more than $54,000 in U.S. transactions—as Greenwood readily admits. (*See* Greenwood Br. 9 ("[T]he prosecution's evidence [at Scott's trial] showed that OneCoin's activity in the United States . . . involved approximately $10 million in transactions); *see also* Greenwood Br. 10, 18, 26, 42)).

58

Scott further claims that "the Government offered little proof" that the money originating from the U.S. victims who testified at trial "eventually made its way into" the Fenero Funds. (Scott Br. 45). "But Scott cites no authority . . . for the assertion that the Government was required to conduct financial tracing at such a level of detail." (SPA 27). "Moreover, the Government offered evidence at trial that both [of the U.S. victims who testified] wired money to a U.S.-based OneCoin depository account, which subsequently directly and indirectly transferred money to the Fenero Funds." (SPA 27).

## POINT V

### The District Court Did Not Plainly Err in Declining to Give a Jury Instruction that Inaccurately Stated the Law

Judge Ramos did not err, much less plainly err, in rejecting Scott's belated request for a jury instruction that misstated the law regarding wire fraud.

### A.   Relevant Facts

Shortly before the Government rested, the District Court held a lengthy charge conference in which the parties requested changes to the jury instructions. (SA. 456-68). After the Court resolved any disputes and settled on a final set of instructions, the parties delivered their summations on November 20, 2019. (SA. 519-46). The Court then charged the jury and dismissed them for the day. (SA. 547-62). Later that night, Scott filed a letter requesting—for the first time —a supplemental jury instruction that "in order for

59

proceeds to be the proceeds of a specified unlawful activity, the funds have to be proceeds of a fraudulent scheme that occurred in the United States." (Dkt. 181).

The Government opposed the request, explaining that Scott was "sandbagging the government after the closings," and that it "could have addressed these issues in the closing statements" had it known that Scott was seeking such an instruction. (SA. 563). Moreover, the Government noted, the cases cited in support of Scott's instruction were raised in "a completely different context," and the instructions the Court had already delivered were "correct." (SA. 563-66). The Court declined to give the instruction, concluding that, "as the parties agreed before last night, the instruction that was given concerning wire fraud is an appropriate instruction." (SA. 566).

## B. Applicable Law

Federal Rule of Criminal Procedure 30(a) requires that requests for jury instructions be made at or before the close of evidence. Rule 30(b) requires the court to "inform the parties before closing arguments how it intends to rule on the requested instructions," so that they can tailor their arguments accordingly. And Rule 30(d) requires a party to inform the court of objections to the jury instructions "before the jury retires to deliberate."

A district court's refusal to provide a requested jury instruction is typically reviewed *de novo*. *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005). On appeal, "[a] conviction will not be overturned for refusal to give a requested charge" unless that instruction

60

"represents a theory of defense with basis in the record that would lead to acquittal." *United States v. Bok*, 156 F.3d 157, 163 (2d Cir. 1998). Moreover, reversal is only warranted if the requested instruction was "legally correct" and the charge actually given was prejudicial. *United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008).

Although preserved challenges to jury instructions are reviewed *de novo*, where a party failed to make a timely objection to a jury instruction it now challenges on appeal, the claim is reviewed for plain error. *United States v. McDonald*, 759 F.3d 220, 223 (2d Cir. 2014). The defendant bears the burden of establishing plain error. *United States v. Dominguez Benitez*, 542 U.S. 74, 75 (2004).

## C. Discussion

Because Scott requested the jury instruction after "the close of evidence," Fed. R. Crim. P. 30(a), after the closing arguments, Fed. R. Crim. P. 30(b), after the Court had charged the jury, and after the jury "retire[d] to deliberate," Fed. R. Crim. P. 30(d), his argument is reviewed for plain error. *See, e.g.*, *United States v. Watson*, 894 F.2d 1345, 1350 (D.C. Cir. 1990); *United States v. Hunter*, No. 05 Cr. 188 (JG), 2008 WL 268065, at \*14 (E.D.N.Y. Jan. 31, 2008). "Rigorous plain error analysis is especially appropriate in contexts that present the possibility of 'sandbagging.'" *United States v. Alvarado*, 720 F.3d 153, 157 (2d Cir. 2013). Applying a *de novo* standard in this context would only encourage exactly the type of sandbagging that Scott engaged in here—withholding objection

61

until after the Government had already closed, and seeking a supplemental instruction that may grab the jury's attention more acutely on its own, rather than included within the full charge.

In any event, Scott's argument fails under either standard. First, as the District Court held, Scott's requested instruction "misstate[d] the law." (SPA 29-30). As discussed above, the case law "simply states that a fraud carried out entirely outside the United States, with absolutely no domestic nexus except a tangential and limited use of U.S. wires, is insufficient for domestic application of wire fraud." (SPA 27). Scott's proposed instruction would have misled the jury into thinking that a much more substantial domestic nexus was required. (Dkt. 181). And the jury had already been appropriately instructed on the jurisdictional requirement of wire fraud. (SA. 551 (explaining requirement of a domestic wire)). Because the instruction was unnecessary and not "legally correct," reversal is unwarranted under any standard. *Desinor*, 525 F.3d at 198.

Furthermore, even assuming the District Court erred by failing to give the belated instruction, that error was harmless under any standard. *Bok*, 156 F.3d at 163. The Government presented ample evidence that important aspects of the OneCoin scheme occurred in, and were directed toward, the United States. (SPA 26-27). Thus, even if the Court had given Scott's instruction, the jury would have reached the same verdict.

62

## POINT VI

### Sufficient Evidence Supported Scott's Conviction for Conspiring to Commit Bank Fraud

As the District Court held, the Government presented sufficient evidence proving that Scott conspired to commit bank fraud. (SPA 14-20). Viewing the evidence "in the light most favorable to the government," *Josephberg*, 562 F.3d at 487, as required on a sufficiency challenge, the evidence that Scott conspired to commit bank fraud was not "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt," *Cuti*, 720 F.3d at 461.

### A. The CryptoReal Transaction

First, the Government introduced sufficient evidence that the CryptoReal transaction constituted bank fraud. (SPA 15-17). Scott conspired to mislead a New York bank into processing a transfer of $30 million by falsely representing that the money was for a "loan" to CryptoReal and Breidenbach, when in fact it was for the purpose of laundering money to Ruja. (SPA 4, 15-17).

Scott argues that "the Government never proved that the statement that the transaction was a 'loan' was materially false." (Scott Br. 53). But as the District Court found, "the Government presented evidence that the money the Fenero Funds transferred to CryptoReal was not a loan, and that Scott was aware of that, including an email from Scott to Dilkinska and other OneCoin associates wherein Scott stated that the allegedly loaned money was 'considered available

63

cash for obvious reasons.'" (SPA 15; *see also* SA. 523 ("[W]hen you make a real loan, . . . that money is not available to you until they pay it back. . . . But when it's a fake loan, . . . and you're just sending the money where Ruja tells you to, the money is available. It's available cash.")). Scott argues that the jury should have reached a different inference—that money loaned to another entity is somehow still "available cash" (Scott Br. 53)—but the jury was not required to accept that strained interpretation. Viewing the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor," *Josephberg*, 562 F.3d at 487, "the Government sufficiently proved that Scott committed a false representation" (SPA 16).

Scott further claims that the Government did not prove that he knew his false statement would be relayed to a U.S. bank. (Scott Br. 53). As Judge Ramos held, however, "the Government sufficiently proved that Scott was aware of the involvement of a New York correspondent account in the CryptoReal Transaction." (SPA 16). For example, the Government "presented evidence that Scott knew that an international [U.S. dollar] transaction like the CryptoReal Transaction would use a U.S. correspondent bank." (SPA 16; *see* SA. 419-20 (head of anti-money laundering for U.S. bank discussing multiple Fenero Fund transactions involving the bank's correspondent accounts in New York); GX 1441 (email Scott sent to himself of incoming wire instructions, indicating that U.S. dollar transactions would be processed through a correspondent account in New York)). "Crediting every inference that could have been drawn in the Government's favor"

64

(SPA 16), this evidence was sufficient to demonstrate Scott's knowledge.

In any event, "Scott's awareness of the use of a New York correspondent account is irrelevant, as he need not have specifically intended to deceive [the U.S. bank] to be convicted under [18 U.S.C.] ¶ 1344(2)." (SPA 16); *see Loughrin v. United States*, 573 U.S. 351, 356-57 (2014). "The false representation may be made to a third party and need not be made to the bank nor even the entity with custody and control of the property obtained, so long as the false representation is the 'means' of obtaining the property." (SPA 14 (citing *Loughrin*, 573 U.S. at 363-64).

## B. The Armenta Transactions

Second, the Government "sufficiently proved that Scott conspired with Armenta to make false representations [to U.S. banks] to induce the banks to effectuate the transfers to the Fenero funds" on Ruja's behalf. (SPA 19). With Scott's knowledge and participation, Armenta falsely told the banks that the transfers to the Fenero Funds, totally approximately $10 million, were investments in a private equity firm investing in renewable energy, when in fact, they were for the purpose of laundering money to Ruja. (SPA 5, 17-20).

Scott contends that, while the "evidence shows that *Armenta* lied to *his banks*," it fails to show that "Scott knew Armenta would tell such lies or suggested that he do so." (Scott Br. 51). The District Court correctly rejected this argument, concluding that "the Government presented evidence that Scott worked with Armenta to effectuate the transactions and was aware of

65

the misrepresentations made to" the U.S. banks. (SPA 18). "Scott knew that the Fenero Funds were not legitimate investment vehicles, knew that banks were refusing to process transactions involving OneCoin, and knew that the origin of the funds in Armenta's . . . accounts was OneCoin (because Scott himself was the one to direct the transfer to Armenta)." (SPA 18). Scott therefore "knew Armenta would only be able to transfer the OneCoin funds if Armenta lied to the banks." (SPA 18). In fact, "Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes, despite knowing that his Fenero Funds were not legitimate investment funds," demonstrating his "knowledge of and complicity in Armenta's misrepresentations to the banks." (SPA 18).

Scott also argues that Armenta's statements to the U.S. banks were not material. (Scott Br. 51-52). The District Court correctly rejected this argument as well, holding that "Scott and Armenta did not merely fail to inform" the U.S. banks "about the true nature of the transactions"; "they also affirmatively misrepresented that the Fenero Funds were legitimate private equity funds which were meant to invest in endeavors such as windmills and renewable energy." (SPA 18-19). "Moreover, the false representations were also material in that the banks would not have processed the transactions had Scott and Armenta disclosed their relationship with OneCoin." (SPA 19). Crediting every inference in the Government's favor, there was sufficient proof that Scott conspired to commit bank fraud.

66

For similar reasons, the Government sufficiently proved venue by a preponderance of the evidence. (SPA 21). Scott claims that it was not reasonably foreseeable to him that conduct in furtherance of the scheme would take place in this District. (Scott Br. 56-57). But as noted above, both the CryptoReal transaction and an Armenta transaction went through a Manhattan correspondent account, and "the Government adduced evidence that Scott was aware that international [U.S. dollar] transactions would use U.S. correspondent accounts." (SPA 21). A reasonable jury could therefore find that the Government established venue. (SPA 21).

Finally, the District Court did not plainly err by neglecting to give a jury instruction regarding venue that Scott did not request. For the first time on appeal, Scott argues that the Court erred by failing to tell the jury that, in order for venue to be proper, it must have been reasonably foreseeable to Scott that an overt act would occur in this District. (Scott Br. 55-56). Because Scott did not request this instruction below, his objection is reviewed for plain error. "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). This is not such a case. Scott has not met his burden of showing that Judge Ramos plainly erred by neglecting to give an instruction no one requested, that the absence of the instruction prejudiced him by changing the outcome of the trial, or that the purported error seriously affects the public reputation of judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010). Nor could he, given the robust

67

evidence that Scott knew that the CryptoReal and Armenta transactions went through Manhattan accounts. (SPA 21).

## POINT VII

### The District Court Properly Concluded that the Guidelines Calculation Should Include Both Domestic and International Loss from the OneCoin Scheme

Greenwood argues that the District Court should only have held him responsible for a small fraction of the billions of dollars of international loss that his OneCoin fraud scheme caused to victims.[8] In support of this argument, he relies on this Court's opinion in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), which limited consideration of foreign conduct at sentencing in certain instances. But Greenwood dramatically overreads the holding of *Azeem*. Here, unlike in *Azeem*, the charging instrument, allocution, and underlying facts make clear that the international OneCoin scheme was the very offense of which he was convicted. Loss to both foreign and domestic victims of that scheme was therefore properly considered by the District Court in calculating the applicable Guidelines range.

---

[8]   Scott adopts Greenwood's arguments on this issue by reference. (*See* Scott Br. 49-50).

68

### A. Standard of Review

In reviewing a challenge to the district court's calculation of the Guidelines, this Court reviews the district court's interpretation of the Guidelines *de novo* and its findings of fact for clear error. *United States v. Taylor*, 961 F.3d 68, 74 (2d Cir. 2020). "A finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left with the definite and firm conviction that a mistake has been committed." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *United States v. Cho*, 713 F.3d 716, 722 (2d Cir. 2013). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015).

"A district court's factual findings at sentencing need be supported only by a preponderance of the evidence." *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015). It is well-established that "a sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *Gaskin*, 364 F.3d at 464. In reviewing a district court's factual findings, this Court "must view the evidence in the light most favorable to the government." *United States v. Gasperini*, 894 F.3d 482, 485 (2d Cir. 2018).

The "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v.*

69

*Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997). Indeed, the sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993).

## B. The District Court Properly Held Greenwood Responsible for the Full Loss Amount of His Fraud Scheme

As an initial matter, Greenwood does not contest that his convictions were sufficiently tethered to the United States to confer U.S. jurisdiction. (*See* Greenwood Br. 17-46). Nor could he. Victims in the United States received communications about the scheme and made investments in the scheme through bank wires. Both those communications and those investments were "wires" sufficient to satisfy the wire fraud and wire fraud conspiracy statutes. *See Bascuñán*, 927 F.3d at 122. And the laundering of hundreds of millions of dollars by U.S.-based co-conspirators Armenta and Scott plainly met the requirements for 18 U.S.C. § 1956(f) to apply extraterritorially. Specifically, there was ample evidence of "conduct . . . by a United States citizen," "conduct occur[ing] in part in the United States," and transactions with a "value exceeding $10,000." 18 U.S.C. § 1956(f); *see also United States v. Approximately $25,829,681.80 in Funds*, No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) (requirement that "the conduct occurs in part in the United States" met despite lack of physical presence in United States).

70

Greenwood's plea allocution alone is sufficient to meet the jurisdictional requirements of these statutes:

> I also knew that in the second half of 2015, with my participation, the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States. I also knew that banks were reluctant to accept the proceeds of sales of OneCoin. I therefore agreed with others to conceal the source of those proceeds when engaging in financial transactions. I understood that the same agreement would apply to any of those proceeds coming from the United States market.

(GA. 56).

Furthermore, Greenwood and his co-conspirators deliberately targeted the U.S. market and planned to make huge profits from that market. (Greenwood PSR ¶¶ 43-44; Dkt. 519 at 10). Greenwood emailed a draft "grand opening" announcement for launching in the U.S. market, and OneCoin officially launched in the United States on July 4, 2015. (Greenwood PSR ¶¶ 43-44; Dkt. 519 at 10). During that presentation, Ruja explained their plan to "catch Bitcoin," which would rely in part on the "huge market" of the United States, and showed a slide describing the total value of Bitcoin as $11.7 billion. (Greenwood PSR ¶¶ 43-44; Dkt. 519 at 10).

71

Because Greenwood created and operated a single, unified scheme in violation of U.S. law, he is responsible for the full losses resulting from that scheme. Indeed, the Guidelines hold defendants broadly responsible for the losses resulting from fraud schemes they orchestrated. U.S.S.G. §§ 1B1.1 n.1(I) ("'Offense' means the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct)"); 1B1.3(a)(1)(B) (Guidelines calculation "in the case of a jointly undertaken criminal activity" includes "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity"); 2B1.1 cmt. n.3(A)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense"). Greenwood's OneCoin scheme was plainly a "jointly undertaken criminal activity," and the billions of losses OneCoin investors suffered were reasonably foreseeable to Greenwood (and, in fact, intended by him). U.S.S.G. § 1B1.3(a)(1)(B). He is therefore properly held responsible for the full loss amount suffered by victims of his fraud scheme.[9]

––––––––––

[9] Because the District Court properly considered the foreign losses in calculating the fraud Guidelines, it likewise properly considered foreign losses in calculating the money laundering Guidelines. *See* U.S.S.G. § 2S1.1(a)(1) (base offense level for money laundering incorporates the loss amount of the underlying offense when the defendant committed the underlying offense).

72

### C. *Azeem* Does Not Apply to Greenwood's Convictions

Greenwood's primary argument is that he should not be held liable for the billions of dollars in losses that he caused OneCoin victims to suffer, and the hundreds of millions of dollars in funds that he and his co-conspirators laundered, based on this Court's holding in *Azeem*. But as the District Court recognized, *Azeem* is inapposite. (GA. 115).[10]

In *Azeem*, this Court held that uncharged, entirely foreign drug transactions that were nonetheless "part of the same course of conduct . . . as the offense of conviction" should typically not be considered under the Guidelines. Here, by contrast, the losses to foreign victims and the funds laundered from the United States (and around the world) were the core of the very offenses to which Greenwood pled guilty. These losses and the full amount of the funds laundered should therefore be part of the sentencing calculation for three independent reasons: (1) they are part of the "offense of conviction" itself; (2) they are part of a

---

[10] In an apparent effort to undermine the District Court's ruling, Greenwood describes the District Court as "unfamiliar" with *Azeem*. (Greenwood Br. 38). But Judge Ramos plainly analyzed *Azeem* carefully, received nearly 100 pages of briefing on this issue, and held oral argument on the issue prior to sentencing. (Dkt. 516, 519, 522, 523, 530; GA. 79-119). His determination of the issue was therefore the product of careful and thorough consideration.

73

"common scheme or plan," and (3) they are "closely intertwined" with the domestic conduct.

### 1. Applicable Law

Under the Sentencing Guidelines, courts must take into account the "offense of conviction," as well as "all acts and omissions [ ] that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G § 1B1.3(a)(2).[11] The Supreme Court has explained that the "offense of conviction" is different from those two additional categories: "'relevant conduct,' in a case like this, includes *both* conduct that constitutes the 'offense of conviction,' *and* conduct that is 'part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Edwards v. United States*, 523 U.S. 511, 514 (1998) (emphasis in original). The Guidelines likewise make clear that there is a difference between "the offense of conviction" (on the one hand) and conduct that is "part of the same course of conduct or common scheme or plan" (on the other). *See* U.S.S.G. § 1B1.1 n.1(I) (distinguishing "offense of conviction" from "relevant conduct"); U.S.S.G. § 3D1.2(b) (allowing for grouping of multiple separate

––––––––––

[11] U.S.S.G § 1B1.3(a)(2) specifically governs "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." The wire fraud and money laundering counts at issue here are such offenses. *See* U.S.S.G § 3D1.2 (specifically stating that Section 2B1.1 (which governs the wire fraud offense) and Section 2S1.1 (which governs the money laundering offense) are covered by Section 3D1.2(d)).

74

offenses of conviction when "constituting part of a common scheme or plan"); U.S.S.G. § 3E1.1 n1(a) (noting that for acceptance of responsibility, "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction").

Those distinctions make sense. When making a relevant conduct determination as to a "common scheme or plan" or the "same course of conduct," there must be a point of comparison—something that the proposed other conduct can be "common" *to* or the "same" *as*. That comparison point is, of course, the "offense of conviction."

There are also differences between (1) a "common scheme or plan"; and (2) the "same course of conduct." The Guidelines explain that "common scheme or plan" means that the acts are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, cmt. n.5(B)(1). In contrast, as to the "same course of conduct," the Guidelines state, "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n.5(B)(2).

There are thus three types of conduct that are relevant to the Guidelines determination: (1) "the offense of conviction," (2) acts that are part of a "common scheme or plan as the offense of conviction," and (3) acts that are part of the "same course of

conduct . . . as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).[12]

In the vast majority of cases governed by U.S.S.G § 1B1.3(a)(2), these categories are a distinction without a difference—courts take the conduct into account as long as it fits into any one of the three categories and therefore need not determine *which* of the three categories apply.[13] However, this Court has created a very limited exception for the third category—acts that are part of the "same course of conduct" and not part of the offense of conviction itself—when that same

──────────

[12] For other cases clarifying these distinctions, *see United States v. Feldman*, 647 F.3d 450, 462 (2d Cir. 2011); *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000); *United States v. Robie*, 166 F.3d 444, 456 (2d Cir. 1999); *United States v. Stanley*, 12 F.3d 17, 20 (2d Cir. 1993); *United States v. Burnett*, 968 F.2d 278, 280 (2d Cir. 1992); *United States v. Eisenhart*, 710 F. App'x 50, 52 (2d Cir. 2018); *United States v. Ayala*, 75 F. Supp. 2d 126, 129 (S.D.N.Y. 1999); and *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996).

[13] One of the instances in which it matters—and which clarifies the distinction—is in the restitution context. Restitution is limited to victims of the offense of conviction, and does not include victims of other relevant conduct otherwise properly considered under the Guidelines. *See Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Lussier*, 104 F.3d 32, 33 (2d Cir.1997).

76

course of conduct occurred entirely abroad and was not a crime against the United States.

In *Azeem*, the defendant was convicted of conspiracy to import heroin into the United States in connection with the transportation of one kilogram of heroin from Pakistan to New York. 946 F.2d at 14. At sentencing, the district court enhanced the offense level based on the transportation of additional heroin from Pakistan to Egypt by the same co-conspirators, even though that Egyptian heroin was not intended for the United States. *Id.* at 15. The defendant had not been charged with or convicted of this separate Egyptian drug deal. *Id.*

While this Court agreed that the Pakistan-to-Egypt transportation was part of the same "course of conduct" as the defendant's importation of heroin into the United States, it reversed, finding that the Guidelines "assign to foreign crimes a rather limited role," and that transporting narcotics from Pakistan to Egypt was "not a crime against the United States." *Id.* at 16-17. This Court was explicit that its analysis was based on the third category, "course of conduct." *Id.* at 16. The first category—"the offense of conviction"—plainly was not implicated. The charged crime was a conspiracy to import heroin into the United States, and it was therefore impossible for the transportation of heroin from Pakistan to Egypt to be part of that "offense of conviction." *See id.*

The few Second Circuit decisions interpreting *Azeem* are consistent with that narrow holding. In *United States v. Chunza-Plazas*, 45 F.3d 51 (2d Cir. 1995), the defendant was convicted of possessing two

77

fraudulent alien-registration cards in his home in Staten Island. At sentencing, the district court departed upward based on the defendant's role in the Medellin cartel in Colombia years earlier. This Court reversed, explaining:

> [W]hile Azeem's Egyptian heroin conspiracy was viewed as part of the same course of conduct underlying his United States activity, Chunza's possession of the fraudulent registrations and the counterfeit social-security cards was not part of the same crimes as committing homicide and terrorist acts for the Medellin cartel in Colombia. Thus, the reasons for excluding consideration of Chunza's foreign conduct are even stronger than the circumstances in *Azeem*.

*Id.* at 57-58. In other words, in *Chunza-Plazas*, this Court held that the district court erred because the Medellin conduct fit in *none* of the three categories that a court should consider when calculating the Guidelines.

In *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), this Court held that the district court erred when it did *not* include foreign drugs as "relevant conduct' in a conviction under the Maritime Drug Law Enforcement Act ("MDLEA"). At the outset, the Court emphasized that "Section 1B1.3 provides that *all* acts committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant and that occurred during the commission of the offense *shall* be factored into the determination of the base

offense level." *Greer*, 285 F.3d at 179. "Contrary to the District Court's suggestion," the Court continued, "nothing in the [Guidelines] limits [their] application to activity undertaken against the United States." *Id.* This holding, the Court explained, was fully consistent with *Azeem* because, unlike the statute in *Azeem*, the MDLEA covered conduct outside the United States and thus was not a foreign crime. *Id.* at 179-80.

Most recently, in *United States v. Tokhtakhounov*, 607 F. App'x 8 (2d Cir. 2015), this Court distinguished *Azeem* and affirmed the application of leadership points to a member of a transnational gambling enterprise. *Id.* at 14. The Court reached this conclusion even though the bookies the defendant supervised lived in Ukraine and primarily collected bets from individuals in Eastern Europe, given their "ties to the criminal activity that took place in the United States." *Id.*[14]

---------

[14] Greenwood relies extensively on this Court's decision in *United States v. Khodadad*, 122 F.3d 1058, 1995 WL 595073 (2d. Cir. Sept. 12, 1995) (unpublished). (*See* Br. at 39-40). *Khodadad* is unpublished and relies on a 30-year-old concession made by the Government that does not bind it here. *See United States v. Mendoza*, 464 U.S. 154 (1984) (offensive nonmutual collateral estoppel inapplicable against the Government). But more importantly, the Government's position in *Khodadad* is exactly consistent with its position here. In *Khodadad*, the indictment charged the defendant with one substantive count of transporting stolen goods and one substantive count of receiving stolen goods. (Dkt. 523-1 at 9-10). As

Other courts have recognized an additional basis to include foreign conduct as part of the Guidelines calculation: when that foreign conduct is closely intertwined with the offense of conviction. *See, e.g., United States v. Dawn*, 129 F.3d 878, 885 (7th Cir. 1997) (allowing foreign conduct when "inextricable" from offense of conviction); *United States v. Teyer*, 322 F. Supp. 2d 359, 367 & n.3 (S.D.N.Y. 2004) (Lynch, J.) (allowing foreign conduct within the same course of conduct to be considered when "closely intertwined" with offense of conviction); *see also Tokhtakhounov*, 607 F. App'x at 14 (citing favorably the "inextricable" language in *Dawn*). While this Court need not adopt that standard for all the reasons set forth in this brief,

---

to both counts, the indictment's to wit clause defined the stolen goods as "one painting by Pieter Brueghel the Younger, entitled 'The Flemish Proverbs,' worth approximately $1,000,000." (Dkt. 523-1 at 9-10). At sentencing, the district court considered as relevant conduct the value of other stolen art and rugs that were not charged in the indictment and had never been transported into the United States. (Dkt. 523-1 at 24, 27-28; Dkt. 523-4 at 9-11). On appeal, the Government consented to remand because the district court had improperly considered conduct that was not part of the offense of conviction (the transport and receipt of the single painting) and was entirely foreign criminal conduct.

the foreign losses would be included under that standard as well. (*See infra* Point VII.C.2.c).[15]

## 2. Discussion

### a. The Foreign Losses on the Wire Fraud Counts Were Part of the Offenses of Conviction

In this case, the losses to foreign investors were part of the "offense[s] of conviction" that the Government charged and to which Greenwood pled guilty. Where, as here, the foreign conduct is part of the crime of conviction, it is by definition part of a crime against the United States, and *Azeem* does not apply. Greenwood should therefore be held fully responsible for all

---

[15] Other Circuits to consider the issue have generally rejected the holding of *Azeem* or kept it sharply narrow. *See, e.g., United States v. Wilkinson*, 169 F.3d 1236, 1238 (10th Cir. 1999) ("[I]t would be absurd to suggest that there is a long-standing principle that judges cannot consider in calculating a sentence relevant conduct committed outside of the United States."); *see also, e.g., Dawn*, 129 F.3d at 879; *United States v. Castro-Valenzuela*, 304 F. App'x 986, 911 (3d Cir. 2008); *United States v. Zayas*, 758 F.3d 986, 988 (8th Cir. 2014); *United States v. Spence*, 923 F.3d 929, 930 (11th Cir. 2019); *but see United States v. Chao Fan Xu*, 706 F.3d 965, 993 (9th Cir. 2013), *abrogated on other grounds by RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016); *United States v. Elbaz*, 52 F.4th 593, 609 (4th Cir. 2022).

81

investor losses that resulted from the crimes he committed.

Greenwood participated in a single, massive wire fraud scheme encompassing millions of victims all over the world. He pled guilty to an Information charging both substantive wire fraud and wire fraud conspiracy as a single overarching scheme:

> From in or about 2014 through in or about January 2018 ... GREENWOOD, and others working on his behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in 'OneCoin,' a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depositor accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(GA. 19-21). In addition, in his plea allocution, Greenwood pled guilty to a single overarching fraud scheme that targeted both international and domestic victims:

> I knew and intended that people would buy into OneCoin and related products based on the misconception that it would be a profitable investment and based on

> the misconception that OneCoin, like
> Bitcoin, was a cryptocurrency based on a
> distributed blockchain and valued by
> supply and demand. In fact, I knew the
> company would set and manipulate the
> stated value of OneCoin. . . . I also knew
> that in the second half of 2015, with my
> participation, the company targeted the
> United States using these same misrep-
> resentations, including by sending these
> misrepresentations by wire transmis-
> sions into the United States. . . At the
> time I participated in this conspiracy in
> the United States, I knew what I was do-
> ing was wrong.

(GA. 55-56).

Greenwood repeatedly claims that the Govern-
ment's characterization of his offenses as a unitary,
overarching scheme is simply the result of "artful
pleading." (Greenwood Br. 17). Not so. Even putting
aside the text of the Information (to which Greenwood
pled guilty), the Court should treat OneCoin as a sin-
gle, global scheme because *it was in fact* a single,
global scheme. With Greenwood and Ruja at the helm,
OneCoin operated as a highly coordinated interna-
tional enterprise. (Dkt. 519 at 16). Greenwood and
Ruja promoted a single core product to all their cus-
tomers: the OneCoin cryptocurrency. (Dkt. 519 at 16).
And while OneCoin was sold to investors around the
globe, there was one headquarters (in Sofia), where
Ruja worked, where OneCoin's operations were

83

centralized, and where key decisions were made by Ruja and Greenwood. (Dkt. 519 at 16-17).

Furthermore, multi-level marketing frauds are by their very nature interconnected. Unlike, for instance, a romance scam—where the fraud on each victim is separate and discrete—in a multi-level marketing fraud, each victim is counted on to recruit additional victims. (*See* Dkt. 519 at 17). These schemes rely on a perception that the network is growing quickly and that it will be easy for a new participant to recruit additional members. Without growth and increasing size, a multi-level marketing fraud scheme would quickly peter out. Greenwood and his co-conspirators understood this, and they knew they needed to constantly expand into new markets if the scheme was to survive. (*See* Dkt. 519 at 17). As Ruja explained when launching in the United States and attempting to recruit American victims, "It's something that is about prestige. It's a huge market . . . a place where we have to be if we want to be big." (Dkt. 519 at 17).

Within this global structure, Greenwood oversaw OneCoin's marketing and sales. (Dkt. 519 at 17). Ruja called him the "magic sales machine," he had the formal title of "Global Master Distributor," and he earned 5% of global sales, regardless of whether they occurred in the United States or abroad. (Dkt. 519 at 17; PSR ¶ 27).

Under these circumstances, the losses to foreign investors were plainly a core part of the offense of conviction (*i.e.*, the unitary, global OneCoin scheme to which Greenwood pled guilty). *Azeem* is thus

84

inapplicable, and Greenwood's sentence should reflect the full losses resulting from the scheme.

### b. In the Alternative, the Foreign Losses on the Wire Fraud Counts Were Part of a Common Scheme or Plan

Alternatively, even assuming that the foreign losses were not part of the offenses of conviction, they were part of a "common scheme or plan." U.S.S.G § 1B1.3(a)(2). *Azeem*'s holding was expressly limited to the "same course of conduct," the third and most attenuated category of conduct that courts consider at sentencing, and had nothing to do with the second category, a "common scheme or plan." *Azeem*, 946 F.2d at 16 ("The 'same course of conduct' is defined apart from 'common scheme or plan' and looks to 'whether the defendant repeats the same type of criminal activity over time' without requiring that acts be connected by common participants or an overall scheme.")

Here, the losses to both foreign and domestic victims were all part of a common scheme—the OneCoin scheme, which was centralized, sold a single product, operated as an interconnected multi-level marketing program, and was managed by Greenwood. (Dkt. 519 at 16-17). Indeed, Greenwood pled guilty to wire fraud, a statute that explicitly criminalizes "any *scheme* or artifice to defraud." 18 U.S.C. § 1343 (emphasis added). He also pled guilty to a conspiracy, which by its very nature is a "common scheme or plan." *See* U.S.S.G. § 1B1.3 cmt. n.5(B)(i) (the fact that "the conduct constituted an ongoing conspiracy" would

85

necessarily establish a "common scheme or plan"); *United States v. Catapano*, No. 05 Cr. 229 (SJ), 2008 WL 2222013, at *13 (E.D.N.Y. May 22, 2008), *report and recommendation adopted*, 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008). Accordingly, even if the Court were to find that the losses to foreign investors were separate from the "offense of conviction" (which it should not), those losses should still be included in the Guidelines calculation because they were part of a "common scheme or plan."

### c. The Foreign Losses on the Wire Fraud Counts Were Also Closely Intertwined with the Domestic Losses

In the alternative, the foreign losses should be included in the Guidelines calculation because they were closely intertwined with the domestic losses. As described above (*see supra* Point VII.C.1), some courts have used an alternative "closely intertwined" standard to determine whether foreign conduct should be included under the Guidelines. *See Dawn*, 129 F.3d at 885; *Teyer*, 322 F. Supp. 2d at 367 & n.3. The foreign and domestic sides of the OneCoin fraud scheme were, at the very least, closely intertwined: they were controlled by the same people from the same location, they sold the same product, and they used the same fraudulent marketing. (Dkt. 519 at 16-17). Consequently, if this Court were to adopt that alternative "closely intertwined" standard, foreign losses should factor into the Guidelines.

86

### d. Courts Regularly Include Foreign Victims in Loss Amount Calculations

Case law from the Supreme Court and other courts of appeals supports the conclusion that Greenwood should be held responsible for the full amount of global loss under one or more of the theories set forth above.

In *Pasquantino v. United States*, 544 U.S. 349 (2005), the defendants were convicted of wire fraud for smuggling liquor from the United States into Canada. The Government's theory was that the defendants were defrauding Canada out of the high taxes that it would typically charge on imported alcohol. The Supreme Court affirmed the convictions, explaining, "Their offense was complete the moment they executed the scheme inside the United States . . . . This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant." *Id.* at 371.

*Pasquantino* is primarily a case about the defendants' convictions, rather than their sentences, but the quoted language makes clear that the wire fraud statute covers losses to foreign victims. Moreover, the dissent zeroed in on the loss amount sentencing calculation that had been used by the trial court, explaining: "[T]he Pasquantinos avoided over $2.5 million in Canadian duties, and Hilts, over $1.1 million. The resulting offense-level increases yielded significantly longer sentences for the defendants." *Id.* at 375 (Ginsburg, J., dissenting). *Pasquantino*'s sentencing calculation that included foreign loss on a wire fraud conviction—a

87

calculation that the dissent objected to and that the Supreme Court implicitly affirmed—is exactly how the Court should calculate loss here. Any alternative reading of *Pasquantino* would lead to the absurd result that the defendant was properly convicted of defrauding the Canadian government, but that his sentence should not have reflected the loss to the sole victim.

Consistent with *Pasquantino*, courts of appeals have affirmed the inclusion of foreign fraud victims in loss amount calculations. *See, e.g.*, *United States v. Chmielewski*, 218 F.3d 840, 843 (8th Cir. 2000) ("It is no intrusion to gauge the severity of Mr. Chmielewski's domestic crime by measuring the damage done to his extraterritorial victims. In doing so, we consider a foreign loss not to uphold a foreign law, but to uphold our own law, U.S.S.G. § 2F1.1,[16] which directs us to consider the loss caused by fraud as a measure of a just punishment."); *United States v. Okike*, 60 F. App'x 100, 102 (9th Cir. 2003) (rejecting argument in fraud case "that some of the victims whose losses were included in the $1,403,130 figure were not United States residents and that the district court should not have considered their losses"); *United States v. Enwerem*, 482 F. App'x 869, 871 at n.* (4th Cir. 2012) (rejecting argument in fraud case based on "the inclusion of losses

---

[16] The fraud Guidelines were previously codified at Section 2F1.1, rather than Section 2B1.1.

88

sustained by foreign victims to calculate attributable loss").[17]

### e. Policy Reasons Counsel in Favor of Including Foreign Victims in Loss Amount Calculations

An interpretation of the Guidelines that takes losses from foreign victims into account also has three policy justifications in its favor: (1) it accurately captures the culpability of defendants, (2) it is administrable for district courts; and (3) it reduces the need for defendants to be tried *seriatim* in courts all over the world for international offenses.

First, one of the core functions of the Guidelines is to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *See* 28 U.S.C. § 991(b)(1)(A); *Rita v. United States*, 551 U.S. 338, 348 (2007). The Guidelines should therefore be interpreted to best fulfill the Section 3553(a) factors. *See United States v. Kinder*, 64

---------------

[17] Greenwood also argues for application of the rule of lenity. For all the reasons stated herein, there is no "grievous ambiguity" warranting application of the rule of lenity. *See Muscarello v. United States*, 524 U.S. 125, 138-39 (1998). Furthermore, although this Court has applied the rule of lenity to the Guidelines, *United States v. Simpson*, 319 F.3d 81, 85 (2d Cir. 2002), the Supreme Court's decision that vagueness challenges cannot be made to the advisory Guidelines casts serious doubt on that conclusion, *Beckles v. United States*, 580 U.S. 256 (2017).

89

F.3d 757, 772 (2d Cir. 1995) (Leval, J., dissenting) ("These goals [of Section 3553(a)] apply not only in the imposition of individual discretionary sentences but also in the interpretation of relevant sentencing guidelines and statutes."). Taking into account the loss to foreign victims would further the purposes of Section 3553(a). The location of the victims does not bear on the seriousness of the offense, the importance of just punishment and adequate deterrence, or the need to protect the public from future crimes. 18 U.S.C. § 3553(a). Greenwood committed a multi-billion-dollar fraud with millions of victims, and the Guidelines should take the full severity of that conduct into account.

Second, courts regularly consider administrability when interpreting rules or statutes. *See, e.g., Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 393 (2016). Greenwood's interpretation of the Guidelines would be extremely difficult to administer.[18] In every fraud with both international and domestic victims—and there are many—the district court would seemingly have to determine where each victim was located when he or she heard the misrepresentations, where each victim's bank account was located, and where the defendant was located when the misrepresentations were made. In

---

[18] Greenwood criticizes Judge Ramos's concerns about administrability (*see* Greenwood Br. 27-29), but Judge Ramos was clear that those concerns had no impact on his ruling (GA. 117).

90

many cases with large numbers of victims, it would be extremely resource intensive—if not impossible—to make the individualized determination about whether each victim had a sufficient connection to the United States. Of course, courts must often address difficult factual questions related to culpability at sentencing. But Greenwood's interpretation would burden district courts with resolving factual questions wholly unrelated to a defendant's culpability.

Third, Greenwood's interpretation of the Guidelines would have required that he be prosecuted in dozens of countries in order for the full scope of his conduct to be take into account. If the United States were limited to considering only U.S. victims in determining the appropriate sentence, then other sovereigns would naturally want to be able to prosecute defendants like Greenwood as well. Such a rule may impede the Government from successfully extraditing defendants located abroad, as other nations without such a limitation would have compelling reasons for prosecuting defendants first. In order to fully obtain justice for victims of international crimes, it would also require that defendants be transported from country to country so that each nation could prosecute on behalf of its own victims. Such a procedure would be wasteful and impracticable, and a far better rule is simply to allow district courts to consider all victims when calculating the Guidelines.

91

### D. *Azeem* Does Not Apply to Section 2B1.1 of the Guidelines

The foreign losses should be included in the Guidelines calculation for an entirely independent reason: *Azeem* does not apply to Section 2B1.1 of the Guidelines.

In *Azeem*, this Court interpreted the narcotics Guideline, Section 2D1.1. Its holding is limited to that context, and this Court has never applied *Azeem* to limit consideration of foreign conduct governed by Section 2B1.1. Different Guidelines provisions should be interpreted differently, and nothing in Section 2D1.1 indicated an intent that it apply to foreign conduct. Moreover, *Azeem*'s holding was based in part on a concern unique to the drug context—that certain drugs might be illegal in the United States but not elsewhere. *See* 946 F.2d at 17 (describing "the use and sale of certain drugs that would have violated our law, but not the foreign law where sold and used").

Even assuming *Azeem* applies outside the context of Section 2D1.1, it certainly cannot apply to *all* other Guidelines provisions. Many statutes explicitly apply to foreign conduct, and many Guidelines provisions evidence a clear intent that they apply extraterritorially. *See, e.g.*, 18 U.S.C. §§ 32, 37, 1091, 2280; U.S.S.G. §§ 2B1.5(b)(2) & cmt. n.3(a), 2M5.3, 2T1.1(b)(1). Likewise, multiple provisions of Section 2B1.1 evince the Sentencing Commission's intent that it include foreign activity.

For example, Section 2B1.1(b)(17) provides for enhancements if a defendant "derived more than

92

$1,000,000 in gross receipts from one or more financial institutions" or the offense "substantially jeopardized the safety and soundness of a financial institution." As this Court has explained, this enhancement is designed to account for a defendant "putting that institution's financial safety and soundness at risk." *United States v. Huggins*, 844 F.3d 118, 123 (2d Cir. 2016). And notably, the Application Notes explain that a "financial institution" includes a "foreign bank." U.S.S.G. § 2B1.1 cmt. n.1. Section 2B1.1 therefore reflects an intent by the Sentencing Commission that an enhancement should apply to protect a specific type of foreign victim, a foreign bank.

In addition, Section 2B1.1(b)(10) provides for enhancements where "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials [or] a substantial part of a fraudulent scheme was committed from outside the United States." That enhancement also makes clear that foreign activity should be counted under Section 2B1.1. *See Carrasco v. United States*, 820 F. Supp. 2d 562, 568 (S.D.N.Y. 2011) ("This specific reference to extraterritorial application conclusively demonstrates that conduct justifying enhancements under the Guidelines is in no way limited to conduct that occurred within the territorial United States.")

Several of the crimes cross-referenced to Section 2B1.1 are explicitly extraterritorial in scope. *See, e.g.*, 18 U.S.C. § 38(f) (extraterritoriality provision for fraud involving aircraft or space vehicle parts); 18 U.S.C. § 470 (counterfeit acts committed outside the United

93

States); 18 U.S.C. § 1029(h) (extraterritoriality provision for access device fraud); 18 U.S.C. § 2332b(b) (extraterritoriality provision for acts of terrorism transcending national boundaries); 49 U.S.C. §§ 14915(b), 14915(c), 13531(a)(3) (extraterritoriality provision for criminal failure to give up possession of household goods by freight forwarder); 49 U.S.C. §§ 46317(a), 40102(a)(5) (extraterritoriality provision for pilots criminally operating in air transportation without an airman's certificate). Those cross-references indicate that Section 2B1.1 is intended to apply to foreign conduct. The alternative is that the Sentencing Commission essentially intended two separate versions of Section 2B1.1: one for a limited set of crimes in which each of the enhancements was intended to reach foreign conduct, and one for a broader set of crimes in which it was not.

Finally, nothing in Section 2B1.1 indicates that it should be limited to domestic losses or domestic conduct. Section 2B1.1 is among the most detailed provisions in the Sentencing Guidelines—it has 20 separate enhancements and 21 notes, and has been amended approximately 51 times. Despite that level of detail, nothing in the Guideline evidences any intent to limit its provisions to domestic conduct. Accordingly, even assuming *Azeem* announced a rule that most Guidelines do not cover foreign conduct (and it did not), that rule does not apply to Section 2B1.1.

94

## POINT VIII

### Greenwood's Sentence Was Substantively Reasonable

Greenwood next argues that his sentence was substantively unreasonable. This argument is meritless. Because Greenwood created and operated an enormous scheme that defrauded millions of victims out of billions of dollars, the sentence imposed by Judge Ramos—which was substantially below the applicable Guidelines range—was well within the range of permissible decisions.

### A. Applicable Law

Appellate review of a challenged sentence is limited to "reasonableness," *United States v. Booker*, 543 U.S. 220, 261-64 (2005), and "encompasses two components: procedural review and substantive review," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). "The procedural inquiry focuses primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *United States v. Castillo*, 896 F.3d 141, 148 (2d Cir. 2018).

A defendant arguing substantive unreasonableness "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). This Court defers to a sentencing judge's "own sense of what is a fair and just sentence under all the circumstances," *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006), and will not

95

"substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," *Cavera*, 550 F.3d at 189. "[A] district court's substantive determination" will be set aside "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* at 189. Put differently, "only those sentences that are so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing them to stand would damage the administration of justice" will be deemed substantively unreasonable. *Broxmeyer*, 699 F.3d at 289; *see also United States v. Rigas*, 583 F.3d 108, 122-23 (2d Cir. 2009) (observing that the substantive reasonableness standard of review is comparable to considering whether a jury verdict constitutes "manifest injustice" or whether state actors engaged in conduct that "shocks the conscience").

This Court has recognized that in "the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances. It is therefore difficult to find that a below-Guidelines sentence is unreasonable." *United States v. Alcius*, 952 F.3d 83, 88-89 (2d Cir. 2020); *see United States v. Messina*, 806 F.3d 55, 66 (2d Cir. 2015) (the conclusion that a sentence within the Guidelines is substantively reasonable "is warranted in the overwhelming majority of cases, and thus especially when . . . a defendant challenges a below-Guidelines sentence").

96

## B.  Discussion

Greenwood's challenge to the substantive reasonableness of his below-Guidelines sentence should be rejected. The 240-month sentence imposed by Judge Ramos—which was one third of the Guidelines range (720 months), one third of the Probation Office's recommendation (also 720 months), and 10 years below the Government's sentencing recommendation (360 months)—was not "exceptional," *Cavera*, 550 F.3d at 189, or "shockingly high," *Broxmeyer*, 699 F.3d at 289.

As Judge Ramos explained, there was ample justification for a sentence of 240 months' imprisonment. Greenwood was one of the two masterminds of a massive scheme in which he and his co-conspirators defrauded more than 3 million victims out of more than $4 billion. (GA. 169). He and Ruja created and operated OneCoin as a fraud from the very beginning. (GA. 169).

Greenwood also intentionally targeted poor and vulnerable victims. (GA. 170). He described his victims as "idiots" and thought they were "easy marks" that could make him rich. (GA. 170-71). And Greenwood did, in fact, "profit[ ] immensely" from his crime. (GA. 171). Moreover, as Judge Ramos noted, Greenwood "is a person who knew better." (GA. 171). "He didn't need to live a life of crime, and nothing that is before me suggests that there was any need for him to engage in this conduct." (GA. 171). Rather, Greenwood was driven by pure greed. Given the serious nature of the offense—along with Greenwood's history and characteristics, the need to protect the public from future crimes, and the need for adequate deterrence—

97

Greenwood's 240-month sentence was substantively reasonable.

Greenwood argues that several mitigating factors justified a lower sentence, but none of these factors demonstrate that his sentence was "exceptional," *Cavera*, 550 F.3d at 189, or outside the "broad range of sentences that would be reasonable," *Alcius*, 952 F.3d at 88-89. In support of his argument that his sentence was "shockingly high," *Broxmeyer*, 699 F.3d at 289, Greenwood emphasizes the difficult circumstances of his confinement. (Greenwood Br. 46-53). In other words, Greenwood simply rehashes the arguments he made before Judge Ramos and disagrees with the weight that Judge Ramos placed on various Section 3553(a) factors. But this Court "will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor." *United States v. Pope*, 554 F.3d 240, 246-47 (2d Cir. 2009). Instead, "[t]he particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289; *see United States v. Cuthbert*, 466 F. App'x 46, 47 (2d Cir. 2012) ("That the court did not weigh [mitigating factors] as heavily in [defendant's] favor as he would have liked does not make the sentence substantively unreasonable").[19]

_____

[19] Greenwood further argues that a comparison to other high-profile cases and to the other OneCoin participants illustrates the substantive unreasonableness of the sentence. (Greenwood Br. 48-49). But Judge

98

Contrary to Greenwood's suggestions (Greenwood Br. 47-48, 51-52), Judge Ramos considered all the mitigating factors—including the circumstances of Greenwood's confinement—in determining the appropriate sentence. Greenwood's sentencing memorandum and oral presentation at sentencing discussed this issue at length. (Dkt. 566; GA. 151-54). Then, in explaining the reasons for the sentence, Judge Ramos expressly recognized the "horrific conditions" of Greenwood's imprisonment overseas and the "incredibly difficult" conditions of his imprisonment in the United States, finding these factors to be a reason "to grant Mr. Greenwood some measure of lenity." (GA. 172).

In short, in deciding what weight to give these considerations, Judge Ramos thoughtfully engaged in the very analysis that is left to the discretion of the sentencing court. *Broxmeyer*, 699 F.3d at 289. This Court should give "due deference to the sentencing judge's exercise of discretion," informed by its "institutional advantages" of having dealt with Greenwood firsthand. *Cavera*, 550 F.3d at 190. Given Judge Ramos's

─────────

Ramos explicitly considered both the need to avoid unwarranted sentencing disparities and the sentence given to another high-profile fraud defendant—concluding that Greenwood's conduct was arguably worse because he targeted poor people. (GA. 168, 170). Moreover, given Greenwood's leadership role and the stunning personal profit he obtained from the scheme, he was substantially more culpable than any of the other OneCoin participants who have been arrested in this case.

99

specific and accurate consideration of the appropriate sentencing factors, it cannot be said that a sentence of 240 months' imprisonment—well below the Guidelines range—falls outside "the range of permissible decisions." *Id.* at 189.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:    New York, New York
            August 28, 2024

                  Respectfully submitted,

                  DAMIAN WILLIAMS,
                  *United States Attorney for the*
                  *Southern District of New York,*
                  *Attorney for the United States*
                       *of America.*

KEVIN MEAD,
JULIANA MURRAY,
JAMES LIGTENBERG,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On August 26, 2024, this Court granted the Government leave to file an oversized brief of no more than 24,000 words. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its August 26, 2024 order. As measured by the word processing system used to prepare this brief, there are 23,435 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*